RECEIVED

OCT 1 1 2000

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

FILED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE _10-11-00_
BY _BS_

AO 241 (Rev. 5/85)  PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

## United States District Court

| | District | |
|---|---|---|
| Name    Larry Roy | | Western District of Louisiana |
| Prisoner No.   342300 | Case No. | |

Place of Confinement   Louisiana State Penitentiary
Angola, Louisiana

**CV00-2311 A** SEC P

**JUDGE LITTLE**

| Name of Petitioner (include none under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| Larry Roy | **MAGISTRATE JUDGE KIRK** |
| | v.   Burl Cain, Warden |

The Attorney General of the State of:      Louisiana

### PETITION

1. Name and location of court which entered the judgment of conviction under attack   Ninth Judicial District

   Court, Parish of Rapides, Alexandria, Louisiana

2. Date of judgment of conviction   April 21, 1997

3. Length of sentence   Death

4. Nature of offense involved (all counts)   Two Counts of First Degree Murder (La. R.S. 14:30)

5. What was your plea? (Check one)
   (a) Not guilty     ☒
   (b) Guilty         ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   n/a

6. If you pleaded not guilty, what kind of trial did you have? (Check
   (a) Jury        ☒
   (b) Judge only  ☐

7. Did you testify at the trial?
   Yes ☒   No ☐

X. Did you appeal from the judgment of
   Yes ☒   No ☐

(2)



AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court  Louisiana Supreme Court

(b) Result  Conviction Affirmed

(c) Date of result and citation, if known  October 4, 1996, State v. Roy, 95-0638, 681 So.2d 1230 (La. 10/4/96)

(d) Grounds raised  37 issues raised, 5 briefed: (1)Trial court erroneously failed to excuse two prospective jurors for cause (issues 7, 10, 11); (2) Statements by DA during voir dire and penalty phase closing were prejudicial (issue 35); and (3)trial court erred by prohibiting examination of venire persons on race issue.

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:
(1) Name of Court  n/a

(2) Result  n/a


(3) Date of result and citation, if known  n/a

(4) Grounds raised  n/a


(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:
(1) Name of Court  United State Supreme Court

(2) Result  Writ Denied


(3) Date of result and citation, if known  April 21, 1997 -- Roy v. Louisiana, cert. denied, 117 S.Ct. 1474 (1997)

(4) Grounds raised  Does Turner v. Murray, 476 U.S. 28 (1986), grant an African American defendant in a capital case involving African American victims the opportunity to examine potential white jurors on race bias and prejudice?

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒    No ☐

11. If your answer to 10 was yes, give the following
(1) Name of Court  Ninth Judicial District Court, State of Louisiana, Parish of Rapides

(2) Nature of proceeding  Application for Post-Conviction Relief


(3) Grounds raised  Please see attached pages 3A through 3D

## ISSUES RAISED IN POST-CONVICTION PROCEEDINGS

1.    Petitioner's constitutional rights pursuant to Article 1, sections 2, 3, 13, and 20 of the Louisiana Constitution of 1974 and Amendments VI, VIII, and XIV of the United States Constitution, were violated when his attorneys at trial failed to seek or secure a plea for life.

2.    Petitioner was indicted by an unconstitutionally constitutional Grand Jury in violation of Article 1, Sections 2, 3, 15, 16, and 20 of the Louisiana Constitution of 1974 and Amendments VI, VIII, and XIV to the United States Constitution and counsel was ineffective for failing to move to quash the indictment on that basis.

3.    Inconsistent defenses alleged by trial counsel which they unnecessarily revealed to the State prior to trial, demonstrated that they had no real defense strategy in violation of Petitioner's rights to effective assistance of counsel as provided by Article 1, sections 2, 3, 13, 16 and 20 of the Louisiana Constitution of 1974 and Amendments V, VI, VIII, and XIV of the United States Constitution.

4.    Trial counsel were ineffective in committing Petitioner to take the stand during voir dire, forcing him to take the stand against his will, and putting him on the stand without conducting an adequate pretrial investigation to determine whether there was evidence that could have substituted for his testimony, that corroborated his testimony or that discredited his testimony, all in violation of the rights afforded Petition under Article 1, sections 13, 16 and 20 and Amendments 5, 6, 8 and 14 of the United States Constitution.

5.    The Prosecution's failure to provide critical information prior to trial, despite discovery requests and its stipulation that it provided its complete file to the defense, and its failure to provide exculpatory evidence to the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963)., and progeny, violated Petitioner's rights afforded at Article 1, sections 2, 3, 14, 16, 19 and 20 of the Louisiana Constitution of 1974 and Amendments VI, VIII, and XIV of the United States Constitution.

6.    Trial counsel's failure to ensure that a complete record of the proceedings was being transcribed and appellate counsel's failure to obtain missing portions of the record, to reconstruct the record, or to raise the abysmal state of the record as an issue on appeal violated petitioner's rights pursuant to Article 1, sections 2, 3, 16, 19 and 20 of the Louisiana Constitution of 1974 and the VI, VIII, and XIV amendments to the United States Constitution.

7.    The voir dire in this matter was conducted in an improper manner that was aggravated by prosecutorial misconduct and ineffective assistance of trial counsel all in violation of Petitioner's rights as afforded by Article 1, sections 2, 3, 13, 16, 17, 19 and 20 of the Louisiana Constitution of 1974 and Amendments V, VI, VIII, and XIV of the United States Constitution.

8.    The trial court failed to provide instructions to the jury prior to recesses, lunch breaks and at the end of each day's proceedings, thereby violating Petitioner's right to due process and a fair trial as guaranteed by Article 1, sections 2, 16, 19, and 20 of the Louisiana Constitution of 1974, and Amendments V, VI, VIII, IX, XIV of the United States Constitution.

9.    Petitioner's rights under Article 1, sections 2 and 16 of the Louisiana Constitution of 1974 and Amendments VI and XIV of the United States Constitution were violated when the trial court permitted Archie Blue to testify to the hearsay statement by David Richard that Petitioner committed the crime.

10.    Trial counsel's failure to cross-examine witnesses and object to misstatements of the prosecutor regarding physical evidence was ineffective, all in violation of the rights guaranteed to petitioner under the Louisiana Constitution of 1974, Article 1, sections 2, 3, 13, 16, and 20 and Amendments VI, VIII, XIV to the United States Constitution.

11.    The admission throughout all phases of trial of enlarged color photographs of the victims was in contravention to La.C.E. art 403 in that they were prejudicial and lacked probative value; thereby violating Article 1, sections 2, 3, 16 and 19 of the Louisiana Constitution of 1974 and Amendments VI and XIV of the United States Constitution.

12.    The Prosecution's prejudicial remarks and repeated misstatements of the law, which permeated the entire trial, so infected the proceedings with unfairness as to violate due process and render the death sentences reached in this matter unreliable, all in violation of Petitioner's rights under Article 1, sections 2, 13, 16 and 20 of the Louisiana Constitution of 1974 and Amendments V, VI, VIII and XIV of the United States Constitution.

13.    The death sentences must be vacated as the jury relied on invalid aggravating factors that were erroneously submitted to the jury in violation of Petitioner's VI, VIII and XIV Amendment rights to the United States Constitution and Article 1, sections 2, 3, 16, 19 and 20 of the Louisiana Constitution of 1974.

14.    Trial counsel's failure to adequately investigate and present mitigation in the penalty phase denied Petitioner the effective assistance of counsel and rendered

his death sentences unreliable, all in violation of Article 1, sections 2, 3, 16 and 20 of the Louisiana Constitution of 1974 and amendments VI, VIII and XIV of the United States Constitution.

15. Appellate counsel was ineffective in failing to fail a Sentence Review Memorandum, failing to obtain and file a complete record, failing to assign and argue errors apparent on the face of the record, failing to argue 32 of 37 assigned errors, filing an inadequate and incomplete brief lacking in proper legal argument and legal support, failing to file an application for rehearing to the Louisiana Supreme Court, and filing an inadequate and incomplete petition for certiorari to the United States Supreme Court, all in violation of Petitioner's constitutional rights guaranteed by the Louisiana Constitution of 1974, Article, sections 2, 3, 13, 19, and 20 and Amendments VI, VIII and XIV to the United States Constitution.

16. Additional acts and omissions of defense counsel throughout the proceedings denied Petitioner the effective assistance of counsel in violation of rights secured to him by Article 1, sections 2, 3, 16, 19 and 20 of the Louisiana Constitution of 1974 and Amendments VI, VIII and XIV to the United States Constitution.

17. Petitioner was denied a full and fair hearing in all previous state court proceedings in violation of his due process rights afforded under the Louisiana and United States Constitution.

18. The death qualification of Petitioner's guilt-phase jury was illegal and in violation of the Louisiana and United States Constitutions.

19. The comparative appellate review of Petitioner's sentence was constitutionally inadequate.

20. Petitioner's Sentences are Excessive and Disproportionate in Violation of the Louisiana and United States Constitutions.

21. Petitioner's sentence is arbitrary and capricious and in violation of the Louisiana and United States Constitutions.

22. Lethal injection is a cruel and unusual means of punishment which violates Petitioner's Constitutional Rights.

23. Petitioner's sentence is invidiously discriminatory and meted out, and therefore violates his Louisiana and United States Constitutional Rights.

24. Petitioner's rights afforded under the Louisiana and United State's Constitutions

3 (C)

are violated by the capital punishment he is subjected to, as it is an excessive penalty.

25.    The cumulative effect of the violations of Petitioner's rights is per se a violation of Petitioner's constitutional rights.

AO 241 (Rev. 5/85)

_____
_____
_____
_____
_____

(4) Did you receive an evidentiary hearing on your petition, application or
Yes ☐  No ☒

(5) Result  Petition denied
_____

(6) Date of result June 22, 2000
_____

(b) As to any second petition, application or motion give the same information:

( 1 ) Name of court  Louisiana Supreme Court
_____

(2) Nature of proceeding ___ Application for Supervisory Writs (filed July 24, 2000 -- still pending in the

Louisiana Supreme Court)
_____

(3) Grounds raised  Please see attached page 4(B)
_____
_____
_____
_____
_____
_____

(4) Do You receive an evidentiary hearing on petition, application or motion?
Yes ☐  No ☒

(5) Result  Still Pending
_____

(6) Date of result  Still Pending
_____

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
( 1 ) First petition, etc.      Yes ☒   No ☐
(2) Second petition,           Yes ☒   No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

n/a
_____
_____
_____
_____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly the facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
   CAUTION: In order to Proceed in the federal court. You must ordinarily first exhaust Your available state court remedies as to each around on which You request action by the federal court. If you fail to set forth all grounds in this petition, YOU may be barred from presenting additional grounds at a later date.

## ASSIGNMENTS OF ERROR RAISED IN
## APPLICATION FOR SUPERVISORY WRITS

The Petitioner's Due Process and Equal Protection rights as guaranteed by the United States and Louisiana Constitutions were violated and obviated when the District Court granted the State's procedural objections and denied Petitioner an opportunity to explain his reasons for default or support his substantive claims (See La. Art. 1, Sections 2, and 3, and United States Constitution, Amendment XIV).

A.        The District Court erred in summarily granting the procedural objections of the State, thereby failing to conduct any hearings on the substantive issues even though the Petitioner's claims are numerous and complex.

B.        The District Court violated La.C.Cr.P. article 930.4(F) by failing to advise Petitioner it was considering dismissing the petition due to procedural defaults and by failing to give Petitioner an opportunity to explain why any such defaults were excusable.

C.        The State objected to allegations in Petitioner's Application and argued that they should be stricken from the record – the trial court erred by adopting such method.

D.        Miscellaneous general objections by the State.

E.        The District Court's reasons for judgment merely adopts the State's proposed findings of fact and conclusions of law as the trial court's reasons.

4 (B)

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, you *should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one:     PLEASE SEE ATTACHED MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS FOR THE CLAIMS URGED AND SUPPORTING FACTS AND ARGUMENT.

Supporting FACTS (state *briefly* without citing cases or law)

B. Ground two:     PLEASE SEE ATTACHED MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS FOR THE CLAIMS URGED AND SUPPORTING FACTS AND ARGUMENT.

Supporting FACTS (state *briefly* without citing cases or law):

AO 241 (Rev 5/85)

C. Ground three: _PLEASE SEE ATTACHED MEMORANDUM IN SUPPORT OF PETITION FOR_
_WRIT OF HABEAS CORPUS FOR THE CLAIMS URGED AND SUPPORTING FACTS AND_

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

_____

D. Ground four: _PLEASE SEE ATTACHED MEMORANDUM IN SUPPORT OF PETITION FOR_
_WRIT OF HABEAS CORPUS FOR THE CLAIMS URGED AND SUPPORTING FACTS AND_

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12 A, B, C and D were not previously presented in any other court, state or federal, state *briefly* what the grounds were not so presented, and give your reason for not presenting them: _____

_____

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☒   No ☐

15. Give the name and address. if known. of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing      N/A

(b) At arraignment and plea      Kenneth P. Rodenbeck, 909 6th Street, Alexandria, Louisiana 71301

W. T. Armitage, 418 DeSoto, Alexandria, Louisiana 71301

AO 241 (Rev. 5/85)

(C) At trial    Kenneth P. Rodenbeck, 909 6th Street, Alexandria, Louisiana 71301

W. T. Armitage, 418 DeSoto, Alexandria, Louisiana 71301

(d) At sentencing    Kenneth P. Rodenbeck, 909 6th Street, Alexandria, Louisiana 71301

W. T. Armitage, 418 DeSoto, Alexandria, Louisiana 71301

(e) On appeal    Nick Trentacosta, Loyola Death Penalty Resource Center,

636 Baronne Street, Third Floor, New Orleans, LA 70112

(f) In any post-conviction proceeding    Laurie A. White, 633 Carondelet Street, New Orleans, Louisiana

70130, 504-525-1020; Phyllis E. Mann, P.O. Box 705, Alexandria, Louisiana 71309; Jelpi P. Picou, 210

Baronne Street, Ste. 906, New Orleans, Louisiana 70112

(g) On appeal from any adverse ruling in a post-conviction  proceeding    Laurie A. White, 633 Carondelet Street,

New Orleans, Louisiana 70130, 504-525-1020; Phyllis E. Mann, P.O. Box 705, Alexandria, Louisiana 71309;

Jelpi P. Picou, 210 Baronne Street, Ste. 906, New Orleans, Louisiana 70112

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☒  No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under aback?
Yes ☐  No ☒
future:    n/a

(b) Give date and length of the above sentence:  n/a

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐  No ☒

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_Laurie A. White_
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

9 - 18 - 2000
(date)

_Larry Ray_
Signature of Petitioner

(7)

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIAN-
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

OCT 1 1 2000

ROBERT H. SHEMWELL, CLERK
BY_____
                    DEPUTY

LARRY ROY,
            Petitioner                    :

                                          :

vs.                                       :      CIVIL ACTION NO.

                                          :

BURL CAIN,                                :
            Respondent                    :

# CV00-2311 A SEC P

## JUDGE LITTLE

## MAGISTRATE JUDGE KIRK

### PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY

### THIS IS A DEATH PENALTY CASE

### INTRODUCTION

1. Larry Roy is a prisoner in the custody of the State of Louisiana, under sentence of death for two counts of first degree murder. He is being held at Louisiana State Penitentiary, Angola, LA in the custody of Warden Burl Cain. Mr. Roy was convicted and sentenced to death in violation of the Constitution and laws of the United States, and therefore respectfully moves the Court to issue a writ of habeas corpus to the State of Louisiana requiring the State to grant him a new trial or release him from custody.

### JURISDICTION

2. This Court has jurisdiction to grant the requested relief under 28 U.S.C. § 2254.

### PROCEDURAL HISTORY

3. On July 19, 1994, following a jury trial in the Ninth Judicial District Court, Parish of Rapides, Louisiana, Mr. Roy was found guilty of two counts of first degree murder in violation of La.R.S. 14:30, the Honorable Alfred A. Mansour, Judge, presiding. Two days later, on July 21, 1994, the same jury returned sentences of death on each count. On August 30, 1994, Judge Mansour formally sentenced Mr. Roy to death on two counts of first degree murder.

4. On October 4, 1996, the Louisiana Supreme Court affirmed Mr. Roy's convictions and death sentences. State v. Roy, 681 So.2d 1230 (La. 1996).[1] Mr. Roy's application for rehearing before the Louisiana Supreme Court was denied on November 15, 1996. The United States Supreme Court denied Mr. Roy's petition for writ of certiorari on April 21, 1997. Roy v. Louisiana, 520 U.S. 1188 (1997).

5. For much of the following year, Mr. Roy was unrepresented.

6. On October 10, 1997, the Louisiana Supreme Court granted in part Mr. Roy's application for supervisory and/or remedial writs taken to vacate the execution warrant issued by the trial court, ordering the trial court to stay Mr. Roy's scheduled execution, to appoint counsel for Mr. Roy and to set a reasonable time for counsel to file an application for post conviction relief, if appropriate. State ex rel. Roy v. State, 703 So.2d 590 (La. 1997). Thereafter, the district court appointed Jelpi Picou, the Director of the Louisiana Indigent Defense Assistance Board ("LIDAB"), to represent Mr. Roy and set a deadline of February 13, 1998 for the filing of Mr. Roy's post conviction petition.

7. Mr. Picou's role as director of the LIDAB precluded his active representation of Mr. Roy. Accordingly, Mr. Picou sought and located counsel willing to represent Mr. Roy in his state post conviction proceedings. On January 12, 1998, the trial court appointed Laurie A. White and Phyllis E. Mann as counsel, in addition to Mr. Picou, to represent Mr. Roy in his state post conviction proceedings.

8. On February 13, 1998, the trial court granted Mr. Roy's motion for an extension of time in which to file an application for post conviction relief until May 15, 1998.

---

[1] The Louisiana Supreme Court's opinion, which consists of a published opinion and an unpublished appendix, is attached as Exhibit "A" hereto.

9. On April 21, 1998, exactly one year from the date that Mr. Roy's convictions and death sentences became final by virtue of the United States Supreme Court's denial of his petition for writ of *certiorari*, Mr. Roy filed his Petition for Post Conviction Relief pursuant to La.C.Crim.P. Arts. 924, *et seq.* (Exhibit "B" hereto). In conjunction with his Petition, Mr. Roy filed a Motion for Leave to File Petition for Post-Conviction Relief with Permission to Amend and Supplement by May 15, 1998, Prior to Dismissal, Denial or Any Merits Ruling on the Petition, which was granted by the trial court on April 21, 1998. (Exhibit "C" hereto).

10. Through a series of orders, the deadline for amending and supplementing the Post Conviction Petition was extended until March 1, 1999. On May 15, 1998, the trial court granted Mr. Roy's motion to extend the deadline for filing his amended and supplemental petition to August 14, 1998. On August 13, 1998, the trial court extended the deadline for amending and supplementing the post conviction petition an additional one hundred and eighty (180) days, i.e. until February 13, 1999. On February 8, 1999, the trial court granted Mr. Roy an additional fourteen (14) days, until February 27, 1999, to amend and supplement his post conviction petition. As February 27, 1999 fell on a Saturday, the deadline for filing Mr. Roy's amended and supplemental petition was actually Monday, March 1, 1999. (Exhibits "D" through "F" hereto).

11. On March 1, 1999, Mr. Roy filed his amended and supplemental Application for Post-Conviction Relief (the "PCR Petition"), which dates back to the initial post conviction petition filed on April 21, 1998. (Exhibit "G" hereto). The PCR Petition raises twenty-five separate claims for relief, many relating to the ineffectiveness of trial and appellate counsel.

12. On June 1, 1999, Assistant District Attorney, Thomas R. Willson, filed on behalf of the State of Louisiana and Burl Cain (collectively "the State") Respondent's Procedural Objections and

3

Answer to Application for Post-Conviction Relief. (Exhibit "H" hereto). Although not clearly articulated, these objections appear to raise three alleged procedural bars to consideration of Mr. Roy's PCR Petition and a host of merits-related arguments seeking the unprecedented relief that a variety of Mr. Roy's claims for relief be "stricken" from the Petition.[2] Mr. Roy responded to the Objections and Answer on July 9, 1999, filing a Brief of Petitioner on State's Procedural Objections which demonstrated, claim by claim, that each of the State's objections were meritless. (Exhibit "I" hereto). That same day, the State filed Respondent's Proposed Findings of Fact and Conclusions of Law. (Exhibit "J" hereto).

13. On June 22, 2000, the trial court issued an order denying the PCR Petition and stating as its reasons solely that "[f]ollowing an examination of the record and Defendant's accompanying memorandum in support of the motion for post conviction relief, this Court grants the State's objections and adopts as its reasons the State's proposed findings of fact and conclusions of law." (Exhibit "K" hereto).

14. Currently pending before the Louisiana Supreme Court is Mr. Roy's Application for Supervisory Writs Seeking Reversal of the Trial Court's Granting of the State's Procedural Objections and Request for a Remand for an Evidentiary Hearing on Petitioner's Post-Conviction Claims (Exhibit "L" hereto).[3] As Mr. Roy argues in his Writ Application, the procedural objections

---

[2] The procedural bars raised by the State are (1) that the PCR Petition and attached Affidavit attesting to its veracity were signed by counsel, rather than Mr. Roy; (2) that the PCR Petition did not conform to the "Uniform Application for Post Conviction Relief approved by the Supreme Court of Louisiana" as required by La.C.Crim.P. Art. 926(D); and (3) that some of the claims raised in the PCR Petition were successive under La.C.Crim.P. Art. 930.4.

[3] As set forth *infra* at ¶ 18, Mr. Roy is filing his habeas corpus petition now so that his rights to federal review will not be irretrievably lost.

4

to the PCR Petition lack merit and any ruling by the trial court on the merits of Mr. Roy's PCR

Petition was prematurely made in violation of the rules governing state post conviction proceedings

in Louisiana, which require that all procedural objections be disposed of prior to any consideration

on the merits of the petition.  See La.C.Crim.P. Art. 930(C)("No evidentiary hearing on the merits

of a claim shall be ordered or conducted, nor shall any proffer of evidence be received over the

objection of the respondent, and no ruling upon procedural objections to the petition shall purport

to address the merits of the claim over the objection of the respondent, unless the court has first

ruled upon all procedural objections raised by the respondent, and such rulings have become final.

Any language in a ruling on procedural objections raised by the respondent which purports to

address the merits of the claim shall be deemed as null, void, and of no effect.")

15. The State's Response to the Writ Application (Exhibit "M" hereto) urges solely that the

PCR Petition was properly denied because (1) post conviction counsel, rather than Mr. Roy, signed

the PCR Petition and attached Affidavit attesting to its veracity (an objection the State raised before

the trial court) and (2) the PCR Petition is time barred (an objection that was not raised before the

trial court).  Mr. Roy's Reply Brief (Exhibit "N" hereto) demonstrates that neither of these

procedural objections have merit.  First, the proper signatories to the Petition and Affidavit were Mr.

Roy's attorneys, who investigated and authored the Petition.[4]  Second, not only did the State waive

---

[4] Even if Mr. Roy's signature and affidavit, rather than those of counsel, were held to be necessary components of his state post conviction petition, the proper remedy was not to dismiss the PCR Petition, but to allow Mr. Roy to cure this defect. La.C.Crim.P. Art. 926(E) provides that the application for post conviction relief may be dismissed only for "[i]nexcusable failure of the petitioner to comply with the provisions of this Article . . . ."  Surely, the filing of a petition under the signature of the attorneys who investigated and prepared it, and accompanied by counsel's affidavit attesting to its truthfulness cannot be deemed an "inexcusable failure" to comply with the rules.  Moreover,  La.C.C.P. Art. 863(C) provides that an unsigned pleading

the argument that the Petition is time barred by failing to raise this objection in the trial court, but the Louisiana post conviction rules expressly exempt death-sentenced prisoners from the limitations period for filing a state post conviction application, see La.C.Crim.P. Art. 930.8(A)(4), and the Petition was in any event timely filed on April 21, 1998.

16.  In the event that the Louisiana Supreme Court either affirms the trial court's ruling denying the PCR Petition or denies the writ application currently pending before the court, the state courts' rulings do not impose a bar to this Court's review of any of Mr. Roy's claims.  Any procedural basis for the denial of Mr. Roy's PCR Petition does not constitute an independent and adequate state ground under Wainwright v. Sykes, 433 U.S. 72 (1977), as the procedural objections raised in the trial court by the State were not affirmatively established and regularly applied, see Ford v. Georgia, 498 U.S. 411, 423-25 (1991), and any conclusion that the State PCR was untimely is clearly erroneous under both state law and the facts of this case.  To the extent that the state courts' rulings may be construed as adjudications on the merits of the PCR Petition, moreover, such a decision was reached in clear violation of the rules governing state post conviction proceedings in Louisiana, see La.C.Crim.P. Art. 930(C), and are thus entitled to no deference under 28 U.S.C. § 2254(d).

17.  Given the procedural posture of the state proceedings, Mr. Roy has had no opportunity to seek the right to conduct discovery from the state trial court, to present evidence in support of his

---

should be stricken only if it has not been "promptly signed after the omission is called to the attention of the pleader."  There has been no ruling placing Mr. Roy on notice that counsel's signatures and affidavits are insufficient to comply with the formal requirements of La.C.Crim.P. Art. 926(C).  Even were the trial court's summary ruling sufficient to place Mr. Roy on notice of this formal defect, the court's denial of the Petition gave Mr. Roy no opportunity to cure the error.

claims in an evidentiary hearing, or to make a proffer of the evidence he would present at such a hearing.  See La.C.Crim.P. Art. 930(C)(providing that no proceedings relating to the merits of a post conviction application shall be conducted prior to final disposition of any procedural objections raised by the State).  Accordingly, he intends to seek discovery in this Court pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, and requests that this Court conduct an evidentiary hearing on the claims raised in this Petition.  See Williams (Michael) v. Taylor, __ U.S. __, 120 S. Ct. 1479 (2000)(state prisoner who has diligently sought to develop facts in state court is not barred by 28 U.S.C. § 2254(e)(2) from obtaining evidentiary hearing in district court).

18.  Although Mr. Roy's state proceedings are still pending, he is filing this Petition for a Writ of Habeas Corpus now because otherwise he will be precluded from seeking federal review of his convictions and death sentences.  28 U.S.C. § 2254(d)(1)(A) imposes a one-year statute of limitations period for the filing of a federal habeas corpus petition following the date on which the judgment of conviction became final, i.e. one year from the date on which the United States Supreme Court denied *certiorari* on direct appeal.  See Flanagan v. Johnson, 154 F.3d 196 (5th Cir. 1998).  The statute is tolled during the pendency of state post conviction proceedings.  28 U.S.C. § 2254(d)(2).  As Mr. Roy's state post conviction petition was filed exactly one year after the United States Supreme Court denied his petition for writ of *certiorari*, Mr. Roy must file his federal habeas corpus petition no later than the very day on which the Louisiana Supreme Court finally rules on his PCR Petition.  Accordingly, this Petition is being filed now so that Mr. Roy's opportunity to

seek federal review of his convictions and death sentences will not be irretrievable lost.[5]

## STATEMENT OF FACTS

19.  The evidence presented in the guilt/innocence phase of the trial, largely through the testimony of the surviving victims, Sally Richard and her two sons, David and Frederick, indicated the following:

20.  Larry Roy and Ms. Richard had been involved in an intimate relationship that had ended about three months prior to the crime when Ms. Richard had asked Mr. Roy to move out of her house.  On May 2, 1993, the day prior to the murders, Ms. Richard's ex-husband, Freddie Richard, Jr., came to stay at her home in order to help her take one of their children to the doctor the next day. During the course of the day, the Richards ran into Mr. Roy a few times around town and their house.  In one such encounter, Mr. Roy allegedly made the cryptic comment, "Things are going to be on tonight."

21.  At approximately 1:30 a.m. on May 3, 1993, after all four of the Richards had retired to one bedroom, while Rosetta Silas, an aunt, had gone to bed in another, Ms. Richard heard a noise at the bathroom door and got up.  Shortly thereafter, Mr. Roy burst through the bedroom door.  He and Freddie Richard began to fight.  At some point during the struggle, Mr. Roy pulled out a knife which he used to stab Freddie Richard to death.  Mr. Roy then forced Ms. Richard to take him into her aunt's bedroom and forced Ms. Silas to give him the $50.00 she kept under her mattress.  He

---

[5] In conjunction with the filing of this Petition, Mr. Roy is filing a motion seeking to hold this Petition in abeyance pending the final adjudication of his PCR Petition by the state courts and requesting a scheduling order establishing periods of time from the date of the final adjudication of the PCR Petition to seek discovery and to file an amended habeas corpus petition.

then tied up Ms. Richard and her two sons in the hallway with telephone cord and slit the throats of each of them.  Mr. Roy then proceeded back to Rosetta Silas's bedroom.  Ms. Silas was later found stabbed to death and with her throat slit.

22.  Ms. Richard and her sons somehow managed to get up and flee the house.  Ms. Richard got as far as a neighbor's home and was taken to the hospital.  Her sons collapsed in the yard.  By the time police and medical personnel arrived, Mr. Roy was not at the scene, but was identified by David Richard as the man who had cut his throat.  Mr. Roy was arrested two days later in Bunkie, Louisiana, and charged with two counts of first degree murder.  Ms. Richard, David and Frederick survived the incident and testified at trial that Mr. Roy was the person who had attacked all of them.

23.  Despite the horrific nature of this crime and the very real threat of the death penalty in this case, Mr. Roy was appointed two public defenders who were inexperienced in capital defense to represent him.  This was Kenneth P. Rodenbeck's first death penalty case and W.T. Armitage, Jr.'s second death penalty case, the first case having been litigated shortly after Louisiana adopted a bifurcated system, *i.e.* in the late 1970's.  As the proceedings reveal, his attorneys' lack of experience proved fatal.

24.  This was a case that any reasonable attorney would realize was virtually certain to proceed to the penalty phase if it went to trial.  Yet, defense counsel did nothing to seek a pretrial settlement of the case — they conducted little investigation, had inexcusably minimal contact with their client, and failed to litigate pretrial issues with any vigor.  As a result, they were not in any position to work out a deal with the prosecutor, and did not attempt to do so, despite the fact that no other capital defendant in Rapides Parish has received a death sentence without first rejecting a formal offer from the State to a sentence of life without parole.

9

25. Counsel's failure to investigate thoroughly or to engage the State in meaningful pretrial litigation had the predictable consequence of prejudicing Mr. Roy at trial. There was no cogent strategy in the guilt/innocence phase — instead, counsel presented the mutually exclusive defenses of cocaine intoxication and alibi. Indeed, in the face of the State's strong evidence from the surviving victims that a man they knew well had committed the crimes, Mr. Roy's attorneys committed him to taking the stand in support of his alibi by informing prospective jurors during voir dire that he would do so *if the State had proved its case*. Mr. Roy, who testified unwillingly before the all-white jury, denied that he had committed these crimes and asserted that he had been in a vacant crack house getting high at the time. The defense argued that Mr. Roy was innocent because of this alibi, but if he was not, he was too intoxicated to form specific intent to kill or inflict great bodily harm. The jury predictably rejected these contradictory defenses and found Mr. Roy guilty of two counts of first degree murder.[6]

26. The penalty phase case in mitigation, as well, was inexcusably lame. Defense counsel failed to investigate potential areas of mitigation and did not prepare either their expert or lay witnesses to testify. Moreover, by undermining their credibility in the guilt phase through the presentation of the conflicting defenses of intoxication and alibi, defense counsel ensured that the

---

[6] Counsel's performance throughout the trial was remarkably lackluster. Mr. Roy's attorneys did little to minimize the prejudicial impact of the evidence regarding the attacks on the surviving witnesses, two of them young children, even though Mr. Roy was not being tried for attempted murder and this inflammatory evidence was of limited relevance to the jury's guilt determination. The jury heard cumulative, emotional accounts of the crime from both the victims and the police and medical personnel at the crime scene, all without objection from the defense. The defense did little to curtain prosecutorial excesses throughout the trial. As a result, the trial was conducted in an atmosphere of heightened emotions that precluded the jury from considering the evidence in a rational manner.

statutory mitigating circumstance of intoxication, La.C.Crim.P. Art. 905.5(e), would have absolutely no persuasive force in the jury's sentencing decision and, indeed, that little that they presented or said would have weight in the jury's sentencing decision.[7]

27.  The failures of trial counsel to protect the rights of their client were augmented on appeal. Mr. Roy was appointed a new attorney, Nick Trenticosta, for his direct appeal, who likewise failed to do his job. Despite several continuances for the filing of the brief, appellate counsel filed a meager twenty-eight-page brief, five pages of which simply listed the assignments of error and three pages of which were only a half-page long. The brief argued the merits of only five of the thirty-seven assignments of error raised in the appeal and failed to cite relevant case law in support of some of the arguments made. Appellate counsel, moreover, failed to raise additional, meritorious issues that were apparent on the face of the appellate record, such as the prejudicially incomplete state of the record and the patent ineffectiveness of trial counsel. In its published opinion affirming the convictions and death sentences, the Louisiana Supreme Court addressed solely those issues that had been briefed and relegated its discussion of the remaining assignments of error to an unpublished appendix which gave cursory review to the issues that appellate counsel had not bothered to argue.

28.  The deficiencies of counsel at trial and on appeal undermine the reliability of the jury's guilt and penalty phase verdicts. These and other errors raised below require that this Court issue

---

[7] These and the numerous other instances of trial counsel's ineffectiveness are discussed *infra* at ¶¶ 29-89.

11

a writ of habeas corpus to the State of Louisiana.[8]

## CLAIMS FOR RELIEF

### I.
### MR. ROY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS

### Introduction

29.  The Sixth and Fourteenth Amendments guarantee an accused "the guiding hand of counsel at every stage of the proceedings against him." Gideon v. Wainwright, 372 U.S. 335, 342 (1963) (quoting Powell v. Alabama, 287 U.S. 45, 68-69 (1932)).  Beginning with pre-trial preparation and continuing through the verdict at sentencing and the prosecution of the direct appeal, Mr. Roy's appointed attorneys failed to provide the reasonably effective assistance guaranteed by the Sixth and Fourteenth Amendments.  Their errors and omissions fell objectively outside the wide range of professional representation and, but for counsel's deficient performance, there is a reasonable probability that the results of Mr. Roy's trial would have been different and he would not have been sentenced to death.[9]

---

[8] All of the claims raised herein have been presented to the Louisiana state courts on direct appeal and in Mr. Roy's PCR Petition.  Should this Court conclude, however, that any of the claims raised in this Petition have not been exhausted (once the state courts finally rule on the PCR Petition), Mr. Roy respectfully requests leave to amend this Petition to delete those claims that are unexhausted rather than suffering dismissal of this Petition.  See, e.g., Calderon v. United States Dist. Ct., 134 F.3d 981, 986 (9th Cir. 1998)(noting that the Supreme Court in Rose v. Lundy, 455 U.S. 509, 520 (1982), "specifically provided habeas petitioners with the option of amending their applications to delete unexhausted claims rather than suffering dismissal.").

[9] For the Court's convenience, Mr. Roy is indicated where each claim discussed in this Petition was raised in state court.  Errors raised in the appeal will be referred to by the number of

### A.
### <u>INEFFECTIVENESS OF TRIAL COUNSEL</u>

### 1.
### Counsel Were Ineffective in Failing to Seek and
### <u>Obtain a Plea to Life Imprisonment (PCR Issue No. 1)</u>

30.  The homicides for which Mr. Roy has been sentenced to death occurred on May 3, 1993. Two people were killed and three were injured.  Mr. Roy was arrested on May 5, 1993 and immediately incarcerated.  At the first substantive meeting with Mr. Roy, before conducting any investigation, trial counsel told him they would try to get him a plea to a life sentence, and Mr. Roy, understandably, indicated that he did not want to go to prison for the rest of his life.  The files of trial counsel indicate that the only other direct discussion they had with Mr. Roy regarding a plea occurred on January 27, 1994.  At that time, trial counsel inquired whether Mr. Roy would be interested in a plea for life, and suggested the DA might be interested if Mr. Roy were interested. There is no indication in the files of trial counsel that they made any efforts to explain to Mr. Roy the effects of a plea to a life sentence or the grave dangers of going to trial and facing the death penalty in this case.  Trial counsel have advised that they *never* at any time discussed the possibility of a plea with the State.

31.  Trial attorneys for capital defendants have an obligation to attempt to secure a plea offer short of death, regardless of whether their client has indicated an interest in accepting a plea offer. The failure to do so is ineffective assistance of counsel.  This is particularly true where, as here, the evidence against the client is strong and a jury trial will almost certainly result in a conviction for

_____

the Assignment of Error on Appeal ("AEA No. [#]"); errors raised in the petition for post conviction relief will be referred to as "PCR Issue No. [#]."

first degree murder subjecting the client to the death penalty. See, e.g., Martin v. Rose, 717 F.2d 295 (6th Cir. 1983)(per curiam)(in noncapital case holding that "the conduct of petitioner's attorney prior to trial [minimal contact with client, failure to interview witnesses and unfamiliarity with file of prior counsel] and in entering the trial without any defense while making no effort to obtain a plea bargain constituted ineffective assistance of counsel . . . ."); cf. Sloane v. Estelle, 710 F.2d 229, 231 (5th Cir. 1983)(counsel "chose to bargain with the prosecutors for leniency rather than pursue the issue of Sloan's mental capacity. Considering the weight of the evidence against petitioner and the fact that the death penalty would have been sought on at least two of the charges, we cannot fault counsel's decision to strike a bargain with the prosecutors as ineffectiveness . . . .").

32. Perhaps most importantly, in Rapides Parish, the ability to secure a formal offer to a life sentence is virtually guaranteed. Since 1972, one hundred thirty-five (135) people have been arrested for first degree murder and prosecuted. Four of those cases are currently pending on first degree murder indictments, and the outcome of those cases cannot be predicted. Of the remaining 131, however, no one has ever been ultimately sentenced to death without having first declined a formal offer from the State to accept a plea to first degree murder with a life sentence.[10]    See

---

[10] Simply because it is within the prosecutor's discretion to offer a plea bargain does not preclude this Court's review of trial counsel's failure to seek and obtain such a plea bargain. First, as the facts set forth above make clear, it is the *standard* practice of the Rapides Parish District Attorney's Office to make pretrial settlement offers in capital cases. Moreover, the fact that discretion lies with the prosecution does not preclude this Court's consideration of whether trial counsel was ineffective in failing to seek and secure a plea to life. In United States v. Castro, 26 F.3d 557 (5th Cir. 1994), the Fifth Circuit held that trial counsel was ineffective in failing to advise petitioner of his right to seek and in failing to request a Judicial Recommendation Against Deportation (JRAD) from the sentencing court pursuant to 8 U.S.C. § 1251. Noting that the decision to grant a JRAD lies within the court's discretion, the Fifth Circuit observed that "[a] deprivation of an opportunity to have a sentencing court exercise its discretion in a defendant's favor can constitute ineffective assistance of counsel." Id. at 560.

14

Exhibit "C" to PCR Petition (attached as Exhibit "G" hereto)(Disposition of First Degree Murder

Charges in Rapides Parish (1972-1998)).  It is difficult to imagine that over 27 years and 135 capital

murder defendants, Larry Roy would be the only defendant for whom an offer to plead to life could

not have been secured.

33.  Trial counsel's failure to seek an offer to life from the State of Louisiana and to

meaningfully convey such an offer to Mr. Roy falls well below the standard of care of any

reasonable capital defense attorney at the time of Mr. Roy's trial and was clearly deficient; the

deficient performance of trial counsel prejudiced Mr. Roy, who is now sitting on death row facing

two death sentences, as there is a reasonably probability that but for trial counsel's deficient

performance, the results of the proceeding would have been different.  See Williams v. Taylor, _

U.S. __, 120 S. Ct. 1495, 1511-12 (2000)(citing Strickland v. Washington, 466 U.S. 668 (1984)).

The failure of trial counsel to purposefully and continuously seek an offer to life from the State of

Louisiana, and then to  methodically and intelligently present such an offer to Mr. Roy, deprived

Mr. Roy of his constitutional rights guaranteed under Amendments VI, VIII, and XIV of the United

States Constitution.

**2.**
**Counsel Were Ineffective in Committing Mr. Roy to Take the Stand**
**During Voir Dire, Forcing Him to Take the Stand Against His Will,**
**and Putting Him on the Stand Without Conducting an Adequate**
**Pretrial Investigation to Determine Whether There Was Evidence that**
**Could Have Substituted for his Testimony, that Corroborated his**
**Testimony or that Discredited his Testimony (PCR Issues Nos. 4 and 7)**

34.  A defendant charged with a crime has an *absolute* right under the Fifth and Fourteenth

Amendments to remain silent and refuse to incriminate himself.  Trial counsel withdrew that right

from Mr. Roy.

35.  During voir dire, trial counsel repeatedly informed the jury that they intended to put their client on the stand in the event that the State proved its case:

> It is ... uh ... our intention to have Mr. Roy testify, but that would all depend on what the State's evidence is.  Do you understand that my client here has a right to remain silent and that he doesn't have to take the stand, and that if he does not take the stand that you cannot hold that against him.  He has a constitutional right to go ahead and take the stand.  And we may very well have him take the stand but it depends on the level of proof that we feel that the State has brought.  If we do not feel that they have proved their case he may not take the stand and avail himself of his constitutional right not to testify.

R. 322.

> I think you need to understand that there is, in the constitution, a right for my client not to testify.  We intend for my client to testify, but that would only depend on what the prosecution [puts] forth in evidence.  So while we intend for him to testify the prosecution puts on its case first and then we determine whether it's necessary for him to testify.  And if we don't think that it is necessary for him to testify he won't take the stand, but we intend at this point that he will testify.  You understand that if he should not testify he has that perfect constitutional right not to testify, and you cannot ... and the Judge will instruct you that you cannot draw any inference from his failure to testify?  Y'all understand that.

R. 503-504.

> Now, it is my intention in this case to have Mr. Roy testify in this case, but that will all depend on the evidence that the prosecution puts on in this case.  You all realize that the Constitution of the United States allows my client to remain silent and have the prosecution carry its burden of proof, and if they do not carry ... well, if he should prevail uh ... decide not to testify because he feels that they haven't carried the burden of proof he can just remain in his seat and never take the witness stand.  We are going to have him testify if the facts that are presented indicate that he should testify.

R. 707.

> My client is also entitled to remain silent and not take the stand.  We intend to put Larry Roy on the stand and to tell you his side of this matter, but we still have a right not to have him take the stand, and depending upon what the prosecution puts on in their case, and they go first.  We will reserve that decision until it comes, until it's the appropriate time to make that decision.  So, while we intend to put him on

16

> the stand ... uh ... we don't know what the State's case is going to be, so we haven't made that final decision.  If we were not to put him on the stand, if we were ... uh ... to allow him to remain silent and require the State to prove their case, could you give him the presumption ... or not the presumption, could you not infer any guilt simply because he did not take the stand?"

R.909-910.  These commitments by defense counsel that Mr. Roy would testify and that if Mr. Roy testified it was because the State had proved its case all violated Mr. Roy's federal constitutional rights under Amendments V, VI, VIII, and XIV of the United States Constitution, by denying him his right to remain silent and undermining the presumption of innocence.[11]

    36.  Having committed Mr. Roy to testifying in the trial, defense counsel thereafter forced him to take the stand against his will.  After the jury was selected and prior to the State's presentation of evidence, Mr. Roy informed his attorneys that he would *not* testify before an all-white jury.  During an *ex parte* conference with the trial court, which defense counsel request be sealed, see R. 20, his attorneys explained to the court that they had not given an opening statement because Mr. Roy had told them that he would not testify before the all-white jury.[12]  See Exhibit "O" hereto (sealed transcript dated 7/16/94).  His attorneys have subsequently admitted that they strong-armed their client into taking the stand at trial.

    37.  Mr. Roy's unwilling testimony, given under the compulsion of his trial attorneys, trammeled his absolute right to remain silence, in clear violation of his rights under Amendments

---

[11]  These representations, moreover, served no useful purpose — the only relevant inquiry along these lines was whether jurors would honor the presumption of innocent and not require Mr. Roy to testify.  Defense counsel thus painted themselves and their client into a corner without any justifiable reason.

[12]  As set forth *infra*, at ¶¶ 91-92, appellate counsel were ineffective in failing to secure and introduce into the record the sealed transcript of the *ex parte* hearing, and in failing to raise on appeal the blatant violation of Mr. Roy's fundamental right not to testify.

V, VI, and XIV of the United States Constitution. "Failure by counsel to advise a client of his right to remain silent, and a representation by counsel that a client has no choice under law but to take the stand would be among the most serious instances of attorney error." Burnett v. Kerr, 835 F.2d 1319, 1321 (10th Cir. 1988). Surely counsel's actions in committing Mr. Roy to testify and then forcing him to do so was equally egregious.

38. Despite their insistence that Mr. Roy testify, defense counsel did nothing to prepare for Mr. Roy's testimony, which they clearly knew would be that he was in a crack house smoking crack at the time of the murders.[13] Defense counsel did not interview or present individuals who could support Mr. Roy's statements, elicited on direct examination, that he had money with which to purchase drugs on May 2, 1993, which he testified he obtained from a job doing work on people's cars, from unemployment and from a lawyer representing him. R. 1527-29. More importantly, defense counsel failed to obtain or present any support for his testimony that he was high on drugs — the defense introduced no one during the guilt phase who could testify that Larry Roy had a drug problem (other than an expert, whose testimony was based solely on interviews with Mr. Roy and was denigrated by the prosecutor on this basis), although the defense presented such testimony during the penalty phase through the testimony of Deborah Simmons and attempted to do so through the testimony of John Lemoine.

39. In the face of the surviving victims' testimony that Mr. Roy (a man the victims had lived with and knew well) had committed the crimes, the decision to put Mr. Roy on the stand to testify

---

[13] Defense counsel had (1) provided the state with notice of the alibi that defendant was in a crack house at the time of the crime, and (2) introduced photographs of the crack house as Defense Exhibits 1 and 2.

that he was alone in some crack house during the murders — without any evidence (solid or otherwise) to back him up — was the height of incompetence. More fundamentally, trial counsel had no right to force him to testify *against his will* to a defense that was so incredible and, indeed, had an obligation to forcefully advise him against giving such testimony under the circumstances of this case.

40. Mr. Roy testified to devastating effect — the prosecutor had no difficulty in painting the inconsistent alibi and intoxication defenses as a sham.[14] Moreover, there can be no doubt that

_____

[14] The prosecutor argued, for example in his guilt phase closing argument:

> The defense is intoxication. I would suggest to you, you've heard the evidence from both sides, heard the defendant testify. There's only one person that can testify that Larry Roy was intoxicated that night, that is Larry Roy. No one else. Larry Roy was certainly truthful in his testimony, wasn't he. He didn't try to deceive anybody. He didn't change his stories. The only evidence is Larry Roy.

R. 1656.

> We have two defenses here ... I'm getting ready to sit down ... we have two defenses. One is he didn't do it. It's a horrible thing but I didn't do it. The other is if he did it he was intoxicated.

> Look at the circumstances surrounding the crime. If you want to take Sally Richard's testimony and throw it out the window, do it. Look at the boys. You don't want the boy's testimony look at the physical evidence. We have two dead people. We have three people with their throat slashed. The person who did this brought the cord in. The person who did this chased a 75 year old lady down to that bathroom. The person who did this had enough sense to get that coat hanger.

R. 1662.

> In rebuttal, the State urged:

> Look at all this evidence, determine whether Larry Roy did this determine if Larry Roy did this. And if he did, if you do not accept the defense that I didn't do it ... I didn't do it ... I swear before God I didn't do it. But if I did I couldn't form

19

the complete failure of this testimony in the guilt phase reverberated throughout the defense's pathetic attempt during the penalty phase to present intoxication as a mitigating circumstance.[15]

41.    Trial counsel's commitment to the jury that Larry Roy would testify (but only if the State presented a strong case-in-chief) and presentation of this testimony against the will of their client and without considering either the viability of the testimony or ways in which it could be bolstered amounted to ineffective assistance of counsel of the grossest kind.  Counsel should not have taken the drastic step of putting their client on the stand without (1) careful consideration of the pros and cons of such a strategy; (2) a thorough explanation of these to the client; (3) consideration of ways to get such information before the jury without the risk of putting their client

_____

> the specific intent to kill.  Didn't do it but if I did I couldn't form the necessary intent to kill.  If you accept that defense then vote not guilty.  But if you think that those defenses don't float and you find as to each defendant [sic] any one of these things, then vote guilty for first degree murder.

R. 1686.

[15]  In the State's penalty phase closing, the prosecutor argued, for example:

> Now, you have a choice here ladies and gentlemen, your choice is you can believe Larry Roy, that he was intoxicated; or is he intoxicated as he says he was?  Maybe he was, had a few beers.  Maybe he even had gin which you can't buy on Sunday.  Or maybe even he smoked a little crack.  We don't know where he got the money from, he tells us, but do we see any checks from unemployment, I mean, is the kind of guy's gonna get unemployment?  What did Mr. Forsyth say?  He'd hit bottom.  He didn't work, he hadn't worked in a long time.  He's gonna get unemployment?  Did we see the attorney, receipt of the hundred dollars he supposedly got?  Did the person whose car he fixed come in and testify.  Oh yeah, I gave 'im a hundred and fifty dollars.  None of that.  You have to accept Larry Roy's word, that he had the money to buy cocaine with.  Larry Roy, the person who his own witness says, lives a lie.  Who another witness says he's a con man.  You have to accept Larry Roy's word that he was intoxicated then.

R. 1889-90.

20

on the stand; (4) an evaluation of the purpose of such testimony in the overall defense strategy (assuming that there was one); and (5) investigating ways in which to corroborate their client's testimony. In the face of Mr. Roy's opposition to testifying, they should not have put him on the stand at all.

42. In Johnson v. Baldwin, 114 F.3d 835 (9th Cir. 1997), the court granted a writ of habeas corpus on the grounds that trial counsel was ineffective for failing to investigate and discredit their client's unconvincing testimony that he was not present at the crime scene. Counsel had failed to interview relevant witnesses and did not inquire about possible sources of corroboration for the alibi. Id. at 839. In concluding that counsel was ineffective, the court observed:

> We do not find it anomalous that an attorney who fulfills his or her duty to investigate the facts of a case may discover and need to act upon information contrary to that which the client has furnished. As the facts were found by the state courts, Albert [Johnson] offered Haslett [his attorney] an uncorroborated denial that, in light of evidence that minimal investigation would have revealed, was utterly unconvincing. Haslett was not entitled to stop there, but for all practical purposes, he did. If Haslett had talked to Albert's grandmother and his girl friend in search of corroboration for Albert's alibi, and they had told him the truth, he would have found none. Had he confronted Albert with the lack of corroboration for his alibi, and the strength of the defense that no sexual intercourse had occurred, Albert probably would have elected not to lie to the jury. The prejudice from failing to investigate the alibi and confer more fully with Albert is not avoided by the fact that Albert misinformed his attorney.

Id. at 840.

43. Similarly, in Coss v. Lackawanna County District Attorney, 204 F.3d 453 (3rd Cir. 2000), the court granted a writ of habeas corpus, concluding that trial counsel's deficient performance in failing to call witnesses who could have testified that petitioner did not assault officer and whose testimony would have rendered it unnecessary for petitioner to testify to a "clearly fictional rendition" "had a pervasive effect, altering the entire evidentiary picture at trial." See also

Stringer v. State, 627 So.2d 326 (Miss. 1993), cert. denied, 512 U.S. 1209 (1994)(counsel ineffective for failing to call witnesses to testify that the defendant did not live in the home where drugs were discovered, which forced the defendant to testify to that effect, allowing the prosecution to impeach him with prior drug convictions); cf. People v. Benvento, 657 N.Y.S.2d 606 (N.Y. App. Div. 1997)(counsel ineffective in robbery case where, *inter alia*, the record revealed no defense strategy and counsel stated in opening that defendant would testify and he did not); Pitts v. Le Cureux, 156 F.3d 1231 (6th Cir. 1998)(unpublished opinion), 1998 WL 449691, at *3 (trial counsel ineffective where failure to provide notice of alibi defense precluded testimony from third parties regarding alibi and forced defendant to take the stand); Anderson v. Butler, 858 F.2d 16 (1st Cir. 1988)(counsel ineffective for failing to call expert psychiatric witnesses he said he would call in opening; nonproduction left jury with inference that witnesses would not testify as counsel had said they would and cast doubt on testimony of lay witnesses who testified about petitioner's mental state).

44.  Counsel's actions in forcing an unwilling client to testify, a consequence of their own error in promising the jury he would do so, and putting him on the stand without any sort of preparation, strategy or meaningful investigation undercut the entire defense in both the guilt and penalty phases.  This conduct  so undermined the proper functioning of the adversarial process that neither the guilt nor penalty phases can be relied on as having produced a just result.  But for this conduct, there is a reasonable probability that the results of the proceedings would have been different.

22

**3.**

**Inconsistent Defenses Presented in the Guilt Phase, Which Trial Counsel
Unnecessarily Revealed to the State Prior to Trial, Demonstrated that
Counsel Had No Real Defense Strategy and Served Only to Undermine the
Credibility of the Defense in Both the Guilt and Penalty Phases of the Trial,
in Violation of Mr. Roy's Rights Under Amendments V, VI, VIII, and
XIV of the United States Constitution (PCR Issue No. 3)**

45. The harm arising from counsel's error in forcing Mr. Roy to testify to an unbelievable,

otherwise unsupported alibi which they had not investigated was magnified by counsel's decision

to present an alternate *and inconsistent* defense that if Mr. Roy was not innocent because he was

elsewhere getting high, then he was too intoxicated to form the specific intent to commit the crimes.

Moreover, defense counsel needlessly revealed these defenses to the State in advance of the trial.

Counsel's failure to maintain the confidentiality of the defense "strategy" and their presentation of

inconsistent defenses prejudiced Mr. Roy's rights to effective assistance of counsel in both the guilt

and penalty phases.

46. Mr. Roy was arraigned on these charges on July 20,1993 and trial counsel was aware

that the state intended to seek the death penalty. On September 15, 1993, without seeking funding

in an *ex parte* fashion, as permitted under Louisiana law, so that the prosecution would not be

informed of every step that the defense was making in this case, trial counsel filed a Motion for

Funds to hire a psychologist to assist in the second phase of the trial and investigate mitigating

circumstances. R.44. By filing this motion in open court, rather than *ex parte* as is clearly

permissible, see State v. Touchet, 642 So.2d 1213 (La. 1994), and the appropriate, standard method

of practice in death penalty defense, trial counsel subjected the issues of Mr. Roy's defense strategy

and his mental status, to a public and contradictory proceeding involving the State. Trial counsel

clearly could have allowed the court to rule *ex parte* on his request for funds for a private

23

psychologist or other expert for the purpose of investigating Mr. Roy's mental status and developing mitigation and a defense in a confidential manner.[16]

47.  On December 7, 1993, defense counsel filed a Supplemental Answer to Motion of Discovery By The State, informing the State of their intention to use alibi as a defense.  Trial counsel alleged that "defendant was in a vacant 'crackhouse' in Cheneyville, Louisiana at the time of the crime." R. 80. The alibi rule provides that the defendant, upon request, must provide 'written notice of his intentions to offer a defense of alibi. Such notice . . . shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi." La.C.Crim.P. Art.727(A).

48.  Article 727(D), however, does not require notice that the *defendant* intends to testify to alibi.  The article permits the court to exclude testimony of undisclosed witnesses, but provides that "[t]his rule shall not limit the right of the defendant to testify in his own behalf."  Clearly the rule did not require the defense to inform the State of Mr. Roy's intention to testify at trial or to provide notice that he was somewhere else than at the crime scene, as Mr. Roy was the only witness the

---

[16] Moreover, rather than seeking funding *ex parte* to conduct an initial investigation of potential areas of mental health mitigation without the State's scrutiny, on September 20, 1993, defense counsel filed a request for a Sanity Commission to be appointed, allegedly based on several interviews with Mr. Roy, thereby subjecting the question of Mr. Roy's mental status to a public and contradictory hearing and, essentially, providing the State discovery to which it would otherwise not have been entitled. R.48-50.  A sanity commission should only have been sought after careful defense investigation of mental health defenses.  As a result of the formation of this sanity commission, Dr. Rhea provided a report and opinion that Mr. Roy was malingering, which was ultimately used against Mr. Roy in cross examination of defense expert Patrick Kent during the guilt phase. R. 1558-1562.  Defense counsel, moreover, allowed the determination of Mr. Roy's competency based only on the reports offered by the sanity commission doctors and without any testimony. See Minutes from 11/30/93. R.5.

24

defense contemplated calling. The defense had no alibi witnesses, other than Mr. Roy, to say that Mr. Roy was at the crackhouse at the time of the crime. Consequently, his attorneys were not required by article 727(D) to inform the State in advance of trial. This disclosure and action by trial counsel was both deficient and prejudicial.[17]  See, e.g., Blanco v. Singletary, 943 F.2d 1477, 1499-1500 (11th Cir. 1991)(counsel ineffective *inter alia* in disclosing confidential defense information to trial court).

49. The defense that was actually presented in the guilt phase of the trial was precisely the inconsistent and senseless dual defense of alibi (I wasn't there and didn't do it) and intoxication (I did it but must have been out of my mind). Not only were these defenses mutually exclusive, but the presentation of the unbelievable alibi evidence[18] undermined the credibility of intoxication both as a defense to guilt and as a mitigating factor at the punishment phase. In their guilt phase closing argument, defense counsel incoherently argued both defenses and actually denigrated these defenses:

---

[17] Defense counsel, moreover, gave the State advance notice that they intended to present contradictory defenses. On June 30, 1994, the defense filed a Motion to Give Notice of Intoxication, thereby informing the State of their intent to use intoxication as a defense as provided in La. R.S. 14:15. By alleging intoxication and alibi the defense put forth inconsistent theories of "I did not commit the crime because I was at a crack house and if I did commit the crime I did not have the requisite  mental state because I was intoxicated." In voir dire, the prosecutor commented on his unusual foreknowledge of the defense's case: "Let me talk to you real quickly about what the defense is going to be in this case. Normally the defense is not required to tell me what their defense is, but in this case they did. They have notified me that their intent and their defense is intoxication." R. 607.

[18] The defense did not present any evidence or suggest any theory for why Sally Richard and her two sons would identify Mr. Roy as the man who slit their throats and murdered Freddie Richard and Rosetta Silas. Without an explanation of why the surviving victims would falsely accuse Mr. Roy, the defense that Mr. Roy was not at the crime scene was obviously unbelievable.

25

Now, we have asserted the defense of intoxication. While the State has the burden beyond a reasonable doubt, our burden is by a preponderance of evidence. You, the jurors, are the sole determinors [sic] of facts that have proven what the evidence is.
* * *

But the prosecution has the burden and you should hold them to that burden of proof. You should consider the lack of evidence in this case. There is a total lack of evidence in this case, physical evidence . . . I'm talking about physical evidence a total lack of physical evidence to connect my client with this crime.

R. 1664-65.

Now, I don't like particularly the defense that I have in this case. I'd like to have another defense, or a better defense, but this defense is based on the facts. I would have liked to at least have had three or four other people in that crack house, but there wasn't three or four other people in that crack house and we didn't make that up. We went with the facts that we had.

R. 1668-69.

Larry Roy was drinking a sufficient amount of alcohol with his background and his history or years and years of substance abuse, that that triggered the .. uh .. wanting the desire for crack cocaine and between the crack cocaine and the alcohol, triggered the blackout.

Pat Kent, who took his history of substance abuse addition, told you about Larry Roy, told you about his substance abuse addiction and Pat Kent told you that that addiction was consistent with a blackout or a toxic psychosis. That's the reason that Larry Roy cannot remember. He went through a blackout period. That's the reason that I've asked you to consider the element of specific intent. I would have loved to have other defenses in this case, but what we put before you are the facts.

If Larry Roy was in that house that evening he doesn't remember it, because he was going through a blackout period, because he was sky high on crack cocaine. Other than testimony of Sally and the two kids what physical evidence do you have that he was there. Surely he would have left something. And you've got to remember . . . you've got to remember, Sally didn't say he was wearing gloves or anything so he wouldn't have left any mark of him being there.

Larry Roy was in a crack house. Larry Roy sky high on cocaine, and that's why Larry Roy can't tell you where he was that evening.

Our burden of proving by a preponderance, that's our burden, to prove by a

26

preponderance of the evidence that he was intoxicated and that that intoxication stopped him from forming a specific intent. I think we've carried that burden . . . .

R. 1670-71.

50. In <u>Ross v. Kemp</u>, 393 S.E.2d 244, 246 (Ga. 1990), the Georgia Supreme Court found ineffectiveness in a capital case where appointed counsel presented an insanity defense and retained counsel had the witness take the stand to present an alibi defense, concluding that "the presentation of a fractured defense, and the placement of petitioner on the stand with no preparation whatsoever in a trial in which his life hung in the balance is evidence of ineffectiveness 'so pervasive that a particularized inquiring into prejudice would be "unguided speculation."'" (citation omitted). See also <u>Bland v. California Dept. Of Corrections</u>, 20 F.3d 1469, 1479 (9th Cir. 1994)(finding that trial counsel was ineffective in presenting inconsistent defenses and observing that "[i]nconsistencies between the theories presented by the defense and prosecution are a given. However, when those inconsistencies also arise from the defense's own camp, 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"); <u>cf.</u> <u>Jackson v. Shanks</u>, 143 F.3d 1313, 1320 (10th Cir. 1998)(trial counsel not ineffective in failing to pursue diminished capacity/intoxication defense as "trial counsel's defense was that Mr. Jackson was not present and did not participate in the robbery. Pursuing a diminished capacity defense would have been inconsistent with Mr. Jackson's complete denial of involvement in the robbery."); <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 630 (9th Cir. 1997)(counsel not ineffective in failing to investigate and develop intoxication defense, as "[s]uch a line of defense would have been inconsistent with the theory of defense advanced at trial.").

51. The presentation of conflicting defenses and counsel's illogical argument thereon

27

poisoned both the guilt and penalty phases. But for counsel's conduct, there is a reasonable probability that the results of the trial would have been different.

### 4.
### Trial Counsel's Failed to Protect Mr. Roy's Right to Trial
### by a Jury Selected Without the Taint of Racial Bias (PCR Issue No. 7)

A.    Counsel failed to move to quash the petit jury venire from which Mr. Roy's jury was drawn.

52. Two hundred twenty-five (225) people were listed on the petit jury venire for Mr. Roy's trial on July 12, 1994. At the conclusion of the initial purge, the bailiff notified the trial court and the attorneys in chambers that 68 members, or 30%, of the venire had failed to appear without excuse. R. 131-132, 1923-1929. Trial counsel expressed concern about the absence of the venirepersons, and the trial court indicated that it would look into the reasons for their absence. R. 1923-1929. Apparently, no effort was ever made to determine whether the absent persons had been served with a summons for jury duty and, if so, why they did not appear. No effort was ever made to determine the race of the 68 venirepersons who failed to appear.

53. The remaining venire of 157 persons was then examined, outside Mr. Roy's presence, for qualifications and hardship excuses. R. 14. Fifty-four persons were released during this process at which Mr. Roy was not present. No effort was made to determine or record the race of persons excused during purging of the jury.[19]

54. At the conclusion of the calling and initial examination of the venire, all conducted outside Mr. Roy's presence and without any waiver of his right to be present, 96 venirepersons

---

[19] Trial counsels' files contain questionnaires complete by 13 venirepersons who were excused prior to questioning. Of those 13, 7 were white and 6 were black, as reflected on their questionnaires. The race of the other 41 venirepersons excused during purging is unknown.

remained for further examination.[20]  Of these 96, the records of trial counsel reveal that 19 were

black.  The 96 remaining prospective jurors were then divided into 8 panels, with 13 in each of the

first 7 panels and 5 in the last panel.

55.  Only at this point was Mr. Roy allowed his right to be present during the critical stage

of voir dire.[21]  When voir dire began and Panel 1 was called into the jury box, Mr. Roy saw one

black person among thirteen.  Panel 2 was sitting in the audience, and there was likewise one black

person out of twelve.[22]  Despite the first two panels having only 8% black members, trial counsel

failed to move to quash the petit jury venire prior to commencing voir dire.  The records of the clerk

of court of Rapides Parish show that blacks made up 25% of the jury pool from which petit juries

are drawn.  Nine (9) of the jury members were selected from these first two panels, with both black

persons, Gloria Sollibellas and Deidra McNeal, being excused at the request of the State.  R. 360-

---

[20] Seven venirepersons are wholly unaccounted for.  Neither the trial attorney records nor the records of the court reflect why 7 persons were not questioned as potential jurors, nor is the race or identity of those persons reflected in any available records.

[21] Counsel's failure to ensure Mr. Roy's presence during the calling and initial examination of the petit jury venire from which his jury was drawn, violated his fundamental right to be present at all critical states of the proceeding.  See Snyder v. Massachusetts, 291 U.S. 97, 106-108 (1934); United States v. Tipton, 90 F.3d 861, 872 (4th Cir. 1996); United States v. Gordon, 829 F.2d 119, 124 (D.C. Cir. 1987; see also La.C.Crim.P. Art. 831(B)(3)(providing that a criminal defendant charged with a felony shall be present "[a]t the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror; ...").  The record does not reflect that the presence of Mr. Roy was waived during the calling and initial examination of the petit jury venire from which his jury would be drawn.  Trial counsel was ineffective in failing to object to Mr. Roy's absence during this critical stage of the proceedings.  Appellate counsel was ineffective in failing to raise the ineffectiveness of trial counsel apparent on the face of the record.

[22] Venireperson Mark Glaze was initially placed on Panel 2, but was excused due to lack of qualification.  R. 416.

362, 373, 405, 441.

56. The remaining three (3) members of the jury were selected from Panel 3. Panel 3 had two black persons out of thirteen, Kenna Silas and Albert Cooper Jr., both of whom were peremptorily struck by the State. R. 801, 802. The two alternates were chosen from Panel 4. Panel 4 had five black persons out of thirteen. Only one of these was reached prior to completion of alternate selection, and he, Barrie Vinson, was also peremptorily struck by the State. R. 990.

57. Mr. Roy's death qualified jury was selected after examination and selection of 45 people, only five of whom, or 11%, were black, in a parish where blacks make up 25% of the jury pool. The twelve jurors and two alternates selected were all white. The *all-white* jury selected from this unconstitutional venire ultimately convicted Mr. Roy, *who is black*, of two counts of first degree murder and sentenced him to death on each of those two counts. The racial composition of the venire in this case provided grounds to challenge the venire on the basis of racial discrimination in the manner in which the venire and panels were selected. Accordingly, counsel should have moved to quash the venire. See Smith v. Texas, 311 U.S. 128, 130 (1940)(exclusion of a racial group from jury service is "at war with our basic concepts of a democratic society and a representative government"). "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." Taylor v. Louisiana, 419 U.S. 522, 528 (1972). While a defendant is not entitled to a jury of any particular composition, "the jury wheels, pools of names, *panels*, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id. at 538 (emphasis added). The lack of a petit jury venire constituting a fair cross section of the community, and particularly in the first 4 panels of that venire from which Mr. Roy's

30

jury was actually chosen, and the failure of his trial attorneys to move to quash the petit jury venire and preserve the record, and the failure of the trial court to secure the presence of all persons summoned for jury duty, all denied Mr. Roy his constitutional rights guaranteed under Amendments VI, VIII, and XIV of the United States Constitution. Taylor v. Louisiana, 419 U.S. 522 (1975); Peters v. Kiff, 407 U.S. 493 (1972). Trial counsel's failure to move to quash, to adequately and timely object, and to preserve the record for appeal and review was ineffective, especially in light of Mr. Roy's repeated complaints to counsel about the absence of black persons on the venire. R. 20, 1099; Exhibit "O" hereto (sealed *ex parte* conference with court conducted 7/16/94).

2.      Counsel failed to challenge the State's exercise of peremptory challenges to remove all black venirepersons under *Batson v. Kentucky.*

58. The first and only two black persons on Panels 1 and 2 of the venire, Gloria Sollibellas and Deidra McNeal, were struck for cause by the trial court at the request of the State. R. 360-362, 373, 405, 441. The next two black persons on Panel 3, Kenna Silas and Albert Cooper Jr., were peremptorily struck by the State. R. 801, 802. Only one black person on Panel 4 was reached for challenges prior to completion of the jury, and he, Barrie Vinson, was also peremptorily struck by the State. R. 990. Despite the State challenging *every* black venireperson, trial counsel failed to challenge the prosecutor's discriminatory use of peremptory challenges under Batson v. Kentucky, 476 U.S. 79 (1986).

59. Despite the lack of a Batson challenge by Mr. Roy's trial attorneys, on the second day of testimony during the guilt phase of the trial, the prosecutor requested to place on the record his reasons for peremptorily challenging three minority members of the panel. R. 1094-1098. It was, of course, far too late for the defense attorneys to argue that the State actually had race-related

31

reasons for excusing blacks from the jury.  Further, at the time this Batson *explanation* was

proffered by the State, trial was in progress and the State was taking testimony from its third

witness.

60.  The exclusion by the State of black persons from the jury serving at Mr. Roy's trial, and

the systematic exclusion of black persons from criminal juries generally, denied Mr. Roy and the

excluded jurors their rights to equal protection of the law under Amendment XIV of the United

States Constitution.  The failure of trial counsel to properly and timely object and preserve the

record for appeal and review denied Mr. Roy his rights guaranteed under the United States

Constitution, Amendments VI, VIII, and XIV.[23]  See, e.g., Gov't of Virgin Islands v. Forte, 865 F.2d

59, 63 (3rd Cir. 1989)(defense counsel's failure to object to prosecutor's use of peremptory

challenges to excuse white prospective jurors in prosecution of white male for rape of black female

was unreasonable under prevailing professional standards--Batson was pending at the time--and

prejudiced defendant's direct appeal since Batson error had not been preserved, noting that making

a Batson objection would have required little effort and would not have been a reprehensible or

unprofessional act.  * * * [T]he Supreme Court has long held that a state denies equal protection of

the laws when a black is put on trial before a jury from which blacks are purposefully excluded.");

see also Triplett v. State, 666 So.2d 1356 (Miss. 1995)(counsel ineffective for, *inter alia*, failing to

make Batson challenge when county was 41% black and no blacks seated); State v. Williams, 679

So.2d 275 (Ala. Crim. App. 1996)(court denied state's petition for writ of mandamus from trial

_____

[23]  As set forth *infra* at ¶ 92, the failure of appellate counsel to raise and argue on appeal
the ineffectiveness of trial counsel apparent on the face of the record denied Mr. Roy his rights
guaranteed under the United States Constitution, Amendments VI, VIII, and XIV.

court's order granting a new trial because counsel was ineffective in failing to make Batson objection even though a *prima facie* case of racial discrimination in jury selection existed); State v. Robertson, 630 N.E.2d 422 (Ohio Ct. App. 1993), appeal denied, 628 N.E.2d 1390 (Ohio 1994)(counsel ineffective for failing to make a timely and specific Batson motion when state challenged three African-Americans from jury panel leaving only one African-American as an alternate); State v. Belcher, 623 N.E.2d 582 (Ohio Ct. App.), appeal denied, 622 N.E.2d 650 (Ohio 1993)(counsel ineffective for failing to make a timely Batson motion when state removed all three African-Americans from venire); Ex Parte Yelder, 575 So.2d 137 (Ala. 1991)(counsel ineffective for failing to make Batson objection when the state used peremptories to strike 17 of 18 black jurors; prejudice presumed where a *prima facie* case of purposeful discrimination exists and trial counsel fails to make Batson objection); see also Watkins v. State, 632 So.2d 555 (Ala. Crim. App. 1992), cert. denied, 114 S.Ct. 2153 (1994)(appellate counsel ineffective for failing to supplement record to establish Batson claim; properly supplemented, the record would have shown that the state used 12 of its 13 peremptory challenges to remove 12 of 13 blacks from the jury, the court would have granted a Batson hearing).

33

**5.**

**Trial Counsel's Derogatory and Prejudicial Statements to the Venire
Revealed Their Own Racist Feelings, Insulted the Venire and Misinformed the
Venire Regarding Critical Matters, All to Mr. Roy's Detriment (PCR Issue No. 7)**

61. Counsel's failure to ensure that racism did not taint the jury selection process may have

been attributable to their own racial biases.  In an ill-considered attempt to inquire about the venire's

views on race, trial counsel unwittingly disclosed to the venire their own prejudicial attitudes toward

their client.  During voir dire, trial counsel said to Panels 1 and 2:

> Now, I'm not ... uh ... it is obvious here that my client is black, so I am going
> to ask you some questions to probe your feelings on racial bias.  I want you to know
> that it's my duty to do that but it is also necessary that I probe that to make sure that
> you folks understand that there can be no bias with regard to race, so if you'll bear
> with me I'll try and go through this, but I want you to be as frank with me as
> possible.  Now, does ... uh ... anybody that has any ... uh ... feelings about ... strong
> feelings against integration?
>
> [Juror asks what he means.]
>
> Well, we know that integration is taking place in our schools.  We know
> *they're equal* ... blacks are equal to whites with regard to ... uh ... jobs.  Uh ... we
> know that ... uh ... it's the law of the land that ... uh ... *they* should be a part of *our*
> society and integrated into the society.  Does anybody feel that this should not be the
> law of the land?

R. 342-343.  Trial counsel then stated to Panels 3 and 4:

> Now, one other area I think we've obviously got to cover ... uh ... is that my
> client is an African American.  It's obvious that he is an African American and I
> want to ask a general question of you, is the fact that my client is an African
> American, would there be any inference of guilt just because my client does not
> happen to be caucasian or that he is an African American?  I don't see anybody that
> is saying yes, and so that I ... and it's clear to me that all of you agree that you can
> give him every benefit of a doubt.  And the fact of his race doesn't have anything to
> do with this case, is that correct?  Anybody doesn't agree with that?
>
> Have any of you ... one more question in this area and I think I'll be through
> ... *if any of you feel threatened ...uh ... because of African Americans in your*
> *presence or around you?*  Then you certainly shouldn't feel ... uh ... that to be the

34

case with my client or in this courtroom, and I'll take your word for that, and everybody is indicating that there is no ... uh ... they don't feel threatened simply because a person is black.

R. 730 - 731. Finally, he stated to Panel 4:

> All right.  One last area that I am going to touch on, I think I . . . I want to be sure that you understand.  My client is an African American.  *The fact that he is an African American doesn't make you feel threatened in any way, does it?*  Is there anybody that it does?  And the fact that he is an African American ...uh... does it give him any less protections under the law than it would for any other citizen?  Does anybody believe that it would give him less protection?  I take it since nobody has raised their hand that you can give him those protections.  The same protections you give any citizen.

R. 937.  Despite making these inflammatory statements, trial counsel never made any attempt to actually obtain an answer from any venireperson to any of these questions.  There is no coherent, logical explanation for why trial counsel for Mr. Roy, who is black, would make these statements during voir dire.  See, e.g., Miller v. State, 728 S.W.2d 133 (Tex. Ct. App. 1987)(counsel ineffective for making inflammatory irrelevant racist remarks).  This compounded the already difficult problem of a jury venire lacking in a representative numbers of black persons.

62.  Not satisfied with insulting the venire and Mr. Roy in the arena of race, trial counsel throughout voir dire made statements that were derogatory, insulting, and just plain wrong, all to Mr. Roy's detriment.  Trial counsel told Panels 1 and 2 that it was inappropriate for them to disclose any discomfort with the law that would apply in the case.  "[Y]ou've seen where two of your number have determined and stated that they could not follow the law, and because of our scheme of protection ... uh ... of the accused those two had to be removed from the jury, because they have, in effect, said, no we couldn't follow the law as the Judge gave it to us.  You must follow the law." R. 326.  While this might be very effective voir dire for a prosecutor, it is wholly ineffective for a

35

defense attorney attempting to explore the ingrained views of the venire in order to intelligently exercise the use of a precious twelve peremptory challenges.  Trial counsel, later in voir dire, suggested that the venire was simply not very educated.  "What the laymen, that is you, that is not schooled in the law considers a technicality we, that are schooled in the law, most times understand, not all of the time, but most of the time, understand it grows out of a constitutional law of principal."  R. 502.  To a potential juror whose cousin was a State Trooper, trial counsel said, "you probably also heard some derogatory things about police officers, from your cousin," R. 339; and to a young potential juror whose father worked for a crime lab, counsel stated, "I got the impression from listening to you that ... uh ... as it might be with a ... uh ... young adult ...uh ... he discusses, if at all, maybe some drug charges because that is something that young adults are somewhat interested in."  R. 507.

63.  Incredibly, trial counsel instructed the venire that at no point in the proceedings should they consider sympathy for the defendant. R. 323, 709, 912.  Counsel told them specifically that they were to have *"no sympathy for Larry Roy, if you should determine he did it."* R. 912.  Not only was this diametrically adverse to Mr. Roy's interests, but it was also a misstatement of the law.  While sympathy may properly play no part in the determination of guilt or innocence, sympathy is absolutely a basis upon which the jury could vote to impose life sentences rather than the two death penalties imposed upon Mr. Roy.  Indeed, the primary role of counsel representing a capital defendant in the penalty phase is to present mitigating evidence in an attempt to engender a sympathetic response in jurors sufficient to convince one or more of them to spare the defendant's life.

64.  Throughout voir dire, trial counsel made derogatory, insulting, and misinformed

comments, all to Mr. Roy's detriment. None of the statements set out above had any design to elicit from the venire their thoughts and beliefs, so that counsel could intelligently exercise peremptory challenges. These rambling, incoherent statements of trial counsel deprived Mr. Roy of his constitutional rights guaranteed under the United States Constitution, Amendments VI, VIII, and XIV.

**6.**

**Counsel's Unskilled Conduct of Voir Dire Deprived Mr. Roy of His Right to Trial by a Fair and Impartial Jury (PCR Issue No. 7)**

65.    Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury by enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges. See Mu'Min v. Virginia, 500 U.S. 415, 431 (1991); United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996)("[t]he principal purpose of *voir dire* is to probe each prospective juror's state of mind to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice.")(quoting Scott v. Lawrence, 36 F.3d 871, 874 (9th Cir. 1994)); see also Milton v. Procunier, 744 F.2d 1091, 1095-96 (5th Cir. 1984)("[o]ne purpose of *voir dire* is to gain information important to the exercise of peremptory challenges. Yet, and perhaps nearly always, another purpose is to provide a spring-board for the advocate."), cert. denied, 471 U.S. 1030 (1985). Counsel's manner of conducting voir dire in this case failed to take advantage of this essential process of selecting an impartial and fair jury.

A.    Trial counsel failed to challenge for cause jurors who were unable to follow the law.

66.    The statements of a number of jurors clearly indicated the existence of potential grounds for challenge for cause by the defense.

- Venireperson Dennis L. Ray testified, with regard to his ability to consider both a life

37

sentence and the death penalty, "if it was cold blooded murder I would have to vote on the death penalty," R. 385, and with regard to mitigation, "he's responsible for his conduct." R. 386. Trial counsel failed to challenge the potential juror for cause, despite his having clearly stated that he would, if the defendant was found guilty of the charged crimes, automatically impose the death penalty and refuse to consider mitigating evidence. The defense squandered its first peremptory challenge to remove Mr. Ray from the jury. R. 406.

■ Venireperson Jerry Ingram testified that he had not formed an opinion from the publicity he read, but he had formed an opinion now that "our system, the way it does operate, there had to be some cause to arrest Mr. Roy as far as the allegations that were made against him." R. 375. Trial counsel failed to ask any questions tailored to show that Mr. Ingram could not honor the presumption of innocence because of Mr. Roy's arrest. Trial counsel failed to challenge the potential juror for cause based on his apparent believe that Mr. Roy was guilty, which shifted the burden of proof to the defense. Jerry Ingram served on Mr. Roy's jury.

■ Venireperson Rayford Sherrill testified, with regard to intoxication both as an affirmative defense and as a mitigating circumstance, "I can't quite agree that a person can't understand before he does that he's not ... to think that he may not be responsible for what he does after he gets that way. ... I have some doubts," R. 715, and "whatever [drug] you take, any person takes knowingly that it's going to cause a different effect than normal, he's responsible for it for whatever he does or whatever it causes." R. 613. Trial counsel made no effort to ask Mr. Sherrill questions to illuminate or confirm the opinions he expressed. In fact, trial counsel told Mr. Sherrill that all Mr. Sherrill had to say was that he would follow the judge's instructions. R. 715-16. Trial counsel failed to challenge the potential juror for cause based on his inability to follow the law of voluntary

intoxication as a defense and as a mitigating circumstance. The defense exercised its tenth peremptory challenge to remove Mr. Sherrill from the jury. R. 801.

67. The failure to seek the for cause removal of jurors who by virtue of their opinions were not qualified to hear this case was ineffective. See, e.g., Johnson v. Armontrout, 961 F.2d 648, 754-756 (8th Cir. 1992)(trial counsel ineffective for failing to seek the for-cause removal of jurors who had sat on co-defendant's case and failing to question any of these jurors about bias; prejudice presumed where biased jurors sat on jury); Smith v. Gearinger, 888 F.2d 1334, 1338 (11th Cir. 1989)(if "trial counsel knew or had reason to know that the jury was composed in part of persons disqualifiable under Georgia law . . . counsel's performance at the voir dire would fall outside the range of professionally competent assistance."); Presley v. State, 750 S.W.2d 602 (Mo. Ct. App.), cert. denied, 488 U.S. 975 (1988)(counsel ineffective for failing to challenge for cause a venireman who admitted bias against defendant; prejudice presumed); State v. Terry, 601 So.2d 161 (Ala. Crim. App. 1992)(counsel ineffective for failing to challenge for cause or strike juror who stated during voir dire that she would tend to side with the state in considering evidence).

B.    Trial counsel failed to exercise any intelligent, informed, cohesive strategy in the exercise of peremptory challenges.

68. Trial counsel challenged for cause prospective juror Judith Hempstead. R. 407, 413. Ms. Hempstead was a 38-year-old white female, with two teenage children, who said without doubt that she would sentence the defendant to death if he were convicted of the charged crimes of two murder during which three additional people were harmed. R. 393, 405. The trial court, in error, denied the cause challenge. R. 407, 413. See infra at ¶¶ 174-82 Inexplicably, trial counsel failed to exercise a peremptory challenge against Ms. Hempstead, when it had at that time used only one

39

peremptory challenge, and allowed this automatic death penalty juror to serve on Mr. Roy's jury. Similarly, trial counsel failed to exercise a peremptory challenge against Mr. Ingram as set out *supra*. Mr. Ingram believed Mr. Roy was guilty because he had been arrested. Trial counsel failed to strike this juror even though at that time the defense had only used two peremptory challenges. The defense allowed this juror to serve on Mr. Roy's jury even though the responses of the juror clearly indicated that he would impermissibly shift the burden of proof to the defense.

69. Trial counsel wasted four peremptory challenges that could have been used to exclude jurors who had firm opinions that they would impose the death penalty and would not consider voluntary intoxication as either an affirmative defense or a mitigating circumstance. The trial attorneys wasted their sixth peremptory to strike Ms. Oberia Bounds, a 63-year-old white female who did not give a single objectionable answer throughout voir dire or on her juror questionnaire. R. 558. The defense exercised their seventh peremptory to strike Ms. Darlene Bonner, a 34-year-old white female LPN who likewise did not give a single objectionable answer during voir dire examination or on her juror questionnaire. R. 558. Helene Reynolds, a 65-year-old white female, was struck with the eighth peremptory of the defense. R. 801. Ms. Reynolds testified that she could be the lone holdout for life and that she would certainly consider intoxication as a mitigating circumstance. R. 604. Finally, trial counsel used its ninth peremptory to strike Dorothy Knapp, a 53-year-old white female who also did not give a single objectionable answer during examination or on her juror questionnaire. R. 801.

C.    Trial counsel failed to effectively attempt rehabilitation of jurors
      challenged for cause by the State.

70. A number of potential jurors initially expressed some reservations about the death

penalty in questioning by the State.  Trial counsel made no serious effort to questions the jurors to ascertain their true feelings about the death penalty, despite the fact that such questioning would have revealed that the juror was eligible to serve.  Additionally, one black juror was struck following a cause challenge by the State that she was confused.  Although trial counsel objected to the cause challenge, again the defense attorneys made no serious effort to alter their form of questioning and to explain their questions so the trial court could see that this juror in fact understood the proceedings.

71.  The Louisiana Supreme Court has emphasized the importance of allowing a capital defendant to seek to rehabilitate prospective jurors whose initial responses may subject them to a challenge for cause by the State.  See, e.g., State v. Sullivan, 596 So.2d 177, 186 (La. 1992), rev'd on other grounds, 508 U.S. 275 (1993)("[w]hen a juror is challenged for cause because of his answers concerning the death penalty, defense counsel must be given the opportunity to traverse the juror for rehabilitation.")(citing David, supra, 425 So.2d at 1249)); State v. Hall, 616 So.2d 664, 669, n.1 (La. 1993)("Clearly, when a juror is challenged for cause because of his answers concerning the death penalty, defense counsel must be given the opportunity to traverse the juror for rehabilitation.").  Trial counsel's failure to exercise this right resulted in the improper exclusion of jurors who were properly able to sit on this case.  See Morgan v. Illinois, 504 U.S. 719 (1992); Witherspoon v. Illinois, 391 U.S. 510 (1968).

72.  Trial counsel's failure to seek the removal for cause of jurors who were clearly unable to follow the law, their squandering of peremptory challenges on jurors who should have been removed for cause or who should have been retained on the jury, while allowing objectionable jurors to sit, and failure to seek to rehabilitate jurors whose initial responses led to their removal by the

State's successful cause challenges all reveal that defense counsel had no reasonable, informed or intelligent approach to this most critical part of the trial. As a result of trial counsel's failing, Mr. Roy was convicted and sentenced to death by a jury that included members who were not qualified to sit and that excluded prospective jurors who should not have been removed, in violation of his rights under Amendments VI, VIII and XIV of the United States Constitution.

**7.**

**Trial Counsel Were Ineffective in Failing to Cross-examine Witnesses or to Object to Misstatements of the Prosecutor Regarding Physical Evidence (PCR Issue No. 10)**

73. Trial counsel failed to subject the State's case to adversarial testing and permitted the prosecutor, without objection, to make material misstatements of fact regarding the physical evidence — or its lack — introduced at trial.

74. The State produced to the trial attorneys, pursuant to the Joint Stipulation in this case, copies of documents listing the physical evidence obtained in the case and the results of testing performed on those items.

75. Defense counsel never questioned any of the witnesses regarding the fact that shoe print evidence found at the crime scene did not match the footwear that Mr. Roy was wearing when he was arrested. According to the Supplementary Offense Report of Det. A. T. Ribaudo, dated 5-6-93, found at the scene was "a partial shoe print in blood located between two carpets in front of the tub and bathroom door. Photographs were obtained of these areas." According to the Rapides Parish Sheriff's Department Evidential or Acquired Property Record, dated 5-5-93, and signed by Det. John Fagley, the State seized from the defendant a pair of black "FILA" tennis shoes. Both of these items were transmitted to the North Louisiana Criminalistics Laboratory, according to the Certified

42

Report signed by Ray Herd and showing a facsimile date at the top of July 5, 1994. According to that same report, the tennis shoes (Item 32) did not match the photographs of the shoe print (Item 33). Trial counsel failed to elicit testimony from any of the law enforcement or crime lab witnesses to establish the Larry Roy's shoe prints did not match the shoe print recovered from the scene. Trial counsel's failure to elicit this testimony denied Mr. Roy his constitutional rights to due process, to confront and cross-examine witnesses against him, to counsel, to a fair trial, to present a defense, to be free from cruel and unusual punishment, and to full review on appeal, all as guaranteed by the United States Constitution, Amendments VI, VIII, and XIV.

76. Trial counsel did not question any of the witnesses regarding a purse and bill folds found at the crime scene and seized as evidence, even though Sally Richard testified that her purse was not at the house when she returned to it later. According to a Rapides Parish Sheriff's Office form, the State seized from the crime scene a black purse, a red billfold, and a red and black woman's billfold, all of which were returned to David Morris Silas by Det. Ribaudo on May 5, 1993. At trial, witness Michael Hanks identified a wallet shown in *State's Exhibit 32* as having been located on top of the dresser in the bedroom where Freddie Richard was found. R. 1072. Mr. Hanks then identified a purse shown in *State's Exhibit 38* as having been found in the rear bedroom — *i.e.* Ms. Richard's bedroom, see R. 1070 — on the bed. R. 1082. At trial, Sally Richard was asked by the State and testified that her purse was not at her house when she went back for it later on. R. 1238. Trial counsel failed to question Sally Richard to establish that the unidentified woman's billfold seized by the State was hers.[24] Trial counsel's failure to elicit this testimony denied Mr. Roy his

---

[24] In the penalty phase, while cross-examining defense expert Craig Forsyth, the prosecutor remarked "[w]e know that Sally's purse was missing which had Seven Hundred

constitutional rights to due process, to confront and cross-examine witnesses against him, to counsel, to a fair trial, to present a defense, to be free from cruel and unusual punishment, and to full review on appeal, all as guaranteed by the United States Constitution, Amendments VI, VIII, and XIV.

77.   Trial counsel did not object to the prosecutor's argument that no prints were tested because Mr. Roy had lived in the house previously, even though State witnesses clearly testified that fingerprint evidence found at the house did not match Mr. Roy's prints.  The July 5, 1994 Certified Report from the North Louisiana Criminalistics Laboratory, signed by Ray Herd, also shows that the crime lab received a set of reference fingerprints and palm print cards from Larry Roy.  That Report indicates that "one partial latent print was determined to be present on the telephone receiver in Item 5.  The partial latent print present in Item 5 was determined not to match the reference prints from Larry Roy in Item 1."  The Report also states that the lab attempted to detect latent prints on Items 2, 3, 4, and 5, which were 4 pieces of phone cord and the telephone base with a phone cord attached.

78.   During the State's questioning of witness Michael Hanks, the following exchange occurred:

| | |
|---|---|
| **STATE:** | Did you know that sometime in the past Larry Roy had been in that house? |
| **HANKS:** | Yes, I did. |
| **STATE:** | If you were to take fingerprints would you expect to find Larry Roy's fingerprints in that house? |
| **HANKS:** | Yes, I would. |

_____

Dollars in it."  R. 1873.

R. 1121.  Then during the cross-examination by the defense of witness Tom Ribaudo, the following took place:

> **DEFENSE:**  Did you run the fingerprints on ... run these cords for fingerprints?
>
> **RIBAUDO:**  I requested that they be done.
>
> **DEFENSE:**  Do you know what the outcome of that was?
>
> **RIBAUDO:**  I don't believe they found any.
>
> **DEFENSE:**  Didn't find any.
>
> **RIBAUDO:**  To my recollection.
>
> **DEFENSE:**  On the entire ... any of the cords?
>
> **RIBAUDO:**  That's correct, sir.
>
> **DEFENSE:**  The ... did they also run the phone itself or the base to the phone for fingerprints.
>
> **RIBAUDO:**  It was requested.
>
> **DEFENSE:**  To your knowledge were any fingerprints found on the phone?
>
> **RIBAUDO:**  [NO RESPONSE RECORDED]
>
> **DEFENSE:**  Or the base?
>
> **RIBAUDO:**  Yes, sir.
>
> **DEFENSE:**  Did you find any of Larry Roy's fingerprints on the phone or the base?
>
> **RIBAUDO:**  No, sir.

R. 1152.  Despite this clear testimony by the State's own witnesses that physical evidence was tested for fingerprints, the State argued that this did not happen.  In the State's rebuttal argument in the guilt phase, prosecutor Cliff Strider argued: "Let's suppose that the fingerprints were searched for,

and they weren't searched for, the crime scene people said they didn't do the fingerprint thing, but let's suppose they were." R. 1674. The trial attorneys failed to object to this misstatement of the evidence in the case. This blatant misstatement of the evidence by the prosecutor and trial counsel's failure to object denied Mr. Roy his constitutional rights to due process, to confront and cross-examine witnesses against him, to counsel, to a fair trial, to present a defense, to be free from cruel and unusual punishment, and to full review on appeal, all as guaranteed by the United States Constitution, Amendments VI, VIII, and XIV.

**8.**

**Trial counsel's Failure to Adequately Investigate and Present Mitigating Evidence in the Penalty Phase Denied Mr. Roy the Effective Assistance of Counsel and Rendered his Death Sentences Unreliable, All in Violation of Amendments VI, VIII and XIV of the United States Constitution (PCR Issue No. 14)**

79. In the penalty phase, trial counsel presented an extremely weak and superficial case in mitigation. The defense initially called Freddie Richard's mother to testify that she did not want Mr. Roy to be sentenced to death. A few witnesses were called to testify generally that during the time they had known Mr. Roy, they had no trouble with him and that he was a nice man. Mr. Roy's former girlfriend, Deborah Simmons, testified generally that he was a good father to their son and her other children, and that she had kicked him out of the house because of his crack cocaine use. Mr. Roy's father, Tommy Roy, testified that he had divorced Mr. Roy's mother because she was an alcoholic; that he had gotten custody of the children, although Mr. Roy had gone to live with his mother in California at some point; that he had fifteen children with several women; and that he had worked a lot when Mr. Roy was young and throughout his life.[25] Vernon Creecy, the warden of

---

[25] None of these lay witnesses were prepared to testify and provided testimony so lacking in meaningful detail that it had little mitigating value.

Rapides Parish Detention Center, indicated generally that he was not aware that Mr. Roy had caused any problems while incarcerated in the parish prison, but could not say that he had adjusted well to prison life because "is it possible to adjust to prison life?  I can't say, I can't answer that question." R. 1774.  The testimony of Burt Foster, a criminal justice professor, who was called to explain the strictures of a life sentence at Angola Prison and testified that Mr. Roy would likely adjust well to that structured environment, was twisted in cross examination into a discourse on the cushiness of life at Angola, with its 40-hour work week; recreational, athletic and educational opportunities; cable television; fine cuisine and picnic areas for family visits.[26]  The final witness called, Craig Forsyth, a sociology and criminology professor with certification in drug counseling, gave a rambling assessment of the effects of Mr. Roy's poor upbringing and drug use on his life.  On cross examination, the prosecutor got this witness to state that a person with Mr. Roy's supposed personality traits would be called a "sociopath."  R. 1879.

80.  The utter inadequacies of the defense case in mitigation crystalized in the pathetic closing argument given by counsel in the penalty phase.  The entire text of the closing argument, a total of sixteen lines of the transcript, vaguely noted that Mr. Roy was a sick man at the time of the crime, that some people loved him, that he had a drug problem and little or no criminal history; it provided the jury with no basis to consider imposing a sentence less than death:

BY MR. ARMITAGE:

May it please the court.  The choice put before you is simple.  The decision

---

[26]  As the prosecutor urged, "[n]ow this is what you're telling me that, Mr. Roy would have to look forward to if he gets life imprisonment. . . .  Forty hour a week job, free food and free clothes."  R. 1818.  Appellate counsel's failure to raise on appeal the prosecutor's improper "prison life" argument, was ineffective..

> is hard. Do you punish the act, a brutal act that I cannot change and you cannot change and we cannot condone, or do you punish the man. The man you yet, you met yesterday was a sick, emotionally abandoned human being on May the third, 1993. You know that. A man who some people love and some people who don't want to die. He has little or no criminal record. He had a significant drug problem. That man danced with the devil. But Larry Roy is not the devil. Life imprisonment is an issue. And Angola is an issue because your choice is death or life imprisonment without benefit of probation, parole or suspension of sentence. Life without benefit of probation, parole or suspension of sentence is punishment for that man. You know the law. You must each individually decide on that choice and that's a decision that each of you will live with, not just tomorrow, but five years from now and for the rest of your life. No one envies you, and we will pray for you.

R. 1891-92.

81. The inadequate case in mitigation presented in the penalty phase was a direct result of trial counsel's failure to investigate mitigation in any meaningful sense. They did not speak to Mr. Roy's numerous family members (including his mother) who lived in California, even though they would have been the source of vital information regarding Mr. Roy's substance abuse, the sole defense raised in the penalty phase, as well as Mr. Roy's character and background. Counsel did not speak prior to trial with the mother of Mr. Roy's child, who resided in Rapides Parish, or to his son, who was ten years old at the time of the trial. They did not speak to Mr. Roy's friends, fellow church members, and past employers who were located in Rapides and surrounding parishes who could have provided information regarding his character and lack of propensity for violence. They did not investigate the sexual abuse suffered by Mr. Roy as a child and mentioned cursorily by Professor Forsyth in his testimony.

82. "Generally, any lawyer who tries capital murder cases knows that he or she had a duty to investigate the client's life history and emotional and psychological make-up through an inquiry into the client's childhood, upbringing, education, relationship, friendships, formative and traumatic experiences,

48

personal psychology, and present feelings. . . . Since the acquisition of mitigating evidence is

in any capital case, preparation for the sentencing phase must begin when counsel is first appointed."

Valdez v. Johnson, 93 F. Supp. 2d 769, 781 (S.D. Tex. 1999)(internal quotation marks omitted, citation

omitted).

83.  Trial counsel's failure to investigate Mr. Roy's family and social background resulted

in a weak and unconvincing presentation in the penalty phase only vaguely alluding to critical

evidence that Mr. Roy's childhood was marred by deprivation and neglect, but that he nonetheless

had a number of positive characteristics.  Such evidence is of vital importance in presenting a case

for life.  "Mitigating evidence concerning a particular defendant's character or background plays

a constitutionally important role in producing an individualized sentencing determination that the

death penalty is appropriate in any given case."  Moore v. Johhson, 194 F.3d 586, 612 (5th Cir.

1999).  As Justice O'Connor has explained, "evidence about the defendant's background is relevant

because of the belief, long held by this society, that defendants who commit criminal acts that are

attributable to a disadvantaged background, may be less culpable than defendants who have no such

excuse."  Penry v. Lynaugh, 492 U.S. 302, 319 (1989)(citation omitted).

84.  Likewise, evidence of a defendant's good qualities, which reveal a human dimension

of his character typically not discernable from the facts of the crime, are highly relevant to the jury's

sentencing decision.  See, e.g., Parker v. Dugger, 498 U.S. 308, 314 (1991)(evidence of defendant's

"positive adult relationship with his own children and with his neighbors" is mitigating); Payne v.

Tennessee, 501 U.S. 808, 826 (1991)(noting that evidence that defendant was "a good son" and

"extremely polite" is mitigating); Boyde v. California, 494 U.S. 385 (1990)(evidence that defendant

was good with children is mitigating); South Carolina v. Gathers, 490 U.S. 805, 817

(1989)(O'Conor, J., dissenting on other grounds)(evidence that defendant was affectionate and caring person is mitigating); Franklin v. Lynaugh, 487 U.S. 164, 186 (1988)(O'Connor, J., concurring)(acts of "voluntary service, kindness to others [and] religious devotion" are mitigating); Hitchcock v. Dugger, 481 U.S. 393, 397 (1987)(evidence that defendant "had been a fond and affectionate uncle to the children of one of his brothers" is mitigating); Valdez, supra (counsel ineffective for failing, *inter alia*, to discover and present evidence of defendant's "many redeeming, humanizing qualities.").

85.    The testimony of the lay witnesses called by the defense, including such potentially critical individuals as Mr. Roy's father and his former girlfriend (the mother of his child) failed to humanize Mr. Roy, because trial counsel never sought to discover the human aspects of their client or to develop relationships of trust with mitigation witnesses necessary to develop and present their testimony in a meaningful and persuasive fashion.   Had counsel undertaken a constitutionally adequate investigation into their client's life, they would have could have presented evidence that explained in a convincing manner the difficulties that Mr. Roy encountered as a child and how these problems were linked to his drug abuse as an adult; that showed Mr. Roy's positive personality traits and good relationships with family members and friends; that showed that Mr. Roy was a person who, despite this horrible crime, deserved the opportunity to live.

86.    Moreover, trial counsel failed to provide their penalty phase experts with important information, leading to devastating cross examinations of them by the prosecution.   See, e.g. R. 158 1590 (cross-examination of Pat Kent, concluding with prosecutor's statement that "I know what I've just done to you, Doc, you didn't know these facts.").   They failed to hire an appropriate forensic psychiatrist and/or psychologist to provide a thorough, medically sound opinion of Mr. Roy's  problems, particularly

50

his drug addiction and its relationship to this crime, and to present vital mitigation that could have saved Mr. Roy's life.

87.  Finally, the ineffectiveness of trial counsel in the guilt phase, particularly in presenting an intoxication defense that was not viable or believable as presented alongside the unbelievable alibi defense, magnified the inadequacies and implausibility of the case for mitigation.

88.  But for counsel's failure to investigate and develop a meaningful mitigation strategy, there is a reasonable probability that the jury would have returned two sentences of life imprisonment.

### 9.
### Additional Acts and Omissions on Trial Counsel
### Prejudiced Mr. Roy's Rights and Require that This Court
### Issue a Writ of Habeas Corpus (CPR Issues Nos. 2, 6, 7 and 16)

89.  In numerous other ways, trial counsel performed deficiently, to the prejudice of Mr. Roy.  The underlying merits of many of the below-listed incidents of ineffectiveness are addressed elsewhere in this Petition:

■ Trial counsel maintained inappropriately minimal contact with their client in this death penalty matter prior to the trial up to the appeal, refusing collect phone calls (the only method of verbal communication short of visits) and refusing to provide Mr. Roy with a copy of his trial transcript upon request for the purpose of appeal.  As a result of their failure to communicate with Mr. Roy, counsel did not develop a meaningful relationship of trust with their client, a vital component of a proper capital defense strategy and a critical aspect to any attempt to secure a life plea.

■ Trial counsel failed to promptly investigate after their appointment to this matter,

including failing to obtain blood and/or urine samples to support either one of the defenses presented at trial (alibi in a crack-house or intoxication).

■ Trial counsel failed to challenge the constitutionality of the grand jury that indicted Mr. Roy, even though research establishes that the manner in which the grand jury foreperson selection process in Rapides Parish was conducted at the time of Mr. Roy's indictment discriminated against African Americans and women, in violation of Amendments VI, VIII and XIV of the United States Constitution. See infra at ¶¶ 156-60.

■ In a motion requesting individual sequestered voir dire, trial counsel reserved their right to seek a change of venue, rather than filing such a motion pretrial based on pretrial publicity and obtaining an evidentiary hearing thereon. See La.C.Crim.P. Art. 621 ("A contradictory hearing shall be held upon the motion.").

■ Trial counsel did not file any of their motions for funding ex parte, thereby inexcusably revealing to the State their defenses and witnesses.[27]

■ Trial counsel filed motions that revealed their lack of attention to this matter, including the filing of a motion in limine to preclude the State from using the aggravating circumstance that a dead victim was under the age of twelve, although a review of the entire record shows that the State never provided notice of its intent to rely upon this clearly inapplicable aggravator.

■ All objections made during the trial that were not in off-the-record bench conferences were made within the hearing of the jury.

---

[27] One of the defense experts, Pat Kent, ended up having a long telephone conversation with the prosecutor prior to trial. Their conversation was used by the State to make the improper and inflammatory comment that Larry Roy was like Charles Manson. See R. 1578-80; infra at ¶ 138.

■ Virtually every recorded objection lodged by the defense was made after the objectionable material had been heard by the jury, and the defense did not request the Court to admonish the jury to disregard the testimony.

■ Trial counsel failed to object to the prosecutor's repeated misstatements of the law during voir dire. See *infra* at 122-23, 129, 133.

■ Trial counsel failed to object and move for a mistrial when the State improperly commented during opening statement on Mr. Roy's alleged statement to the Richard family at the Jiffy Pack the day before the incident.

■ Trial counsel waived opening statement in the guilt phase.

■ Trial counsel failed to object to the cumulative testimony of the State's police officer witnesses, thereby permitting the State to present the emotional and inflammatory testimony repeatedly.

■ Trial counsel failed to object to testimony by the coroner outside the scope of his expertise, to wit, crime scene reconstruction, blood spatter and the mental state of the perpetrator of these crimes.

■ Trial counsel failed to object the testimony of Richard Beighley on the grounds that "fracture matching" is not a subject of expert knowledge or on the grounds that they received no notice that the "expert" would be testifying at trial.

■ Trial counsel failed to object to the introduction of any of the evidence improperly withheld by the State or move for a mistrial or continuance based on unfair surprise. See *infra* at 109-14.

■ Trial counsel failed to object to the district attorney's prejudicial comments and misstatements of the law and did not request curative instructions thereon. As a result, the jury heard information that they should not have considered and, with respect to guilt phase errors, trial

counsel failed to preserve the record for appeal.  See *infra* at 135-55.

■ Trial counsel did not request an adverse inference jury instruction, even though the State was missing numerous items of evidence, including telephone cords used to bind the victim which the State argued Mr. Roy brought with him to the crime scene and thereby demonstrated specific intent.

■ Trial counsel did not interview any of the State's witnesses.

■ Trial counsel failed to file a motion in limine for the purpose of limiting in the guilt phase evidence regarding the three attempted first degree murders that were returned under separate indictment and were not matters being tried.

■ Trial counsel repeatedly elicited prejudicial testimony from State's witnesses.  See, e.g., R. 1385 (defense counsel eliciting on cross examination of the pathologist, Dr. McCormick, that two wounds on Freddie Richard's neck may have been intended to inflict pain, as they would not have been fatal).

■ Neither trial nor appellate counsel submitted a Sentencing Review Memorandum on behalf of Mr. Roy, in accordance with the Louisiana Supreme Court Rule 28, for the purpose of providing information to the court for its constitutionally mandated review of capital sentences.

**B.**
**INEFFECTIVENESS OF APPELLATE COUNSEL (PCR Issue No. 15)**

90.  Mr. Roy is indigent, and so he received appointed counsel to represent him on his direct appeal to the Supreme Court of the State of Louisiana.  As is shown, in part by the attached affidavit of Ms. Julianne Hernon, an attorney who shortly after graduating from law school worked for the office run by Mr. Roy's appellate counsel, Nick Trenticosta, see Exhibit "F" to PCR Petition

54

(attached as Exhibit "G" hereto), appellate counsel failed miserably to provide Mr. Roy with his right of full and adequate judicial review based upon a complete record of all evidence upon which the judgment is based.

91. Appellate counsel failed to file a sentence review memorandum pursuant to La. S.Ct. R. 28. Despite the fact that numerous pretrial evidentiary hearings occurred but were not contained in the record, appellate counsel failed to have those hearings transcribed (including the sealed *ex parte* hearing at which it became clear that trial counsel were forcing their client to testify against his will) and failed to have the record completed. Despite the fact that almost all objections were argued and ruled upon during unrecorded bench conferences, appellate counsel failed to preserve and complete the record by obtaining affidavits from trial counsel or the prosecutor or the trial court judge or the court reporter or anyone else who might have been privy to those proceedings. Despite trial counsel's objections to the racial composition of the jury and the facts that an all-white jury was selected from a venire in which African Americans were under represented numerous summoned jurors did not appear, appellate counsel made no effort to supplement the record with information concerning the racial composition of the venire.[28] Despite the fact that the trial minute entry from the last day of trial reflects that the trial court had *ex parte* communications with the jury during its penalty phase deliberations, while the transcript of the trial records no such event, appellate counsel failed to resolve this discrepancy in the record or to raise on appeal the trial court's improper *ex*

---

[28] Appellate counsel raised, but did not brief, two assignments of error regarding the racial composition of the jury (Assignments of Error Nos. 14 and 15). Information regarding the racial composition of the jury pool and its selection were obviously critical to any competent briefing of these issues.

*parte* communication with the deliberating jury.[29]

92.  The appellate brief that was filed on Mr. Roy's behalf was woefully inadequate.

Appellate counsel did not bother to brief 32 of the 37 errors that were assigned, including the trial

---

[29] The minutes for July 21, 1994 reflect the following:

The jury retired to deliberate [as to punishment] at 10:23 a.m., with the exception of the alternates.  Court addresses alternates and released.  At 11:55 a.m., the jury sent a note as to the polling of the jury orally.  Court informs jury it can be done in writing.  The jury again retired to deliberate at 12:00 noon.  At 12:14 p.m., the jury returned with the following verdicts . . . .

R. 27.  The trial transcript, however, does not reflect the jury's question and the court's answer, see R. 1903, even though the minutes suggest that this was done in open court, as the "jury again retired to deliberate . . . ."  The minutes do not reflect that Mr. Roy or his counsel were present.  Accordingly, on the face of the appellate record, there appears to have been an unrecorded, *ex parte* communication between the trial court and the jury during its deliberations, in clear violation of Mr. Roy's rights to be present and to the assistance of counsel guaranteed under Louisiana and federal law.  See Rushen v. Spain, 464 U.S. 114, 119 (1983)(holding that *ex parte* communication between trial court and jury is subject to harmless error analysis, but observing that "[t]his is not to say that *ex parte* communications between judge and juror are never of serious concern or that a federal court on habeas may never overturn a conviction for prejudice resulting from such communications.  When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties."); Curtis v. Duval, 124 F.3d 1, 4-5 (1st Cir. 1997)("recalling the jury for supplementary instructions after deliberations are underway is a critical stage of a criminal trial. . . .  It is evident to us that giving a sua sponte jury instruction without consulting, and in the absence of, the defendant's attorney, as occurred here, denies the defendant the assistance of counsel at that critical stage.")(citations omitted); United States v. Smith, 31 F.3d 469 (7th Cir. 1994)(reversing on grounds that defendant's right to be present at every stage of trial violated when trial judge communicated privately with jury); La.C.Crim.P. Arts. 808, 831; State v. Copeland, 419 So.2d 899 (La. 1982); State v. Overton, 337 So.2d 1058 (La. 1976).

This error was particularly harmful here, as the jury's question regarding whether each of its members would be required to state their verdict orally, as they had done in announcing their guilty verdicts, see R. 1700-01, indicates that one or more jurors were uncomfortable with announcing their death sentences in open court.  Appellate counsel failed to seek to supplement the record regarding this discrepancy between the minutes and the trial transcript, and failed to raise the trial court's improper *ex parte* communication as an issue on appeal.

56

court's erroneous denial of cause challenges to Richard Elmer and Doris Kees;[30] the trial court's

erroneous admission of Sheriff Archie Blue's hearsay testimony (Assignment of Error No. 12); the

trial court's qualification of Richard Beighley as an "expert" in "fracture matching" (Assignment

of Error No. 17); the prosecutor's improper cross-examination of Patrick Kent (Assignment of Error

No. 24); the improper submission and findings of aggravating factors (Assignment of Error Nos.

31, 36); and the prosecutor's improper instructions to the jury that it "weigh" aggravating and

mitigating factors in determining sentence (Assignment of Error No. 37). As the affidavit of Ms.

Hernon states, despite having obtained several extensions of time to file Mr. Roy's brief, appellate

counsel was busy with other matters and did insufficient work on behalf of this Petitioner who has

been sentenced to die. See Exhibit "F" to PCR Petition (Exhibit "G" hereto), ¶¶ 10-11. With regard

to the five issues that appellate counsel apparently got around to briefing, he failed to argue extant

law and proper bases for finding error. The entire brief filed on appeal on behalf of Mr. Roy, who

has been sentenced to death *twice* and is awaiting execution on death row, was only 28 pages long,

five of those pages simply listed the assignments of error (most of which were not briefed), and

_____

[30] Trial counsel challenged four prospective jurors for cause (Hempstead, Elmer, Kees, and Leblanc) and the trial court denied the cause challenges. R. 407, 413, 372, 555-56, 559-60. These denials of defense cause challenges were timely assigned as error by trial counsel. Nonetheless, appellate counsel failed to brief two of these erroneous denials of challenges for cause to jurors who would not consider a life sentence, who had a preformed opinion as to guilt, and who refused to consider intoxication as either a defense or a mitigating circumstance. One of these erroneous denials of defense cause challenges, that of Doris Kees, presented a particularly strong issue. Appellate counsel's failure to brief this issue resulted in the Louisiana Supreme Court's incorrect adjudication of this error. See *infra* at ¶¶ 183-86. The failure of appellate counsel to argue these issues on appeal deprived Mr. Roy of his constitutional rights guaranteed under the United States Constitution, Amendments V, VI, VIII, and XIV.

several of those pages were only half a page long.[31]  Appellate counsel failed to assign as error numerous issues, including the ineffectiveness of trial counsel revealed on the face of the appellate record, the incomplete state of the appellate record which precluded adequate review, the trial court's apparent *ex parte* communication with the jury during its penalty phase deliberations, and the prosecutor's improper comments and arguments, including the prosecutor's misconduct in arguing the benefits of prison life at Angola, all of which were apparent on the face of the record. Appellate counsel did not raise several of meritorious issue that Ms. Hernon had pointed out to appellate counsel.  See Exhibit "F" to PCR Petition (Exhibit "G" hereto), ¶ 8.

93.  Appellate counsel failed to prepare and file an application for rehearing before the Louisiana Supreme Court.  Appellate counsel filed an inadequate, ten-page petition for a writ of *certiorari* in the United States Supreme Court, raising only one question for review.

94.  A criminal defendant has the right to effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387 (1985).  A Louisiana appellant in a criminal case has a state constitutional right to a complete record of all evidence upon which his conviction was based, in order to fulfill his right to appeal. La. Const. Art. I, §19, Art. V, §20.  Additionally, he has a federal due process right to appellate review on the basis of an adequate record where a state has granted a criminal appeal as of right.  U.S. Const., Amend. XIV; Griffin v. Illinois, 351 U.S. 12 (1956).

---

[31]  Although the Louisiana Supreme Court, in an unpublished appendix to its decision in State v. Roy, 681 So.2d 1230 (La. 1996), addressed the unbriefed issues raised in the Assignments of Error, it did so in a cursory fashion and without the benefit of argument and authority which appellate counsel had a duty to provide.  The Court's rejection of the unbriefed errors does not constitute a ruling on the merits and its findings are not entitled to deference, particularly as the court's inadequate review is the direct result of appellate counsel's ineffectiveness in failing to brief most of the assignments of error raised on appeal.

This right of appeal is of paramount importance in a capital case to ensure that the death penalty is not inflicted in an arbitrary and capricious manner. U.S. Const., Amends. VIII, XIV; La. Const. Art. I, §20; <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995). Indeed, Louisiana law provides for mandatory review on direct appeal by the state supreme court. La.C.Crim.P. Art. 905.9. The ineffective assistance of appellate counsel denied Mr. Roy his constitutional rights to due process, to equal protection, to counsel, to full and adequate judicial review on appeal, and to be free from cruel and unusual, all as guaranteed under the United States Constitution, Amendments VI, VIII, and XIV.

## C.
### THE DEFICIENT PERFORMANCE OF MR. ROY'S COUNSEL PREJUDICED HIM IN THE GUILT AND PENALTY PHASES

95. Strickland v. Washington, 466 U.S. 668 (1984), and Williams v. Taylor, __ U.S. __, 120 S. Ct. 1495 (2000), set the standard by which this Court must assess whether the performance of Mr. Roy's attorneys denied him a fair determination of his guilt and punishment. Those cases entitle Mr. Roy to relief if (i) counsel's performance fell below an objective standard of reasonableness and (ii) counsel's errors "prejudiced Mr. Roy's defense by depriving him of a fair trial, *i.e.* a proceeding whose result is reliable.

96. Mr. Roy has set out in detail *supra* the different ways in which counsel's performance failed to constitute "reasonable effective assistance," in that counsel did not perform in a manner consistent with the standard of practice for defending capital cases in 1993-1995. He incorporates each of those allegations of fact as if set forth fully herein.

97. Mr. Roy has also discussed above how counsel's various acts and omissions harmed the case actually presented at the guilt and penalty phases, as well as how counsel could, by performing reasonably, have developed a far more powerful and persuasive case to present. However, it is appropriate here to review some of the legal standards governing this Court's review of the "prejudice" component of Mr. Roy's claim of ineffective assistance of trial and appellate counsel. In light of the facts of this case, those standards compel the conclusion that Mr. Roy is entitled to a new trial as to guilt and/or punishment.

98. "Prejudice" is established if, had counsel not performed deficiently, there exists a "reasonable probability" that the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to *undermine confidence* in the outcome." Strickland, 466

U.S., at 694 (emphasis supplied). Strickland does not require that Mr. Roy prove that his counsel's deficient conduct "more likely than not altered the outcome in the case." Id. at 693-94. As the Fifth Circuit has recognized, Strickland's prejudice prong imposes "a lower burden of proof than the preponderance standard: "even where the reviewing court cannot conclude that it is more likely than not that a different result would have obtained absent counsel's errors and omissions, the court can still be 'confident that it meets the "reasonable probability" standard.'" Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990)(citing Strickland).

99. Although a reviewing court owes strong deference to counsel's trial decisions under Strickland, such deference presupposes that the attorney's trial decisions represent "a proper exercise of judgment based on adequate knowledge" of the facts and relevant law. United States v. Cronic, 839 F.2d 1401, 1404 (10th Cir. 1988); see also McDougall v. Dixon, 921 F.2d 518, 537 (4th Cir. 1991)(a "strategic" choice by counsel is one "made with full knowledge of the facts and the law, and the options available to him."). Genuinely strategic decisions, i.e. "choices between alternatives that each have the potential for both benefit and loss," are almost always upheld. Profitt v. Waldron, 831 F2d 1245, 1249 (5th Cir. 1987). But the Fifth Circuit has directed that this measure of deference not be "watered down into a disguised form of acquiescence." Bouchillon, supra, 907 F.2d at 595 (quoting Profitt, 831 F.2d, at 1248)).

100. "Prejudice" exists if, but for counsel's deficient performance, there is a reasonable probability that the results of the guilt phase, the penalty phase and/or the appeal would have been different. As noted, the Strickland "prejudice" standard does not require that Mr. Roy show that "counsel's deficient conduct more likely than not altered the outcome of the case." Nealy v. Cabana, 764 F.2d 1173, 1178 (5th Cir. 1985).

61

101.    Although the prejudice arising from counsel's deficient performance most clearly impacted the reliability of the jury's sentencing decision in this case, Mr. Roy has raised here errors that also undermine the fairness of the proceedings as a whole, *e.g.*, trial counsel's failure to challenge the constitutionality of the grand jury foreperson selection process (which goes to the trial court's jurisdiction over this matter) and trial counsel's failure to move to quash the petit jury venire on the basis of race discrimination and the lack of a fair cross section of the community. Several of the issues inadequately raised in the appeal, moreover, implicate the impartiality of the seated jurors and, if properly litigated, would have resulted in reversal of Mr. Roy's convictions and death sentences.

102.    In analyzing errors respecting the *sentencing* decision in Mr. Roy's trial, this Court must ask only whether there is a reasonable probability that a single juror's mind could have been changed had counsel performed effectively. See, e.g., Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993)("given the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death.").[32]

103.    In measuring whether Mr. Roy has shown such an impact, the Court must consider the cumulative effect of all the alleged deficiencies taken together, rather than judging the effect of each in isolation. See, e.g., Moore v. Johnson, 194 F.3d 586, 619 (5th Cir. 1999)("the question [under Strickland] is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt

_____

[32] In this regard, it is important to note that the question submitted by the jury during its penalty deliberations regarding polling indicates that one or more jurors were hesitate to announce death verdicts in open court.

62

or punishment, unreliable."); <u>Livingston v. Johnson</u>, 107 F.3d 297, 308-09 (5th Cir. 1997)(noting that district court correctly considered whether habeas petition had suffered cumulative harm from various claimed instances of deficient attorney performance); <u>see also, e.g.,</u> <u>Williams v. Washington</u>, 59 F.3d 673, 682 (7th Cir. 1995)("a petition may demonstrate that the cumulative effect of counsel's individual acts or omissions was [prejudicial]"); <u>Rodriguez v Hoke</u>, 928 F.2d 534, 538 (2d Cir. 1991)(a "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions."); <u>Mak v. Blodgett</u>, 970 F.2d 614, 622 (9th Cir. 1978)(observing that "prejudice may result from the cumulative impact of multiple deficiencies.").

104.  Finally, <u>Williams</u> illustrates the proper application of these principles, and further demonstrates why the facts of Mr. Roy's case demand relief.  Williams' counsel failed to conduct an adequate investigation, which would have uncovered extensive mitigating evidence about Williams' background.  <u>Williams</u>, 120 S. Ct., at 1514. Mr. Roy's attorneys similarly failed to investigate, develop or present available evidence to explain meaningfully his troubled childhood and  its connection to his difficulties in adult life and to the crime, and positive aspects of his personality, all of which would have persuaded at least one member of the jury that his life was worth sparing.  According to <u>Williams</u>, such inaction constitutes an inexcusable failure to "fulfill [counsel's] obligation to conduct a thorough investigation of the defendant's background." <u>Id.</u> at 1515.

105.  The Supreme Court's ultimate conclusion in <u>Williams</u> that the result of the sentencing hearing was unreliable — that it is "reasonably probable" that, had counsel performed adequately, Williams would not have been sentenced to death — has particular significance in light of the highly aggravated character of Williams' crime and his serious prior criminal history.  Williams was

63

convicted of murder for beating a drunken, helpless man in the chest with a mattock, apparently rendering him unable to breathe and thereby causing his death, after which Williams took three dollars from the man's wallet and walked out of the house as the victim lay dying, gasping for breath. Id. at 1499, n.1. In the months following the capital murder for which he was ultimately condemned to death, Williams "savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw." See Williams v. Taylor, 163 F.3d 860, 868 (4th Cir. 1998). The elderly woman he assaulted barely survived and, at the time of Williams' sentencing hearing, was in a "vegetative state" and not expected to recover. Williams, supra, 120 S. Ct., at 1500. Williams also had prior convictions for armed robbery, burglary, and grand larceny. Id. In short, Williams both committed a highly aggravated (senseless, violent) crime and then went on a violent crime spree, repeatedly attacking innocent persons. He acted alone in each incident. He had a serious prior criminal history, including a conviction for a violent crime.

106. The Supreme Court found that Williams had established "prejudice" under Strickland, despite these highly aggravating facts. The Court emphasized the potential for mitigating evidence to "influence[] the jury's appraisal of the defendant's moral culpability," and thereby persuade the jury to impose a life sentence even where the jurors were also certain to find the existence of serious aggravating factors. Id. at 1516 ("[m]itigating evidence unrelated to dangerousness may alter the jury's section of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").[33]

---

[33] Indeed, on many occasions, Louisiana juries have returned life sentences in cases involving murders that were as aggravated as Mr. Roy's crimes. See, e.g., State v. Thibodeaux,

107. In sum, Mr. Roy has shown that his counsel performed deficiently in the penalty phase. Had counsel conducted an appropriate investigation, they could have presented a wealth of powerful mitigating evidence that would have given jurors meaningful and convincing reasons to find that sentences of less than death were appropriate. Had they not forced Mr. Roy, against his will, to take the stand in the guilt phase to testify to an unbelievable alibi that counsel had not properly

---

728 So.2d 416 (La. Ct. App. 1998)(defendant guilty of brutally murdering and sexually mutilating two women with knife sentenced to life imprisonment by unanimous jury); State v. Wilson, 631 So.2d 1213 (La. Ct. App. 1994) (defendant found guilty of murdering mother and son, with butcher knife, which was used as well to carve a "'T'-shaped incision ... in [the mother's] abdomen" sentenced to life by unanimous jury); State v. Brown, 715 So.2d 566 (La. Ct. App. 1998)(defendant found guilty of killing a woman and her six-month son sentenced to life where jury could not agree on sentence); State v. Guillory, 715 So.2d 400 (La. Ct. App. 1998)(defendant convicted of three counts of first degree murder for the deaths of an adult male and two teenage boys received three consecutive life sentences where jury could not agree upon sentence). See also Jurors spare life of killer: 'You got to have a heart,' one says, THE TIMES PICAYUNE, A-1 (2/27/99)(attached as Exhibit "A" to PCR Petition (Exhibit "G" hereto)) (discussing jury's unanimous decision in the matter of State v. Whitton to spare life of man convicted of four counts of first degree murder in a case remarkably similar to this one — the defendant had stoned and knifed to death his four house mates, including a woman and her nine-year-old son, and left their bodies decomposing for days in their home; defense presented evidence that the defendant had severely impaired memory from years of substance abuse and that he had been smoking crack and drinking heavily the day of the murders and presented a strong and moving case of mitigation, including testimony of a psychiatrist and psychologist on his substance abuse problems, and extensive testimony from numerous family members and fellow-church members describing the kind and compassionate side of Douglas Whitton that his crime did not reveal and the difficulties that his substance abuse had created).

Moreover, intoxication has appeared prominently in cases in which defendants have received life sentences. See, e.g., State v. Stanfield, 562 So.2d 969 (La. Ct. App. 1990)(jury unanimously recommended life sentence where defendant shot and killed murder victim and shot two others; defendant had been smoking cocaine); State v. Guillory, supra, 715 So.2d at 405 (urine test after arrest revealed presence of cocaine and marijuana in defendant's system); State v. Calhoun, 554 So.2d 127 (La. Ct. App. 1990)(defendant presented evidence that he had been drinking alcohol and using marijuana and cocaine on day of murder); State v. Whitton (Times Picayune article attached as Exhibit "A" to PCR Petition (Exhibit "G" hereto))(unanimous life verdict in four-victim homicide; defense presented penalty phase defense of substance abuse).

investigated, they could have presented the statutory mitigating factor of intoxication in a credible and persuasive manner. Had they engaged in meaningful litigation and developed a trusting relationship with their client, there is a reasonable probability that counsel could have avoided trial altogether by obtaining a formal plea offer from the State giving Mr. Roy his life. Counsel's performance denied Mr. Roy his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments. Because the result of his sentencing proceeding was thereby rendered unreliable, this Court should grant a new sentencing hearing.

## III.
## PROSECUTORIAL MISCONDUCT

108.  The prosecutor engaged in a variety of prejudicial and improper conduct, failing to provide necessary information prior to trial, despite Mr. Roy's discovery requests and the State's stipulation that it had provided its complete file to the defense; failing to disclose exculpatory evidence in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and progeny; and peppering its comments and arguments to the jury with blatant misstatements of law and prejudicial and inflammatory remarks.  The prosecutor's misconduct violated Mr. Roy's rights to due process, to the effective assistance of counsel, to a fair trial and to be free from cruel and unusual punishment under Amendments VI, VIII and XIV of the United States Constitution.

### A.
### The Prosecution's Failure to Provide Critical Information Prior to Trial, Despite Discovery Requests and the State's Stipulation that It Provided Its Complete File to the Defense, and its Failure to Provide Exculpatory Evidence to the Defense in Violation of Brady v. Maryland, 373 U.S. 83 (1963), and Progeny Violated Mr. Roy's Rights Afforded Under Amendments VI, VIII, and XIV to the United States Constitution (PCR Issue No. 5)

### 1.
### Discovery Violations

109.  A criminal defendant is entitled to notice of the nature and cause of the accusations against him and the right to prepare an adequate defense to the State's charges.  U.S. Const. amends. VI and XIV.  Discovery provisions in the Code of Criminal Procedure, La. C.Cr.P. arts. 716 - 722, are intended to secure this right.

110.  Prior to trial, the defense filed the following general and specific motions seeking discovery and to be informed of the nature and cause of the accusations against Mr. Roy: *Motion for Bill of Particulars*, R. 35-38; *Motion for Discovery and Inspection Under Article 716, et seq.,*

67

*of the Louisiana Code of Criminal Procedure*, R. 55-59; *Motion for Disclosure of Impeaching Information*, R. 51-53; *Motion to Compel Disclosure and Furnish Particulars of Aggravating and Mitigating Circumstances*, R. 62-64, 87-88, 89.  In response the State offered to conduct open-file discovery[34] and induced the defense to enter into a Joint Stipulation, R. 77, with the prosecution stating that the State had provided its entire file, would provide future information and would introduce all evidence in the file at trial; including defendant's statements therein and that production of the State's file satisfied the defendant's motions for discovery, bill of particulars, and preliminary exam. The stipulation further obligated the defense to disclose all material discoverable under La.C.Cr.P. arts 724-728.  See R. Vol. 1, p. 77.  Further, on October 5, 1993, the State filed its *Answer to Motion for Discovery and Inspection Under Article 716, et seq. Of the Louisiana Code of Criminal Procedures*, stating: "The State has provided the complete file of this case to defense counsel.  The State has no information which is not included in the provided file."  R. 66.

111.  Despite the State's purported "open-file" discovery, the State did not provide the defense with notice of several important items of evidence that it subsequently introduced at trial:

- ■ Larry Roy's alleged statement that "things going to be on tonight."  R. 1221, 1285, 1313.

- ■ Larry Roy's alleged statement to Sally Richard, "It's dead," referring to the telephone in the Richard home.  R. 1245, 1246.

- ■ Larry Roy's alleged statement to Sally Richard that "About time the police get here ya'll going to be dead."  R. 1234.

- ■ Larry Roy's alleged statement to David Richard and Frederick Richard that "if you don't

---

[34] The State also filed written answers to some motions, however the written answers were filed prior to the agreement to "open file" discovery.

stop running I'm going to cut your mama's neck off." R. 1292.

- The alleged fact that all of the telephone cords used in the perpetration of the crime did not originally come from the Richard home. R. 1068, 1111-1113, 1138-1149, 1173-1184, 1187-1190, 1241-124.

- The alleged fact that the knife used in the attacks did not originally come from the Richard home. R. 1234, 1319.

- The alleged fact that the vomit found on the floor in the bathroom came from Roseta Silas. R. 1375.

112.    The defense received no notice of this evidence prior to trial.[35]    It is nowhere to be found in the materials that defense counsel obtained from the State.  The State's failure to produce this information virtually sabotaged the defense — almost all of this information formed the sole basis for the State's argument that Larry Roy had the specific intent, prior to entering the Richard home, to commit the crimes with which he was charged. R. 1000 ("We will prove that Larry Roy brought a knife into that house.  We will prove that when he walked in that house he disconnected the phone.  Because when this stuff was going on with Frederick she reaches over for the phone and he says, 'It doesn't work, it's dead.'"); R. 1001 ("He could not form the specific intent.  The person who said 'You'll be dead before the police get here.'"); R. 1001 ("This man who could not form the specific intent to kill according to the defense told Sally the phone was dead."); R. 1003 ("Along

---

[35]  During a long series of questions by the prosecutor to defense expert witness Pat Kent, all about the facts as alleged by the State and all beginning "were you aware that," the defense objected stating: "Your Honor, we ... the people with our side didn't know a lot of what the evidence showed, now how can he expect to know these things when even the defense didn't know these things until the prosecution furnished them."  R. 1584-1586.

with the knife that he brought into the house that night, he brought the bindings that he was going to use to tie these two young kids up like cattle and slashed their throats."); R. 1004 ("When they pulled up he pulled up by the side of them and told them, things are going to be on tonight ... things are going to be on tonight. They had no way of knowing what he meant. But I suggest to you, ladies and gentlemen, that he knew exactly what he was talking about.") R. 1649 ("Larry Roy brought that knife into the house that night with him."), 1650 ("he turns to them and says, 'You better stop or I'm going to cut your mother.'"), 1651 ("When she goes for the telephone he says 'It's dead. It's dead.'"), 1652 ("reaches over grabs the back of her head and says 'You'll all be dead before the police get here.'"), 1654-1656 ("whoever did this, whoever did this and whoever did this, brought their own phone cord. They brought their own knife."; "brought his own knife, brought his own bindings"), 1657 ("Sally sees the fight, reaches over to grab the phone, stops the fight and says 'It's dead, ha-ha, it's dead.'"), 1658 ("told Sally what was going to happen, 'You will all be dead before the police get here.'"; "told the children, 'Stop, don't run away or I'll cut your mom.'"), 1659-1660 (""Dr. McCormick expressed his expert opinion that [the person who threw up] was Ms. Roseta, Aunt Cudden. ... Logical step is she ran in here to hide from him. He goes in and gets her ..."), 1677 ("This man had his bindings with him"), 1684 ("Sally goes for the phone, he says, 'it's dead,'"). This information, moreover, was effectively used to rebut the intoxication defense offered at trial (which the defense had committed itself to prior to the revelation of this evidence). R. 11, 117, 222, 248, 331, 332, 452-453, 505, 607-608, 1584-1585, 1588-1591, 1622-1626, 1627-1628,

Finally, this evidence provided the State with compelling arguments in the penalty phase to convince the jury to impose two death sentences in this matter. R. 1726 ("we know that she [Rosetta Silas] threw up, in the bathroom."); R.1889 ("I've believe, at the bottom of my heart, that

you understand that a, a person who's intoxicated cannot form that complex series of tasks. . . . Whoever did this, said, for whatever reason he went over to the house that night, I'm gonna bring some telephone cord to tie somebody up with. I'm gonna bring a knife. How you make the mental leap to what he was gonna do with that knife. But, he brought the phone cord. All right, that shows prior planning.").

113. The defense was precluded from seeking pretrial disclosure of this information by the State's representation that it had disclosed and would continue to disclose to the defense all material in its files. "If a defendant is lulled into a misapprehension of the strength of the state's case by the failure to fully disclose, such a prejudice may constitute reversible error." State v. Scoby, 536 So.2d 615 (La.Ct.App. 1st Cir. 1989)(citing State v. Ray, 423 So.2d 1116, 1118 (La. 1982)); see e.g., State v. Meshell, 392 So.2d 433 (La. 1981)(reversing where state's failure to provide defendant's rap sheet prejudiced defense); State v. DeMoss, 582 So.2d 964, 966 (La.Ct.App. 2nd Cir. 1991)(reversing where, despite open file discovery, state failed to produce defendant's rap sheet and observing that "[t]he state's failure to comply with discovery procedures which results in prejudice to defendant constitutes error.").[36]  See also Gardner v. Florida, 430 U.S. 349, 1207 (1977)(a defendant may not be sentenced to death "on the basis of information which he had no opportunity to deny or explain."). Without the State's promise to provide all of its materials, the defense could have filed additional discovery to find out particulars of the State's case against Mr. Roy. Notice of this evidence, moreover, would have enabled to the defense to reevaluate the viability of its

---

[36] Because trial counsel was ineffective in failing to object to the introduction of this evidence and thereby failing to preserve this issue for appeal, see supra at ¶ 89. Louisiana law regarding the impropriety of the State's failure to disclose material inculpatory evidence is relevant.

intended defense.

114.  The State's misconduct, in duping the defense into thinking that it had obtained all relevant information to prepare its defense when it had not, violated Mr. Roy's constitutional rights to notice of the charges against him, due process and to prepare an adequate defense secured by Amendments VI and XIV to the United States Constitution.

## 2.
## Brady violations

115.  The prosecution additionally failed to disclose relevant, exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963), and progeny.  Its failure to do so ambushed the defense at trial and requires that the convictions be reversed and sentences vacated.

116.  In response to the portion of the defense's bill of particulars seeking Brady material, the State responded: "The State has no knowledge of exculpatory evidence."  R. 40.  This was not true.

■ Crime scene investigators obtained viable fingerprints from the telephone in the Richard home and determined that they did not match Larry Roy.  Nonetheless, during the State's guilt phase closing argument, the prosecutor perjured himself in arguing:

> All right, no fingerprints of Larry Roy, if they were looked for, were found.  But that's OK.  Let's suppose that the fingerprints were searched for, and they weren't searched for, the crime scene people said they didn't do the fingerprint thing, but let's suppose they were.  And they found Larry Roy's fingerprints all over that house;.  Then you would be sitting here saying, well, you see they lived together.  So, Officer Hanks, would you not expect Mr. Roy's fingerprints to be in this house?  Well, yes, I would.  So these fingerprints don't mean anything.

R. 1674.

■ The defense was not informed prior to trial that the prosecution had lost telephone cords

allegedly used to tie up the victims.

■ The defense was not informed that the telephone cords on Rosetta Silas's wrists had been cut at the crime scene, as revealed in crime scene photographs that post-conviction counsel has obtained. Nonetheless, the prosecutor allowed the coroner, Dr. McCormick, to testify that he received Ms. Silas's body tied up by phone cord and that he was informed that she had been found that way. R. 1364-65. This suggests crime scene investigators either tied up Ms. Silas's wrists with the same cord they had severed or had retied her wrists with other phone cord. The phone cords removed from Ms. Silas by the coroner have mysteriously been lost. R. 1365.

117. The phone cords in this case supplied the prosecutor with his most forceful argument that Larry Roy had planned the murders before he entered the Richard home. The prosecutor's failure to provide exculpatory information concerning their loss, and presentation of testimony regarding their use, the accuracy of which defense counsel was not in a position to question, unfairly enabled the prosecution to built a stronger case of specific intent (which impacted the intoxication defense presented in both the guilt and penalty phases) and painted a false picture of the cold-bloodedness of this crime.

118. The prosecution took advantage of defense counsel's ignorance of evidence that the prosecution was under a constitutional duty to disclose. Given the prosecutor's use of the phone cord evidence and perjured reliance on the lack of fingerprinting, there is a reasonable probability that, had the fingerprint and phone cord evidence been disclosed to the defense, the results of both the guilt and penalty phases would have been different.

**B.**

**The Prosecution's Prejudicial Remarks and Repeated Misstatements of Law, Which Permeated the Entire Trial, So Infected the Proceedings with Unfairness as to Violate Due Process and Render the Death Sentences Reached in this Matter Unreliable, All in Violation of Mr. Roy's Rights under Amendments V, VI, VIII and XIV of the United States Constitution (AEA No. 35; PCR Issues Nos. 7 and 12)**

119.    The prosecution, during the entire course of the trial, engaged in misconduct, repeatedly misstating the law regarding such topics as intoxication, burden of proof, the role of mitigation, and process by which the jury was to reach its sentencing decision; and making numerous improper and inflammatory remarks during its opening and closing statements in both phases and its questioning of witnesses.

120.    In determining whether a prosecutor's improper remarks require reversal, the Court must determine "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting [conviction or sentence] a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974). In the capital sentencing context, moreover, improper comments must be reviewed in light of the "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" Caldwell v. Mississippi, 472 U.S. 320, 340 (1985)(citation omitted); U.S.Const. Amends. VIII and XIV.

121.    The instances of prosecutorial misconduct so permeated the trial that, while counsel has attempted to broadly categorize them below, there is some overlap in the discussion.[37]

---

[37] As stated above, trial counsel's failure to object to most of the prosecutor's objectionable conduct was ineffective. See supra at ¶¶ 89.

74

**1.**

**Misstatements of Law**

a.

Misstatements Regarding the Burden of Proof

122.  The prosecutor implied throughout the trial that Mr. Roy had to prove he lacked specific intent.  Many times the prosecutor directly misstated the law, and other times he simply strung his correct statements of law together so as to leave an incorrect impression of the law.  He often stated that the law is "a person is presumed to intend the natural consequences of his actions" — a statement that has been held to unconstitutionally shift the burden of proof to the defendant. See Sandstrom v. Montana, 442 U.S. 510 (1979); see infra at ¶¶ 149-155.

123.  In voir dire, the State made the following statements:

It's not whether the person is intoxicated.  It's is the person so intoxicated that he or she cannot form specific intent.  Not be responsible for their actions is basically what it boils down to.  Not be responsible for their actions.

R. 223-224.  (No objection from defense).

This is what they call an affirmative defense and to prove that the person is intoxicated is their burden.  The defense must prove the intoxication, and that the intoxication was so great the person couldn't form specific intent.

R. 224.  In explaining voluntary intoxication to a particular juror:

A person is presumed to know the natural consequences of his actions.  I mean that's the law.  This person is presumed to know the natural consequences of his actions.

R. 227-228.  (No objection by defense).  In response to a juror who asked if the degree of intoxication had to be so severe that the person could not do the alleged act, the prosecutor responded:

I can't comment on these facts here but I can tell you that one of the arguments that people make is that in order to lose that specific intent you'd have to be so drunk you

75

couldn't do it or so whacked out on drugs.

R. 229.  (No objection by defense).

You've got to be so intoxicated you cannot understand what he's ... I'm sorry, that he cannot form the specific intent. He may ... if he doesn't understand it, that's not enough, it's got to be so that he does not intend what is happening. And there's a presumption in our law that a person intends the natural consequences of his actions, or her actions.

R. 454.  (No objection by defense).

Let me talk to you real quickly about what the defense is going to be in this case. Normally the defense is not required to tell me what their defense is, but in this case they did. They have notified me that their intent and their defense is intoxication. I know you don't know anything about the facts of the case, but the theory of intoxication, the defense of intoxication is this. If a person is voluntarily intoxicated, voluntarily intoxicated that person cannot use intoxication as a defense to his actions, except ... except if the person is so intoxicated ... intoxicated to such a degree that they cannot form the specific intent to commit the crime, then they're not to be guilty of that crime. The next thing I need to say [. . .] is the law has a presumption, and the presumption is that a person presumes the natural consequences of his actions. A person presumes the natural consequences of his actions.

R. 607-608.  (No objection by defense).

So, a person presumes the natural consequences, intoxication is a defense, but only if the intoxication is so great ... only if it's so great that the person can't form specific intent.

R. 610-611. (No objection by defense).

On the intent of intoxication on the defense of intoxication that is what we call an affirmative defense, and the burden of proof to prove the intoxication and the level of intoxication is on the defendant. They have to prove that. I don't have to prove he wasn't intoxicated. A person, by law, is presumed to be sane and responsible for his actions, and presumed to intend the natural consequences. So if they want to rely on the defense of intoxication they have to prove to you the level of intoxication that he was intoxicated and that he was so intoxicated that he couldn't form specific intent. Do you understand his burden in this? Does everybody understand it's their burden to prove the intoxication and that the intoxication is to such a degree they couldn't form the necessary criminal intent?

76

R. 611-612. (No objection by defense).[38]

124.    The prosecutor compounded the error by arguing in the *penalty* phase that the defendant had to prove he could not form specific intent and by again arguing the theory of law disallowed by Sandstrom.  The following statements were made by the State during its closing argument at the *penalty* phase:

> What you have to decide is, how responsible is he for his actions.  *The law presumes that a person intends the natural consequences of his act.*  You have to determine how responsible he is.

R. 1885. (No objection by defense).

> The issue is, Larry Roy.  Let's talk a little bit about the intoxication defense.  The defense has tried to establish that Larry Roy was intoxicated.  And the idea is, that he was intoxicated to such a degree that he couldn't form specific intent.  Remember the defense in the penalty phase, I didn't do it, I didn't do it.

R. 1887 (No objection by defense).

> I would suggest to you, ladies and gentlemen, that the mitigating circumstances and at the most prominent one I see, is intoxication hasn't been proved.  It has not been proved.

R. 1890.

125.    In each instance cited above, the prosecutor misrepresented the law with regard to intoxication.  In each instance, the trial attorneys failed to object.  The trial attorneys also failed to request a curative instruction from the trial court.

126.    The guilt phase instructions given by the trial court, with regard to intoxication and

---

[38] "When a defendant raises intoxication as a defense, he must prove, *by a preponderance of the evidence*, that *he was in fact intoxicated.*  When circumstances exist which indicate that intoxication could have precluded specific intent, *the burden shifts to the State to show, beyond a reasonable doubt, that specific intent was present.*"  State v. Patterson, 752 So.2d 280, 284 (La. Ct. App. 2000).  The prosecutor's comments regarding intoxication were clear misstatements of the law.

specific intent and the burdens and standards of proof, were correct in so far as they went. The instructions failed, however, to advise the jury that the law *does not presume* a person intends the natural consequences of his act. The instructions failed to advise the jury that the defense standard of proof with regard to intoxication was by a preponderance of the evidence. See, e.g., State v. Patterson, 752 So.2d 280, 284 (La. Ct. App. 2000).

127. The penalty phase instructions given by the trial court, with regard to intoxication as a mitigating circumstance, were likewise correct in so far as they went. The instructions failed, however, to advise the jury that the law *does not presume* that a person intends the natural consequences of his act; nor did the instructions advise the jury that the defense was not required to prove that the defendant's intoxication obviated specific intent in order to establish intoxication as a mitigating circumstance; nor did the instructions advise the jury that the mitigating circumstance of intoxication did not have to be proved to them by any particular standard of proof, see State v. Jones, 474 So.2d 919, 932 (La. 1985)(Louisiana's "capital sentencing procedure does not establish any presumptions or burdens of proof with respect to mitigating circumstances.")(quoting State v. Sonnier, 402 So.2d 650 (La. 1981)); and finally the instructions did not advise the jury that they did not have to unanimously agree upon the existence of the mitigating circumstance of intoxication (or any other mitigating circumstance) in order to consider it in determining the penalty. See McKoy v. North Carolina, 494 U.S. 433 (1990); Mills v. Maryland, 486 U.S. 367 (1988).

128. In light of the misrepresentations of the law made by the prosecutor throughout the trial, the failure of defense counsel to object to those misstatements, the failure of defense counsel to request a curative instruction, and the silence of the trial court on the subject, the jury was led to

believe, incorrectly, that the law presumed Mr. Roy had specific intent to commit the crimes unless he proved beyond a reasonable doubt that he was intoxicated to an extent that precluded specific intent. In the penalty phase, the jury was similarly led to believe, incorrectly, that the death penalty should be imposed unless the defendant proved the mitigating circumstance of intoxication to an extent that obviated specific intent and did so beyond a reasonable doubt to a unanimous jury.

b.
Incorrect Statements Regarding Aggravation and Mitigation

129. The prosecutor repeatedly misstated the law regarding application of aggravating and mitigating circumstances and how they are used to determine the appropriate penalty. In voir dire, the State made the following misstatements of law:

> The first thing is you look for aggravating circumstances, that is some circumstance that merits the consideration of the death penalty. Then you look at mitigating circumstances. If you find an aggravating circumstance, and once you find one ... once you find at least one of them, you may find more than one, but once you find one then you are to look for mitigating circumstance *and you weigh them.* What is the appropriate penalty? *You weigh the aggravating circumstances against the mitigating circumstances* and it's not a vote of we have three here and three here, it's a tie. It's not three to two this wins, *you weigh them. It's a weighing process.* You look for aggravating, you have to find an aggravating circumstance before you can even consider the ... consider the death penalty. Once you find one then you look at the mitigating *and you weigh them.* Everybody understand. You got to find the aggravating then you look for mitigating *and you weigh them.*

R. 244 (No objection by defense).

> [B]efore you get to the mitigating you have to find an aggravating. Once you find one or more aggravatings you consider the mitigatings and you weigh them.

R. 247 (No objection by defense).

> The same jury comes back, listens to the evidence that's presented in that phase, we call it the phase of a trial ... that part of the trial, then you look for an aggravating circumstance, or aggravating circumstances. If you find one or more then you apply the mitigating ...[The alcohol] can be used there as a mitigating circumstance. *The*

79

> *question that you have is, is that mitigating circumstance great enough to outweigh this or these aggravating circumstances.*

R. 248-249. (No objection by defense).

> [D]o you also understand that you have certain aggravating circumstances if you find an aggravating circumstance or more than one, *you weigh the circumstances aggravating versus mitigating*, not to numbers but to weight to determine what the appropriate penalty is?

R. 250-251. (No objection by defense).

> Do you understand that you have to find an aggravating circumstance and *then you weigh* the mitigating circumstances to make your determination?

R. 258. (No objection by defense).

> [I]f ... the State shows aggravating circumstances *which outweigh* the mitigating circumstances, could you vote to impose the DP?

R. 261 (No objection by defense).

> The Judge tells you to *weigh* the aggravating circumstances against the mitigating circumstances and if you are convinced that the aggravating circumstances *outweigh* the mitigating circumstances *you would* vote for the death penalty.

R. 263-264 (No objection by defense).

> [I]f the State proves the aggravating circumstances and the defense proves mitigating circumstances and your decision is that the aggravating circumstances *outweigh* the mitigating circumstance, could you vote to impose the death penalty?

R. 270 (No objection by defense).

> You understand there are certain aggravating and certain mitigating circumstances. Most importantly what I want you to understand is that it's not three to two or two to three, it's the weight of them?

R. 275 (No objection by defense).

> Do you understand the Judge is going to tell you that you have to consider the aggravating circumstances and if you find ... at least one of those, and maybe more aggravating circumstances then *you are to perform a balancing*

*test* to determine whether the death penalty is appropriate.

R. 403 (No objection by defense).

[I]f the State proves one or more of those aggravating circumstances you are to consider the mitigating circumstances and *weigh it out* to determine what the appropriate penalty is, that is, the death penalty or life imprisonment?

R. 471. (No objection by defense).

If ... it is proven that there are aggravating circumstances, and those aggravating circumstances *outweigh* the mitigating circumstances, could you vote to impose the death penalty. Do you understand that it's not, oh, there's three aggravating circumstances and two mitigating circumstances, so there's the death penalty. Just like it's not, oh, there's four mitigating circumstances and one aggravating circumstance, so it's life. *You've got to weigh them.* It's not a numbers game.

R. 481 (No objection by defense).

[Y]ou take those aggravating circumstances if you find one, *you weigh it*, and if you find one *then you take it and weight it against* the mitigating circumstances and make your determination as to what penalty is appropriate.

R. 499 (No objection by defense).

[I]t's called the penalty phase, or the penalty trial, at which time aggravating circumstances and mitigating circumstances will be introduced, or will be attempted to be introduced, and then you determine what the appropriate penalty is *by weighing those*. . . . What happens is there are a certain set number or statutory guide lines and mitigating circumstances. There are a certain number of ... I said aggravating right, aggravating and there are a certain number of mitigating circumstances and if you find, as a jury, one or more of those aggravating circumstances then you are to look for the mitigating circumstances, determine what mitigating circumstances there are *and afford them their appropriate weight.* Once you've found the aggravating you look for the mitigating and you decide what their *appropriate weight is of aggravating, mitigating, then you balance them out.*

R. 638-39 (No objection by defense).

[W]e have to find one aggravating, at least one. If you find more that's fine, but you cannot even think about the death penalty until you find one of those aggravating circumstances. Once you find those then you compare the aggravating circumstance, or circumstances to the mitigating circumstances *and weigh it out.*

R. 639 (No objection by defense).

> If the State proves one aggravating circumstance, then you consider the mitigating circumstances. If you don't find the aggravating circumstance and, you know, none is proven, then it's life imprisonment. But if there's one found then you have to consider the mitigating, *and you weigh them.* It's not here's three aggravating and two mitigating, therefore, it's death. It's not here's one aggravating and 15 mitigating so it's life. *You weigh how appropriate you think they are. You assign them the appropriate weight.*

R. 650 (No objection by defense).

> I want to talk to you about intoxication for a second. You understand that that is a mitigating circumstance? OK. And do you under that *you assign the weight to that. How much weight you want it to have. As a juror you assign how much weight it's going to have. If you think that it's so great that it outweighs the aggravating circumstances then you should vote for life imprisonment. If you decide that the aggravating circumstances outweigh that then you should do ... you should vote for the death penalty.*

R. 651  (No objection by defense).

> And you basically understand that there are a number of aggravating circumstances that may or may not be proven, and a number of mitigating circumstances that may or may not be proven *and then you weigh them?*

R. 670  (No objection by defense).

130.    The prosecutor's misstatements of law regarding the jury's consideration of aggravating and mitigating factors continued in the penalty phase. In opening statement, the prosecutor told the jury:

> If the State proves at least one aggravating circumstance, then you consider any mitigating circumstances that are shown *and you weigh them.*

R. 1724 (No objection by defense). During its closing and rebuttal arguments in the penalty phase, the State made the following misstatements of law:

> It's monstrous act that he'd planned out. And, we have proven our aggravating

82

circumstances. I would suggest to you, ladies and gentlemen, that the mitigating circumstances and t, the most prominent one I see, is intoxication hasn't been proved. It has not been proved.

R. 1890 (No objection by defense).

Mitigating versus circu, ah, aggravating versus mitigating, we've proven. We've proven at least three on everybody, maybe four. You *weigh those* mitigating and you look at 'em and you determine what they are I would suggest to you that there is only one appropriate penalty in this case. It's a monstrous act as defined by Mr. Armitage. A monstrous act. And the act itself *outweighs any mitigating circumstances* that were proven to whatever level they were proven.

R. 1891 (No objection by defense).

The question is, Mr. Armitage says, you have to make a decision about life or death. The, you basis of that decision is going to be *weighing* aggravating against mitigating.

R. 1892 (No objection by defense).

[Regarding the statutory mitigating circumstance of offender has no significant history of criminal activity] Well, I suggest to you this is not a consideration that *weighs* in mitigation to those aggravating circumstances of this monstrous crime.

R. 1893 (No objection by defense).

131. In each instance cited above, the prosecutor misstated the law with regard to aggravating and mitigating circumstances. In each instance, the trial attorneys failed to object. The trial attorneys also failed to request a curative instruction from the trial court. The instruction given by the trial court, with regard to aggravating and mitigating circumstances, stated:

You are to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed. . . .

Before you decide whether or not a sentence of death should be imposed, you unanimously must find beyond a reasonable doubt that at least one statutory aggravated, aggravating circumstance existed. If you find beyond a reasonable doubt that an aggravated circumstance existed, you may consider imposing a sentence of death. The finding of an aggravating circumstance does not mean that

83

you must impose the death penalty. If, however, you do not unanimously find, beyond a reasonable doubt that a statutory aggravating circumstance existed, then life imprisonment, without benefit of probation, parole or suspension of sentence is the only sentence that may be imposed.

Even if you find the existence of an aggravating circumstance, you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed. . . .

R. 1898.

132. While the penalty phase instructions given by the trial court were correct in so far as they went, they failed cure the erroneous information given them by the State. The court's instructions did not address the fact that aggravating circumstances found were *not* to be weighed against mitigating circumstances found by the jury. See La.C.Cr.P. 905.3; State v. Jones, 474 So.2d 919, 932 (La. 1985). The instructions also failed to tell the jury that they did not have to unanimously agree upon the existence of any one mitigating circumstance in order to consider it in determining the penalty. See, e.g., McKoy v. North Carolina, 494 U.S. 433, 444 (1990); Mills v. Maryland, 486 U.S. 367, 384 (1988). Finally, the instructions failed to tell the jury that the mitigating circumstances did not have to be proved to them by any particular standard of proof. See, e.g., Jones, supra, 474 So.2d at 932 (Louisiana's "capital sentencing procedure does not establish any presumptions or burdens of proof with respect to mitigating circumstances.")(quoting State v. Sonnier, 402 So.2d 650 (La. 1981)). In light of the repeated misstatements of law made by the prosecutor throughout the trial, the failure of defense counsel to object to those misstatements, the failure of defense counsel to request a curative instruction, and the silence of the trial court on the subject, the jury was led to believe, incorrectly, that they were to find whether each of the aggravating circumstances existed, find unanimously whether each of the mitigating circumstances

had been proven beyond a reasonable doubt, and then *weigh* the existing circumstances so that if the aggravators *weighed* more, then the death penalty must be imposed.

c.
Comments improperly committing the defense to the defense of intoxication

133. The prosecutor made other illegal and inappropriate statements throughout the trial committing the defense prior to the conclusion of the State's case-in-chief to the presentation of a voluntary intoxication defense. During voir dire, the prosecutor instructed the venire:

> [T]he defense in this case that has been noticed to me is that the defendant was intoxicated. The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial. Doesn't make any difference, unless it was involuntary or, in this case, where the circumstances indicate that the intoxicated or drugged condition has precluded the presence of a specific criminal intent for or the special knowledge required for a particular crime.

R. 222 (No objection by defense).

> [L]et me talk to you real quickly about what the defense is going to be in this case. Normally the defense is not required to tell me what their defense is, but in this case they did. They have notified me that their intent and their defense is intoxication. I know you don't know anything about the facts of the case, but the theory of intoxication, the defense of intoxication is this. If a person is voluntarily intoxicated, voluntarily intoxicated that person cannot use intoxication as a defense to his actions, except ... except if the person is so intoxicated ... intoxicated to such a degree that they cannot form the specific intent to commit the crime, then they're not to be guilty of that crime. The next thing I need to say [. . .] is the law has a presumption, and the presumption is that a person presumes the natural consequences of his actions. A person presumes the natural consequences of his actions.

R. 607-608. (No objection by defense.) In opening statements, the prosecutor said:

> The defense in this case is intoxication. The defense is going to tell you that he didn't know what he was doing that night. He could not form his specific intent to kill.

R. 1000 (No objection by defense).

134. The prosecutor here improperly suggested that the only defense available to Mr. Roy

85

was the affirmative defense of voluntary intoxication. The prosecutor wrongly suggested that Mr. Roy was no longer pleading not guilty, was no longer alleging an alibi, was not going to present a defense of involuntary intoxication, in short that the only defense he would present was that of voluntary intoxication. The trial attorneys did not object.

**2.**
**Improper and Inflammatory Remarks**

a.
Guilt Phase

135. The prosecution's statements, throughout the course of his questioning of witnesses and during opening statement and closing argument, were peppered with irrelevant, improper and prejudicial comments (which typically were not objected to by the defense), as the below examples illustrate:

136. Throughout the guilt phase, the prosecutor elicited testimony and/or made comments intended to inflame the jury. The prosecutor elicited from each testifying law enforcement officer who was present at the crime scene that this was the first double homicide that they had ever seen, see R. 1030, 1031, 1039, 1084 — a completely irrelevant piece of information that could have no purpose than to prejudice the jury by suggesting that this crime was the worst to be seen in the parish.[39] (Trial counsel did not object to these questions.) The prosecutor, similarly, asked Sheriff Archie Blue, the State's first witness during the guilt phase, "did you get ill going into that house?" R. 1030, again without objection.

---

[39] Even if the prosecutor requested this information for the purpose of justifying the crime scene investigators' failure to preserve evidence (such as the phone cords), this information was both irrelevant and unduly inflammatory.

86

137.   The prosecutor, moreover, pronounced before the jury, in response to a defense objection to hearsay regarding the age of Rosetta Silas, "Your Honor, Ms. Silas will never be here to testify, Judge." R. 1193.  He improperly elicited evidence of unadjudicated other crimes from Sally Richard on direct examination, for which no notice had been given and on which no hearing required under State v. Prieur, 277 So.2d 126 (La. 1973) was conducted:[40]

**Q.** Had you asked Larry not to come back to your house before?

**A.** Yes, sir, I told the policeman.

**Q.** I'm sorry.

**A.** We told the police.

**Q.** OK.  And you'd asked Larry yourself.

**A.** Told the policeman for to tell him.

**BY MR. RODENBECK:** Objection, Your Honor.  May we approach?

COUNSEL APPROACHED BENCH

SIDEBAR CONFERENCE HELD OUT OF HEARING OF JURY

---

[40] At the hearing held on July 5, 1994, the State represented regarding defendant's pending Jackson motion:

> I have responded in the pretrial conference.  I will do it again on the record that the State does not intend to introduce other crimes evidence in its case in chief and the penalty phase, should we get there.  The State may or may not, if it's appropriate, we may or may not cross examine on some of those activities of the defendant in the penalty phase. Depending on what's developed in the penalty phase we may have some rebuttal evidence related to other crimes.  If we do that, the State understands that we would at that time have to have the appropriate Jackson hearing.  For the record, the defense is aware of the actions of the defendant that we're talking about.  They have notice of those, but what I'm saying is I don't plan on using them in the case in chief at this point.

Supplemental Record at 5.

**BY THE COURT:** Ladies and gentlemen, the last answer was not responsive to the question that was asked, so you can disregard that and ... you can proceed.

**Q.** And did you also tell anybody else to ask Larry not to come back to your house?

**A.** The police.

R. 1021.

138.   The prosecutor, during his cross examination of defense expert, Patrick Kent, purposefully compared Larry Roy to Charles Manson:

**Q.** OK.  You compared ... when I talked to you on the phone last week you compared a psychosis to a particular individual.  Do you remember who that was?

**A.** A psychosis to a particular individual?

**Q.** Right.  We were talking about psychosises [sic] (Interrupted)

**A.** No, I don't remember.

**Q.** You don't remember who it was ... talking about babbling and stuff like that?

**A.** I had about six things going on at the time I was talking to you.  Who was it?

**Q.** Charles Manson.

**A.** I'm ... OK.  There you go.

**Q.** Is that (Interrupted)

**A.** Yeah, yeah, that ...

**Q.** He comes and goes.

**A.** Right.

**Q.** Charles Manson, the person that was .. got convicted in California (Interrupted)

**A.** Right.

**Q.** ... for the Sharon Tate murders in 1961 (Interrupted)

88

**BY MR. RODENBECK:** May I approach the bench, Your Honor?

**BY THE COURT:** Yes, sir.

COUNSEL APPROACHED BENCH

SIDEBAR CONFERENCE WAS HELD OUT OF THE HEARING OF THE JURY

\* \* \*

SIDEBAR CONFERENCE [PUT ON RECORD]

\* \* \*

**BY THE COURT:** The mistrial was denied and I admonished counsel not to mention any other incidents similar to the one that's just being objected to.

SIDEBAR CONFERENCE CONCLUDED

**BY THE COURT:** Ladies and gentlemen of the jury you are to disregard the reference that was made to some other incident just a few moments ago. Do you understand what I am talking about? To disregard that, it has no part in this trial whatsoever. All right.

R. 1578-80.

139. Despite the trial court's admonishment not to engage in such improper remarks, the prosecutor, two pages later, adverted to a notorious, fictional serial killer, from the movie "Silence of the Lambs":

**Q.** The FBI, in fact, has a whole unit, the behavioral science unit (Interrupted)

**A.** Yeah. Right.

**Q.** ... devoted to ... that's like that thing in that movie ... uh ... with Jody Foster.

**BY MR. RODENBECK:** Your Honor, I want to object, again, may be approach?

**BY THE COURT:** I'm going to sustain the objection and order the jury to disregard that remark.

**BY MR. STRIDER:** Judge, that's fine. I apologize if I did anything wrong.

**BY THE COURT:** Let's stick to this case.

**BY MR. STRIDER:** OK. I was trying to illustrate that there is a unit at the FBI that does actually do that, it's a science. OK. I'm sorry. I didn't mean anything other than that. I was just trying to illustrate.

R. 1581-82.

140. Yet again, at R. 1622, the prosecutor improperly compared this case to other crimes, asking Mr. Kent, "In the Florida parishes, in the last five years, how many times have you had a crime like this happen?" R. 1595.[41]

141. The prosecutor, moreover, during his cross examination of Mr. Kent, improperly gave a summation in the guise of asking a hypothetical question, R. 1584-1590 (which the court improperly permitted); and patted himself on the back for his success in cross examining the witness: "I know what I've just done to you, Doc, you didn't know these facts."). See also R. 1595 ("In the Florida parishes, in the last five years, how many time have you had a crime like this happen?"); R. 1622-25 (once again, in its direct examination of its rebuttal expert, the prosecutor gave a summation masquerading as a hypothetical question).

142. The prosecutor's closing and rebuttal arguments in the guilt phase, are replete with improper comments (to which the defense did not object). See, e.g., R. 1657 ( "Sally sees the fight, reaches over to grab the phone, stops the fight and says 'It's dead, *ha-ha*, it's dead.'"); R. 1660 ("Why did she throw up? Who knows. Maybe she saw Freddie. I don't know about you, *that was my first impulse, and I wasn't even there*."); R. 1660-1661 ("Why would anyone want to straighten the hook? I straighten a hook to open a can of coffee, to puncture the seal on coffee. Didn't happen

---

[41] The defense again moved for a mistrial, which the trial court denied. R. 1595-96.

here, but there is something that I use it for, when my little four year old decides that she wants to go to the bathroom and lock herself in."); R. 1678 ("That was proved.  I proved it because I had three people that testified to it, under oath, *sworn before God*."); R. 1681 ("Let's talk, very quickly, about the *insanity* defense and what testimony you've heard."); R. 1683 ("What did Dr. Seiden tell us today, the medical doctor.  The man who *referred to the Bible*, the DSM IV."); R. 1685 (about the defendant: "What did he tell you, under oath, *before God*, I didn't even become conscious until it was dark again the next day."); R. 1686 (about the defendant: "he gets on the stand, *swears before God* to tell you the truth"; "I *swear before God* I didn't do it.").  The prosecutor, moreover, perjured himself in his rebuttal closing, arguing at R. 1674: "Let's suppose that the fingerprints were searched for, and they weren't searched for, the crime scene people said they didn't do the fingerprint thing, but let's suppose they were."), when in fact the telephone had been fingerprinted and the fingerprints did not match Larry Roy's.

b.
Penalty Phase

143.   In the penalty phase opening, the prosecutor repeatedly and improperly injected himself into his opening statement.  See, e.g., R. 1723 ("I hope you appreciate that, this is not easy for anyone in this courtroom, *including myself*."); R. 1727 ("Then I'm gonna ask you, and this may sound strange coming from an (words not distinguishable), I'm gonna talk about presumption of innocence *and how I believe in it and all that kind of stuff.  People think prosecutors don't talk like that, but that's not true*.").

144.   During the penalty phase closing, the defense sat mute as the prosecutor engaged in the very conduct that the defense had earlier sought to preclude through a motion to prohibit

91

improper argument,[42] failing to object to a single improper comment by the State, so that the prosecutor's misconduct escalated as closing arguments proceeded.

145. The most egregious of the prosecutor's statements concerned the role of mitigation in the capital sentencing process. The prosecution repeatedly misstated the law concerning mitigation, arguing that the mitigation presented was irrelevant, that it could not "excuse" the crime and was an attempt to "shift" the jury's focus from the task at hand, *i.e.* looking at the "monstrous" crime[43] committed. The prosecutor, moreover, continuously instructed the jury that they were to "weigh" the aggravating against mitigating factors, but that nothing could outweigh the crime. The prosecutor further stressed that the only "just" verdict, in keeping with the jurors' oaths to be just and impartial, was the death penalty [emphasis added]:

> "*What you've seen over the last day; what you saw yesterday, was an attempt to shift the focus. To shift the blame.* But Larry Roy was at 210 Old Jefferson Highway on May 3, 1993. His father wasn't there, his mother wasn't there, his brothers and sisters weren't there, Dr. Craig Forsyth wasn't there; the only person that was there that's in the courtroom today, is Larry Roy. Now certainly, I understand, that there are causes leading up to his action. No doubt about it. *What you have to decide is, how responsible is he for his actions. The law presumes that a person intends the natural consequences of his act. You have to determine how responsible he is ... Let's blame everybody, but, but, the defendant. What it is an attempt to do is shift your focus. Let's shift your focus to somewhere else other than*

---

[42] The defense filed a pretrial motion to prohibit the State from engaging in certain categories of improper argument. R. 81-86. The motion sought to preclude, inter alia, arguments asking the jury to promise to return a death sentence or instructing the jury that they must return a death sentence; that prison life is attractive; and that mitigation does not matter or should not be considered. The State's response to the motion stated that it did not intend to engage in any improper arguments at trial. R. 99. There does not appear to be any ruling from the court on defendant's motion.

[43] The prosecutor purported to take its lead in calling Mr. Roy a monster from the defenses statement in opening that "I'm not here to tell you and I'm not going to tell you, that this was not a monstrous act. But is Larry Roy a monster?" R.1728.

*the Defendant, in this case, let's shift it to his family, let's shift it to the area which he grew up in. I would suggest to you, and I would ask you, to please keep your focus where it belongs. And that's with Larry Roy."* (R. 1885)

*The issue is Larry Roy's handiwork that night, this is the Larry Roy we know, this the Larry Roy and what he does.* This lady, this lady right here, is 75 years old. Is left for the world to see like this. Not by Burke Foster, not by Tommy Roy, not by his mother, but by him. This is your life Larry Roy. How did he get there? Who knows. Dysfunctional family, I would suggest that there may be some people on this jury that their mother and father divorced. Maybe one of their parents is an alcoholic. That maybe, one of their parents worked two jobs or worked twelve hours a day. Maybe you have a lot of kids. *That's not the issue. The issue is, Larry Roy.* (R. 1886-87)

I would suggest to you, ladies and gentlemen, that the mitigating circumstances and t, the most prominent one I see, is intoxication hasn't been proved. It has not been proved. *Let's shift the focus a little bit, let's dance. Let's shift the jury's, in, in the penalty phase, let's shift their attention to the intoxication that wasn't proven.* But ya'll thought about it. Ya'll thought about it and went in that back room and talked about it. *Let's dance a little side step, let's shift the focus.* (R. 1890)

Mitigating versus circu, ah, aggravating versus mitigating, we've proven. *We've proven at least three on everybody, maybe four. You weigh those mitigatings and you look at 'em and you determine what they are. I would suggest to you that there is only one appropriate penalty in this case. It's a monstrous act as defined by Mr. Armitage. A monstrous act. And the act itself out weighs any mitigating circumstances that were proven to whatever level they were proven. And that appropriate penalty, it's hard for me to say, and it's gonna be harder for you to say, but it is, the death penalty.* (R. 1891)

What I would suggest to you, ladies and gentlemen, is this, these are the mitigating circumstances, offender has no significant prior history of criminal activity. The defense's own expert says that ain't so. Over half his life he's been a criminal. He's only done one bad thing. *Well, I suggest to you this is not a consideration that weighs in mitigation to those aggravating circumstances of this monstrous crime.* Was it com, was the offense committed uh, while the Defendant was under the influence of extreme mental or emotional disturbance? I don't see it. . . . At the time of the offense, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication. I refuse to admit that. *Was, was he intoxicated to a degree that it should excuse this monstrous act?* Tell you what I'll do, I'll put that one up there. Do I think it, do I, does the evidence show it? There is some evidence, but where is that evidence from? Larry Roy. *If*

93

*you believe what Larry Roy had to say, then he was intoxicated. The question is, was he so intoxicated that you should excuse this monstrous act? I think not? . . .* And finally, any other relevant mitigating circumstance. Let's talk about that for little bit. Dr. Craig Forsyth, the expert, said, this man is a con man, he's a criminal, he's a pleasure seeker, he has a need for instant gratification. He's deceitful and lived a lie, and he committed criminal acts to get drugs. . . . Dr. Forsyth is the man who talked about his dysfunctional home. *No doubt about it. It's a dysfunctional home. But a lot of homes are dysfunctional and this, this doesn't result from a dysfunctional home. . . . The questions is, if you want to apply this (word not distinguishable), his family history, his dysfunctional home, the question is, is that truly a cause? Sure it's a contributing factor. But the question you have is this, how many double homicides have, have existed in this State? Have double homicides committed with a knife where an eight year old boy and a ten year old boys' throats were slashed, after they were tied up. If that's a common occurrence of people who drug, have drug addictions. If that's a common occurrence of people who come from dysfunc, from dysfunctional homes, then that is a mitigating circumstance. I agree. If this is a common occurrence because of those problems in a pro, a person's upbringing, then this is a mitigating circumstance. But I would suggest to you, from the bottom of my heart, that that doesn't cause of this kind action, 'cause if it did, how many drug addicts do we have in this State? How many drug addicts do we have in the city of Alexandria? What did Mr. Kent say? I handle a thousand people every ninety days. He handles four or five thousand drug addicts, maybe six thousand drug addicts, maybe eight thousand drug addicts a year. Does that mean that this crime, this crime is mitigated because someone's a drug addict. I promise you, and he told you, drug addicts usually come from dysfunctional homes. The, remember th, the list there, you had the recreational user and the social user and all that stuff. Once you get to that bottom, that's a dysfunctional home. Are you gonna tell Larry Roy, we're gonna excuse this act. This monstrous act, because you come from a dysfunctional home. Are you gonna tell Rosetta Silas and Freddie Richard that?* (R. 1893-95)

*Focus on the crime and the Defendant. That's what we're supposed to do here. Focus on the crime. These are Larry Roy.* (R. 1897)

Life is punishment for that man. *Life is punishment for that man, Mr. Rodenbeck, ah, Mr. Armitage told you that. It is, It is. But, is it justice?* I'm not gonna argue that life is not punishment. *The question you have to face, is, is it justice? Is it justice for Freddie Richard. Is it justice for a seventy-five year old lady, who's bound and slaughtered? Le, yes, life is punishment, but is it justice? Do you solemnly swear or affirm that [you] will try this case in a just and impartial manner, to the best of your judgment and to render a verdict according to law and the evidence, so help you God? That was your oath. Your oath is to do justice.* Feel the sorrow, feel the pain, for them and for him. I do. Feel it, for everybody. Feel the sorrow and the

94

pain for that eight year old boy who was tied up and had his throat slashed after watching his daddy get killed. I'm not suggesting that you should not feel that for Larry Roy either. But focus on what we're doing here. *Justice, justice for them, justice of him. It's a monstrous act. . . . N, nothing we can do to make this turn out to a, to be a good situation. But if you wanta feel bad, at least feel tempered with the fact that you've done justice. And justice is, for Rosetta Silas, for Freddie Richard, is the death penalty.* Tell Larry Roy, what you did was evil, what you did was bad, and we're gonna do justice, no matter how hard it is, and no matter how much courage it takes. *The death penalty is the only just thing in this case.* Two people slaughtered, and three people tied up and left to die after having their throats slashed. Sally, you're all gonna be dead before the police get here. Little bitty ole Frederick. *I, I know it's tough, but it's fair and it's justice. And I know you'll do it.* (R. 1897-98)

146. The prosecution's argument improperly belittled the role of mitigation in the jury's sentencing determination. The Louisiana death penalty statute *mandates* that the jury consider mitigating circumstances prior to returning a sentence, La.C.Cr.P. 905.3, and expressly lists seven specific mitigating circumstances, which are mitigating *as a matter of law*, and one catch-all mitigating circumstance. La.C.Cr.P. 905.5. This statutory scheme is dictated by the federal constitution:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the death penalty.

Woodson v. North Carolina, 428 U.S. 280, 304 (1976)(plurality); see Roberts v. Louisiana, 428 U.S. 325, 333 (1976) (plurality)(striking down Louisiana's mandatory death penalty statute and observing that "[t]he constitutional vice of mandatory death sentences [is the] lack of focus on the circumstances of the particular offense *and the character and propensities of the offender....*") (emphasis added); State v. Jones, 474 So.2d 919, 932 (Louisiana's "capital sentencing procedure

95

does not establish any presumptions or burdens of proof with respect to mitigating circumstances."); State v. David, 425 So.2d 1241, 1248-49 (La. 1983)(reversing sentence where judge instructed jury to return death sentence upon finding of aggravating factor); State v. Watson, 423 So.2d 1130 (1982) (same).

147. The United States Supreme Court has repeatedly emphasized the central importance of mitigating evidence to the capital sentencer's decisionmaking. As the Court observed in Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982): "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence.... The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." (emphasis original). See also Buchanan v. Angelone, 522 U.S. 269, 276 (1998)("our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence."); McKoy v. North Carolina, 494 U.S. 433, 442 (1990)("[t]he Constitution *requires* States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall.")(emphasis original); Penry v. Lynaugh, 492 U.S. 302, 327-28 (1989)("it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a "'reasoned moral response to the defendant's background, character, and crime.'"")(quoting Franklyn v. Lynaugh, 487 U.S. 164, 184, 108 S. Ct. 2320, 2333, 101 L.Ed.2d

96

155 (1988)(O'Connor, J., concurring)); <u>California v. Brown</u>, 479 U.S. 538, 541 (1987)("[c]onsideration of [mitigating] evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'")(quoting <u>Woodson v. North Carolina</u>, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)); <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 (1978)("a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.").

148.  The prosecution's improper argument, particularly in conjunction with its improper statements of the law during voir dire, had the effect of instructing the jury to ignore mitigation. The prosecutor's argument completely undermined the crucial role that mitigation plays in ensuring a constitutional sentencing verdict.  The trial court's brief instruction about the role of mitigation did not correct the blatantly erroneous and uncontrolled arguments of the prosecutor which so infected the sentencing process with unfairness as to be a denial of due process.  The result was two death sentences that lack the reliability required under the Eighth and Fourteenth Amendments.[44]

---

[44] The prosecutor's argument was improper in numerous other respects.  Despite the defense's attempt to prohibit such argument at trial, the prosecutor also improperly engaged in name-calling, referring to Mr. Roy as a "monster," ("This was a monstrous act. Who commits monstrous acts? Monsters do. The monster in this case is Larry Roy." R. 1885), and repeatedly referring to him as a liar and "little con man," R. 1888.  The prosecutor discussed for an entire page the attractiveness of life at Angola (commenting that "I spent a long time establishing that Angola is not nearly as bad as people think"), despite contending that conditions at Angola were irrelevant. R. 1886.  The prosecutor, additionally, again improperly injected himself and God into the proceedings.  <u>See</u> R. 1883-84 ("I hope you also appreciate what I do here is also the most difficult thing a prosecutor can do.  But, I took an oath as a prosecutor and you took an

## III.

## THE JURY THAT CONVICTED AND SENTENCED MR. ROY TO DEATH APPLIED AN UNCONSTITUTIONAL PRESUMPTION OF INTENT, IN VIOLATION OF MR. ROY'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (AEA No. 35)

149. As set forth above, *supra* at ¶¶ 122-28, the prosecutor repeatedly instructed the jurors that a criminal defendant is presumed to have intended the natural consequences of his acts.

150. During the voir dire, the prosecutor emphasized this to the venire again and again:

> A person is presumed to know the natural consequences of his actions. I mean that's the law. This person is presumed to know the natural consequences of his actions.

R. 227-228.

> You've got to be so intoxicated you cannot understand what he's ... I'm sorry, that he cannot form the specific intent. He may ... if he doesn't understand it, that's not enough, it's got to be so that he does not intend what is happening. And there's a presumption in our law that a person intends the natural consequences of his actions, or her actions.

R. 454.

> Let me talk to you real quickly about what the defense is going to be in this case. Normally the defense is not required to tell me what their defense is, but in this case they did. They have notified me that their intent and their defense is intoxication. I know you don't know anything about the facts of the case, but the theory of intoxication, the defense of intoxication is this. If a person is voluntarily intoxicated, voluntarily intoxicated that person cannot use intoxication as a defense to his actions, except ... except if the person is so intoxicated ... intoxicated to such a degree that they cannot form the specific intent to commit the crime, then they're not to be guilty of that crime. The next thing I need to say [. . .] is the law has a presumption, and the presumption is that a person presumes the natural consequences of his actions. A person presumes the natural consequences of his actions.

---

oath as a jury and I know we're gonna do our jobs. So let's get it on."); R. 1887 (in penalty phase closing, about the defendant: "He *swore before God* that it wunn't him."). The prosecutor improperly appealed to the jury to do "justice" for the victims by sentencing Mr. Roy to death.

R. 607-608.

> So, a person presumes the natural consequences, intoxication is a defense, but only if the intoxication is so great ... only if it's so great that the person can't form specific intent.

R. 610-611.

> On the intent of intoxication on the defense of intoxication that is what we call an affirmative defense, and the burden of proof to prove the intoxication and the level of intoxication is on the defendant. They have to prove that. I don't have to prove he wasn't intoxicated. A person, by law, is presumed to be sane and responsible for his actions, and presumed to intend the natural consequences. So if they want to rely on the defense of intoxication they have to prove to you the level of intoxication that he was intoxicated and that he was so intoxicated that he couldn't form specific intent. Do you understand his burden in this? Does everybody understand it's their burden to prove the intoxication and that the intoxication is to such a degree they couldn't form the necessary criminal intent?

R. 611-612.

151. The prosecutor repeated this instruction in the *penalty* phase, arguing: "What you have to decide is, how responsible is he for his actions. *The law presumes that a person intends the natural consequences of his act.* You have to determine how responsible he is." R. 1885.

152. The prosecutor's statements were blatant misstatements of the law. In <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979), a case decided fifteen years prior to Mr. Roy's trial, the United States Supreme Court held that an instruction informing the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," unconstitutionally shifted the burden of proof from the state to the defendant. <u>See also United States v. United States Gypsum Co.</u>, 438 U.S. 422, 435 (1978)(finding instruction that "[t]he law presumes that a person intends the necessary and natural consequences of his acts" unconstitutional because "a defendant's state of mind or intent is an element of a criminal antitrust offense which ... cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on

99

prices."). Such an instruction violates the defendant's right to the presumption of innocence and lowers the State's constitutionally imposed burden of proving every element of a crime beyond a reasonable doubt. See Sandstrom, supra, 442 U.S., at 520 (quoting In re Winship, 397 U.S. 358, 364 (1970).

153. As noted, trial counsel was ineffective in failing to object to any of the prosecutor's incorrect statements. See supra at ¶¶ 89. As a result of counsel's failure to object to these comments, the trial court was never asked to admonish the jury or to correct their misunderstanding of the law.

154. In denying relief on direct appeal, the Louisiana Supreme Court concluded that the error was cured by the trial court's instructions. State v. Roy, 681 So.2d 1230, 1239-40 (La. 1996). The trial court, however, failed to provide instructions sufficient to nullify the prosecutor's repeated misstatements to the jury. Although the guilt instructions informed the jury that Mr. Roy was presumed innocent and that the State had the burden of proving his guilt beyond a reasonable doubt, R. 1689, and the court instructed the jury in the penalty phase charge that it must find at least one aggravating factor by proof beyond a reasonable doubt, R. 1899, the instructions did not inform the jury that the burden-shifting instruction repeatedly given them by the prosecutor was incorrect. In Sandstrom, the Court concluded that comparable instructions by the court did not cure the erroneous, burden-shifting instruction:

> The potential for these [improper] interpretations of the presumption was not removed by the other instructions given at the trial. It is true that the jury was instructed generally that the accused was presumed innocent until proved guilty, and that the State had the burden of proving beyond a reasonable doubt, that the defendant caused the death of the deceased purposely or knowingly. . . . But this is not rhetorically inconsistent with a conclusive or burden-shifting presumption. The jury could have interpreted the two sets of instructions as indicating that the

100

presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied.  For example, if the presumption were viewed as conclusive, the jury could have believed that, although intent must be proved beyond a reasonable doubt, proof of the voluntary slaying and its ordinary consequences constituted proof of intent beyond a reasonable doubt.

Sandstrom, supra, 442 U.S., at 518 n.7.

155.  Here, the trial court did not provide any instructions that displaced the prosecutor's repeated, incorrect statement of the law.[45]  As a result, Mr. Roy's jury operated under an incorrect understanding of the law which shifted the burden to him of proving his lack of specific intent — the primary issue in this case (despite the defense's inexplicable decision to additionally present an unbelievable alibi defense) and one which resonated in both the guilt and penalty phases in light of the intoxication defense pursued in both stages of the trial.[46]

## IV.
## MR. ROY WAS INDICTED BY AN UNCONSTITUTIONALLY CONSTITUTED GRAND JURY IN VIOLATION OF AMENDMENTS VI, VIII, AND XIV TO THE UNITED STATES CONSTITUTION (PCR Issue No. 2)

156.  Mr. Roy's counsel failed to challenge the grand jury indictment bringing the two counts of first degree murder against Mr. Roy for which he has been convicted and sentenced to death.[47]  The Grand Jury that indicted Mr. Roy was impanelled on January 21, 1993 and was

---

[45] Accordingly, the Louisiana Supreme Court's conclusion that there was no reversible error was contrary to the clear reasoning of Sandstrom and an unreasonable determination of the facts in light of the evidence.  See 28 U.S.C. § 2254(d).

[46] As argued above, supra at ¶¶ 122-28, the prosecutor's incorrect statements that the law presumes intent were intertwined with the State's erroneous explanations of the intoxication defense.  Any analysis of the harm arising from the Sandstrom error cannot be divorced from the State's repeated and incorrect interpretation of the intoxication defense.

[47] As pleaded supra at ¶ 89, trial counsel was ineffective in failing to challenge the constitutionality of the grand jury.

101

illegally and unconstitutionally constituted in that the Grand Jury foreperson selection process in Rapides Parish was discriminatory and in violation of the statutes of Louisiana, Article 1, Sections 2, 3, 15, 16, and 20 of the Constitution of the State of Louisiana, and the Amendments VI, VIII, and XIV to the United States Constitution.

157. Trial counsel further failed to establish a *prima facie* case that discrimination occurred by eliciting testimony and presenting evidence:

a)   that the group excluded is a recognizable, distinct class, singled out for different treatment under the laws as written or as applied; and

b)   proving the degree of under representation by comparing the proportion of the group and the total population to the proportion called to serve as grand jury foremen over a significant period of time; and

c)   that the grand jury foreman selection process is susceptible of abuse or is not racially neutral.

See Castanada v. Partida, 430 U.S. 482, (1977). Minutes reflecting the Grand Jury selection process were readily available to trial counsel at the time of Mr. Roy's indictment and trial, see Exhibit D, Minutes of Grand Jury, yet trial counsel failed to file a motion to quash or to take any other step to demonstrate the illegal and unconstitutional nature of the selection of the Grand Jury foreperson in Rapides Parish at the time of Mr. Roy's indictment.

158. A *prima facie* case that the grand jury foreperson selection procedure discriminates against African Americans and women is clearly established here. African Americans are a recognizable, distinct class, singled out for different treatment under the Grand Jury foreperson selection process as applied. While African Americans constitute approximately 25% of the jury data base from which the grand and petit juries in Rapides Parish are drawn, they constitute only 4% of the Grand Jury forepersons selected between 1981 and 1994. See Exhibit "E" to PCR

Petition (attached as Exhibit "G" hereto)(Grand Jury Foreman lists for Rapides from 1981-1994, with race percentages in parish).  Likewise, women are a recognizable, distinct class, singled out for different treatment under the Grand Jury foreperson selection process as applied.  Women constitute approximately 54½% of the jury data base from which the grand and petit juries in Rapides Parish are drawn; yet they constitute only 24% of the Grand Jury forepersons selected between 1981 and 1994.  See id.

159.  At the time of Mr. Roy's indictment, and for years prior to that time, the grand jury foreperson was selected, in parishes other than Orleans, by the court from members of the grand jury venire.  La.C.Crim.P. Art. 413(B)(since amended).[48]  This process is susceptible of abuse, see Campbell v. Louisiana, 523 U.S. 392 (1998), and, as shown by the statistics, is not race or gender neutral.

160.  The illegal and unconstitutional manner of selection of the grand jury foreperson tainted the entire proceeding.  The grand jury foreperson in Louisiana, by law, is a voting member of the grand jury.  Further, the discriminatory method of selecting of the foreperson leads to an unfair grand jury in violation of the fair cross section requirements for a fair and impartial trial.  Mr. Roy's trial was thus had upon an indictment returned by an illegal and unconstitutional grand jury, and his two convictions and sentences were imposed on the basis of that illegal indictment.  Mr. Roy was thus denied the state and federal rights guaranteed to him by Article 1, Sections 2, 3, 15, 16, 17,

---

[48]  Prior to 1999, and at the time Mr. Roy was indicted, La.C.Crim.P. Art. 413(B) provided, in pertinent part, that "[i]n parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury.  The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury."  In 1999, the legislature amended the rule to provide for the random selection of the grand jury foreperson.

18, 20, and 22, and Amendments VI, VIII, and XIV to the United States Constitution.  See Rose v.

Mitchell, 443 U.S. 545 (1979); Castanada v. Partida, 430 U.S. 482 (1977); Johnson v. Puckett, 929

F.2d 1067, 1069-70 (5th Cir. 1991).

**V.**

**THE INCOMPLETE STATE OF THE APPELLATE RECORD, WHICH
PRECLUDED THE LOUISIANA SUPREME COURT FROM CONDUCTING
AN ADEQUATE REVIEW OF THE PRETRIAL AND TRIAL PROCEEDINGS
FOR ERROR IN VIOLATION OF MR. ROY'S RIGHTS UNDER STATE LAW
TO APPELLATE REVIEW OF HIS CONVICTIONS AND DEATH SENTENCES,
RESULTING IN THE DENIAL OF MR. ROY'S RIGHTS TO DUE PROCESS,
THE EFFECTIVE ASSISTANCE OF COUNSEL AND THE RIGHT TO BE
FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER AMENDMENTS
VI, VIII AND XIV OF THE UNITED STATES CONSTITUTION (PCR Issue No. 6)**

161.  A substantial portion of the trial proceedings in this matter is missing from the record.

162.  The minutes reflect that a number of hearings were held that are not in the record,

either because they were not recorded at all or because trial and appellate counsel did not bother to

have them transcribed, as follows:

■ Hearing on the motion for individual sequestered voir dire, conducted 11/30/93, at which

testimony was taken.  R. 5.

■ Hearing held on 11/30/93 regarding the Sanity Commission.  R. 5.

■ *Ex parte* hearing held during trial, on 7/16/94 and sealed at defense counsel's request.

R.20.[49]

---

[49] The transcript of this sealed *ex parte* hearing reflects that trial counsel advised the court that their client was refusing to testify before the all-white jury.  As the record reflects, Mr. Roy did take the stand during the guilt phase of his trial — to devastating effect.  Appellate counsel should have obtained this transcript and argued the clear implication of trial counsel's statements — that they were forcing their client to testify against his will in violation of his Fifth, Sixth and Fourteenth Amendment Rights.  See *supra* at ¶¶ 91-92.

163. Furthermore, throughout the trial, a total of 38 bench conferences were conducted that were not recorded by the court stenographer and consequently are not set forth in the transcript. These bench conferences occurred during voir dire, see R. 175, 181, 283, 308, 309, 343, 357, 441, 512, 552, 554, 657, 858, 929 and 990; during the guilt phase; see R. 1005, 1020, 1073, 1113, 1191, 1207, 1221, 1279, 1304, 1380, 1392, 1540, 1579, 1585, 1596, 1622, 1626 and 1688; and during the penalty phase. See R. 1722, 1732, 1788, 1827 and 1844. It is frequently clear from the transcribed portions surrounding these bench conferences that issues vital to the trial, such as objections raised by the parties, were discussed and ruled upon, although often the substance of these objections, and the court's rulings, remain a mystery, as the following examples illustrate:

■ Cause challenges were made and argued in side bar conferences that were not recorded. Although the defense was allowed to put on record its objection to certain of the court's rulings, the basis for cause challenges and the arguments made in support or opposition to the challenges are not discernable from the record.

■ During the defense's cross examination of Sheriff Archie Blue, the first law enforcement officer at the scene, the defense attempted to impeach the witness's testimony with a prior statement he had given. This questioning was interrupted by the State's request to approach the bench, following which a bench conference was held off the record:

Q:    In your statement you seem to indicate that ... uh ...

BY MR. STRIDER: Excuse me, Your Honor, may we approach the bench?

Counsel approached bench

Bench conference was held out of hearing of jury

R.1020. Immediately following the bench conference, testimony resumed. The defense, however,

105

did not question Sheriff Blue about his prior statement. It thus appears that the Court sustained an objection by the State, although the basis of the objection and the ruling cannot be determined.

■ At page 1073, the following is reflected in the transcript with respect to State's Exhibits Nos. 25 through 32, which were gruesome photographs of Freddie Richard:

> **BY MR. STRIDER:** Your Honor, I'd offer, file and introduce into evidence State's Exhibit Number 25 through 32.
>
> **BY MR. RODENBECK:** Your Honor, we'd have no ... can we approach the bench?
>
> **BY THE COURT:** Yes, sir.
>
> Counsel approached bench
>
> Bench conference held out of hearing of jury
>
> **BY THE COURT:** Subject to the previous objection they are admitted. All right.
>
> **BY MR. RODENBECK:** Your Honor, subject to the previous objection that we made, and I believe that was a Motion in Limine.

R.1073. Although it appears that defense counsel renewed the objection that they raised prior to trial, the failure to record the bench conference precludes a determination of whether additional or more fully articulated grounds for the objection were raised and rejected by the court during trial.

■ During the redirect of David Richard, the State attempted to elicit new evidence that it had failed to elicit on direct examination. The defense objected. The State then released the witness and immediate recalled him to ask the same question. Following a bench conference off the record, the State was allowed to resume its new questioning of the witness. R.1304. Although the import of the defendant's objection appears fairly clear, the arguments presented by both sides and the basis of the trial court's ruling are absent.

164. More troubling, however, is the fact with respect to the majority of bench conferences,

it simply cannot be determined what was discussed. Although some bench conferences, no doubt, addressed ministerial matters, it is likely that others addressed issues critical to the trial. Without a record of these bench conferences, appellate counsel, post-conviction counsel and the courts have no way to determine whether significant errors occurred off the record.

165. It is well-settled that a Louisiana appellant in a criminal case has a state constitutional right to a complete record of all evidence upon which his conviction was based: "No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which judgment is based...." La. Const. Art. 1 § 19. This right is necessary to implement the right to appeal, La. Const. Art. V § 20. Where a state grants a criminal appeal as of right, moreover, a criminal defendant has a due process right under the Fourteenth Amendment to the United States Constitution to appellate review on the basis of an adequate record. Griffin v. Illinois, 351 U.S. 12 (1956).

166. The Louisiana Supreme Court has underscored the importance of Art. 843's recordation requirement in preserving the constitutional right to appeal:

> The purpose of the constitutional and codal (C.Cr.P. art. 843) requirement of recording all proceedings in felony cases is to make it possible for a party to support assignments of error on appellate review. When a portion of the trial has not been recorded, a party cannot perfect assignments of error which occurred during that portion of the trial, and the appellate court cannot review any errors pursuant to C.Cr.P. art. 920 in order to insure that the trial was properly conducted

State v. Robinson, 387 So.2d 1143, 1144 (La. 1980) (citation omitted). See also State v. Landry, 751 So.2d 214, 215 (La. 1999)("Complementary to [the] right [to appeal] is the constitutional right to judicial review based on a complete record of the proceedings. La. Const. Art. I, § 19.").

167. In a capital case, the right of judicial review is of paramount importance to ensure that

the requirement, under Article 1, section 20 of the Louisiana Constitution of 1974, and Amendments VIII and XIV of the United States Constitution, that the death penalty not be inflicted in an arbitrary and capricious manner be upheld.  As the United States Supreme Court has cautioned, the "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case."  Kyles v. Whitley, 514 U.S. 419, 422 (1995)(citation omitted).

168.  Here, at every stage of the litigation, Mr. Roy's rights to judicial review of his trial were violated by the failure of the court and his attorneys to make and preserve a complete record.

Error by the trial court

169.  Louisiana Code of Criminal Procedure places on the district courts an affirmative duty to record the entirety of trial proceedings in felony proceedings in order to implement the constitutional right to judicial review.  See State v. Ford, 338 So. 2d. 107, 108-09 (La. 1976). La.C.Cr.P. art. 843 provides:

> In felony cases ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.

"[T]he trial judge is duty bound to see that the court reporter makes a true, complete and accurate record of the trial."  Landry, supra, 751 So.2d at 216.  The district court's failure to comply with the dictates of article 843 thus violated Mr. Roy's right to judicial review secured by the Louisiana Constitution, La. Const. art. 1, §§ 19 and 20, and the VIII and XIV Amendments to the United States Constitution.

Ineffective Assistance of Trial Counsel

170.  Defense counsel, as well, had a duty to ensure that an adequate record was made of the

108

proceedings in the trial court. The right to a complete record of a criminal trial sits solely with the defendant and cannot be waived by defense counsel or anyone else. See State v. Gibbens, 562 So. 2d 457 (La.App. 3 Cir. 1990)(setting aside conviction and sentence and remanding for new trial where the record reflected that defense counsel had waived right of recordation, but did not reflect that the trial court affirmatively determined that the defendant himself had intelligently waived his constitutional right of judicial review).

171. It is clear that trial counsel was aware that bench conferences were not being recorded by the court stenographer, as there are occasions when unrecorded discussion at the bench were subsequently put on the record. See, e.g., R.1052-53 (putting on record objection that appears to have been made during unrecorded bench conference at R. 1005). There can be no strategic reason for trial counsel's failure to make sure that *every* bench conference addressing substantive trial issues was preserved for appellate review. Counsel's failure violated Mr. Roy's right to effective assistance of counsel under La. Const. art. 1, § 13 and U.S. Const. amends. VI and XIV. See *supra* at ¶ 89.

<u>Ineffective Assistance of Appellate Counsel</u>

172. The Louisiana Supreme Court has not hesitated to reverse and remand for a new trial where the failure to provide a complete record of the trial has rendered illusory the constitutional right of appeal. "A criminal defendant has a right to a complete transcript of the trial proceedings, particularly where counsel on appeal was not counsel at trial.... '[W]here a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully recorded trial." Landry, supra, 751 So.2d at 215-16 (citations

109

omitted).  See also Hardy v. United States, 375 U.S. 277, 281 (1964)("when, as here, new counsel represents the indigent on appeal, how can he faithfully discharge the obligation which the court has placed on him unless he can read the entire transcript?"); State v. Robinson, 387 So.2d 1143, 1144 (La. 1980)("[t]he Supreme Court of the United States has ... recognized the right to a complete transcript of the trial proceedings, particularly when (as here) counsel on appeal was not counsel at the trial.")(citation omitted); Ford, supra, 338 So. 2d. at 109-10 (reversing conviction for second degree murder because of incomplete state of record and observing that "[i]n Louisiana, as in the federal courts, an appeal from a felony conviction is an absolute right.  La.Const. art. VII, § 10 (1921); La.Const. art. V, § 5(D)(2) (1974); Coppedge v. United States, 369 U.S. 438, 82 S. Ct 917, 8 L.Ed. 21 (1962).[50]

173.  Here, appellate counsel had no involvement with the trial.  Yet appellate counsel did nothing to reconstruct the missing trial record, other than to seek affidavits by trial counsel regarding a *single* bench conference, at R. 343, during voir dire that was the subject of one of the five issues briefed in the direct appeal; appellate counsel failed to raise as an error the abysmal state of this record, which precluded full and adequate judicial review on appeal.[51]  Counsel's failure violated Mr. Roy's right to effective assistance of appellate counsel Amendments VI and XIV of the United States Constitution.  See supra at ¶¶ 91-92.

---

[50]  Indeed, in this federal circuit prejudice is presumed where a record is incomplete and appellate counsel did not try the case.  See, e.g., United States v. Brumley, 560 F.2d 1268, 1280-1281 (5th Cir. 1977).

[51]  The missing hearings, moreover, even if recorded, were not transcribed — an error that must be attributed to appellate counsel.

# VI.
## THE TRIAL COURT ERRONEOUSLY DENIED CAUSE CHALLENGES TO JURORS WHO WERE SUBSTANTIALLY IMPAIRED IN THEIR ABILITY TO CONSIDER LIFE SENTENCES AND/OR MITIGATING FACTORS (AEA Nos. 6, 10-11)

174. The trial court erroneously denied Mr. Roy's challenges for cause to Judith Hempstead and Doris Kees.[52] The testimony of each of these jurors demonstrated that they were substantially impaired in their ability to consider life sentences in this case and/or to consider statutory mitigating factors. Judith Hempstead ultimately sat on the jury. Ms. Kees was removed by a defense peremptory challenge.[53]

175. The Sixth Amendment right to an impartial jury requires the exclusion of a potential juror if his "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985)(quoting Adams v. Texas, 448 U.S. 38, 45 (1980); see also Greene v. Georgia, _ U.S. _, 117

---

[52] The bench conferences at which cause challenges were raised and argued were not recorded. Accordingly, the arguments of counsel and the conclusions of the trial court can only be guessed at.

[53] Although the Supreme Court held in Ross v. Oklahoma, 487 U.S. 81 (1988), that a state habeas petitioner's due process rights were not violated merely by the trial court's erroneous denial of a cause challenge, where the juror was subsequently removed by a defense peremptory, the Court stressed that the petitioner had not been deprived of any rights guaranteed under state law because Oklahoma law required a defendant to use his peremptory challenges to correct a trial court's erroneously denial of a cause challenge. Such is not the case here. Under Louisiana law, a capital defendant has a state constitutional right to exercise twelve peremptory challenges. The Louisiana Supreme Court has repeatedly held that the wrongful denial of a defense cause challenge requires reversal if the defendant has exhausted his peremptory challenges, regardless of whether an objectionable juror is ultimately seated. See, e.g., State v. Divers, 681 So.2d 320, 323 (La. 1996), cert. denied, 117 S. Ct. 1461 (1997); State v. Maxie, 653 So.2d 526, 534 (La. 1995). Accordingly, as Mr. Roy exhausted his allotment of peremptory challenges, the wrongful denial of even one of his cause challenges violates due process, regardless of whether the challenged juror was seated on the jury.

S. Ct. 578 (1996). Thus, "the requirement that a juror may be excluded only if he would never vote for [or against] the death penalty is now missing...." Witt, 469 U.S. at 421.

176.    Moreover, a prospective juror is substantially impaired in his ability to perform his duties in accordance with his instructions and oath if he "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Morgan v. Illinois, 504 U.S. 719, 729 (1992). A capital defendant accordingly has a due process right to exclude for cause any juror who would reflexively impose the death penalty upon someone convicted of capital murder without consideration of the mitigating evidence presented. "Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude the imposition of the death penalty." Id. at 738. See State v. Divers, 681 So.2d 320 (La. 1996), cert. denied, 117 S. Ct. 1461; Grooms v. Commonwealth, 756 S.W.2d 131, 137 (Ky. 1988); Cumbo v. State. 760 S.W.2d 251 (Tex. Cr. App. 1988); Skipper v. State, 364 S.E.2d 835 (Ga. 1988); Pickens v. State, 730 S.W.2d 230 (Ark.), cert. denied, 484 U.S. 917 (1987); Pope v. State, 345 S.E.2d 831 (Ga. 1986).

177.    Accordingly, a juror's statement that she does not consider statutory mitigating evidence to be relevant to the sentencing decision has announced her inability to follow the law according to the court's instructions. "The sentencer ... may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." Eddings v. Oklahoma, 455 U.S. 104, 115 (1982). It is one thing to say that a juror is free to assign little weight to a mitigating factor after the evidence has been presented and considered. It is quite another, though, to say that a capital defendant has no right to exclude a

prospective juror with a serious bias against a particular mitigating factor.  Such a juror would be substantially impaired in following the capital sentencing instructions under <u>Witt</u> and therefore removable for cause.

**A.**
### The Trial Court Erred in Denying the Cause Challenge to Judith Hempstead

178.  This juror, the wife of a former Alexandria police officer, who maintained friendships with members of the force, R. 337-38, and was familiar with pretrial publicity, R. 289, 365-66, informed the prosecutor during death qualification questions that if the State proved Mr. Roy's guilt and showed that aggravating factors outweighed mitigating circumstances, she could vote for the death penalty if it was appropriate.  R. 261.  The defense later followed up on this questioning:

Q.    [Y]ou said yesterday that you have no moral objections to the death penalty.

A.    No.

Q.    And that if appropriate you could impose the death penalty, is that correct?

A.    Yes.

Q.    What . . . can you explain to me what you mean by appropriate?  What circumstances would have to exist for it to be appropriate for you?

A.    I think that if we prove him guilty of murder of two people and three attempts to murder three other people I'm going to vote for the death penalty."

Q.    OK.  Then that leads me to the question would you automatically vote for the death penalty without regard to the mitigating circumstances that (Interrupted)

A.    Right.

Q.    You would?

A.    I would.

Q.    OK.  Is there anything that would change that opinion?

113

A.    I don't think so.

Q.    Pass the microphone back to Mr. Waldon I believe.

R. 393.

179.  This was Ms. Hempstead's honest, uncoached, unled statement of her position on sentencing for this crime.  She reiterated her views under questioning by the prosecutor:

Q.    I think a second ago a question was asked you ... a scenario was given.

A.    Right

Q.    And they asked for a commitment from you as to what your vote would be?

A.    Right, and I tried to give them that.

Q.    Right.  I understand.  But did you consider the fact that there may be mitigating circumstances?

A.    I tried to and ... and like you said, if he's found guilty of two murders and three attempted murders my first opinion is going to be the death penalty.

Q.    OK

A.    Do you understand what I'm saying.

Q.    Sure.

R. 404-05.

180.  This juror clearly announced that *in this case* she would automatically vote to impose the death penalty.  Although she subsequently conceded that "we haven't heard any facts, we know nothing about the case right now," R. 405, and agreed with the prosecutor that she "would try to" apply the mitigating and aggravating circumstances and balance them out "as much as she could," id., and felt she could follow the court's instructions, id., her vague expressions, in response to leading questions, that she would attempt to follow the law did little to demonstrate that she could

114

cast aside her strong views that the death penalty was the only punishment for *this crime*.

181.   During an unrecorded bench conference, R. 406, defense counsel challenged Ms. Hempstead for cause, presumably on the grounds that she was unable to consider a life sentence, although defense counsel could additionally have raised her ties to police and familiarity with the case as additional grounds.   See R. 407 (defense counsel accepting juror subject to objection to cause challenge that does not appear in record); 413 (defense counsel putting on record its exception to denial of cause challenge that does not appear in record).[54]

182.   The trial court clearly erred in denying the cause challenge to Judith Hempstead. Although the prosecutor, through leading questions, got her to admit that she would "try" to balance out aggravating and mitigating circumstances (a misstatement of Louisiana's capital sentencing law, see *supra* at ¶¶ 129-32), and obtained her general agreement to "follow the Judge's instructions," Ms. Hempstead never retracted her initial, unprompted response that "if we prove him guilty of murder of two people and three attempts to murder three other people I'm going to vote for the death penalty," without consideration of the mitigating factors and that nothing "would change that opinion." R. 393.  "Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude the imposition of the death penalty."  Morgan v. Illinois, 504 U.S. 719, 738 (1992).  As such, Ms. Hempstead was

_____

[54] Inexplicably, trial counsel did not exercise a peremptory challenge to remove this clearly objectionable juror from Mr. Roy's jury.  Counsel have admitted that they have no idea why they did not remove Ms. Hempstead.  Instead, they squandered peremptory challenges on jurors whose voir dire testimony did not indicate a single objectionable position.  See *supra* at ¶¶ 68-69.

"substantially impaired" in her ability to follow the law, as she was unable to consider a life sentence in this case. Accordingly, the trial court erred in denying the cause challenge. As Ms. Hempstead actually sat in Mr. Roy's case, his fundamental right to trial by a fair and impartial jury was denied.[55]

## B.
## The Trial Court Erred in Denying the Cause Challenge to Doris Kees

183. This juror was unable to consider intoxication as a mitigating circumstance for very personal reasons:

> (Indistinct) . . . it's going to be hard for me to say this, but ten months ago I had a precious granddaughter that was killed . . . DWI . . . and it's hard for me to talk about this, so you can seen how I feel about liquor.

R. 520. As shown in her responses, later in voir dire, to questions regarding her ability to consider intoxication in mitigation, this juror's personal tragedy rendered her incompetent to serve in this case.

184. The defense engaged in questioning another prospective juror, Sandra Kreider (who was subsequently removed for cause), regarding her ability to consider intoxication as a mitigating circumstance. Ms. Kreider's responded that she would not consider that statutory mitigating factor. This response led to the following exchange:

> Q.    Does anybody else feel the same way?

---

[55] The Louisiana Supreme Court's conclusion that the trial court did not err in denying the cause challenge to Ms. Hempstead is not entitled to deference under 28 U.S.C. § 2254(d). The court's decision was contrary to and involved an unreasonable application of Morgan and Witt; furthermore, the court's conclusions were based on an unreasonable determination of the facts in light of the evidence — the record simply does not establish that this juror was rehabilitated during the prosecutor's questioning.

116

RESPONSE:  I do.

[The microphone was passed to Doris Kees]

Q.  OK.  Tell me.

A.  I think I've already told you.

Q.  I understand (Interrupted)

A.  And I cannot talk about it any more.

Q.  No .. I .. the question I have is .. as I understand what Ms. Kreider said was, that she could not consider intoxication as a mitigating circumstance, under no circumstances, is that right?

BY MS. KREIDER:  Right.

BY MS. KEES:

A.  I feel the same way.

Q.  OK.  So if the Judge instructed you that you must consider it as an aggravating circumstance ... I mean ... I'm sorry, a mitigating circumstances, you could not?

A.  I could not.

R. 537-38.

185.  Although this juror later told the prosecutor that "according to the law I guess I would have to consider [intoxication], yes," R. 555, it is difficult to believe that this juror could put aside her obviously strong feelings (she could not talk about them), arising from the death of a cherished grandchild in a drunk driving incident, to give meaningful consideration to the mitigating circumstance of intoxication.  Accordingly, Ms. Kees was substantially impaired in her ability to follow the law and should have been excused for cause.  Instead, in an unrecorded bench conference, the trial court denied the cause challenge.  See R. 555-56 (defense counsel placing on record that

117

it was not withdrawing its challenge for cause to this juror, following unrecorded bench conference). The defense struck Ms. Kees with its fourth peremptory challenge.

186.   The Louisiana Supreme Court, in its unpublished appendix to the opinion, cavalierly dismissed this assignment of error on the following grounds:

> As to venireperson Kees (assignment of error no. 6), though the court reporter did not record the bench conference which might tell us why, the judge in the end excused her "altogether," after initially denying the defense challenge.

Unpublished Opinion (Exhibit "A" hereto), at ii-iii. This reasoning is a non-sequitur. Although the trial transcript indicates that the trial court did so comment when excusing this juror (following an unrecorded bench conference requested by the prosecutor), see R. 559, its remarks merely exempted Ms. Kees from complying with the court's instructions to the other excused jurors that they were to "report to Courtroom number 5 across the hall at 9:00 o'clock tomorrow morning . . . ." R. 559; see also R. 410 (similar instructions to the excused jurors from the first panel). The court's dismissal of Ms. Kees from further service in other cases surely had nothing to do with her inability to consider the mitigating circumstance of intoxication or her ability to serve in Mr. Roy's case. For all anyone can know from the record, the prosecutor may have informed the court that Ms. Kees could not serve in some other case because she had a personal connection to that trial. Accordingly, the Louisiana Supreme Court's perfunctory and unsupported conclusion that the trial court's failure to excuse Ms. Kees for cause was not error is entitled to no deference by this Court. Ms. Kees clearly testified to her inability to serve in *this* case, and the trial court's failure to excuse her for cause was clearly erroneous.[56]

---

[56] Appellate counsel's inexplicable failure to brief this clearly strong issue on appeal, though it was raised as Assignment of Error No. 6, was, moreover, clearly ineffective. See

## VII.
### THE TRIAL COURT FAILED TO PROVIDE INSTRUCTIONS TO THE JURY PRIOR TO RECESSES, LUNCH BREAKS AND AT THE END OF EACH DAY'S PROCEEDINGS, THEREBY VIOLATING MR. ROY'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY AMENDMENTS V, VI, VIII, AND XIV OF THE UNITED STATES CONSTITUTION (PCR Issue No. 8)

187.  Mr. Roy's trial was conducted from July 15 through July 21, 1994, and at no time during these proceedings did the trial judge provide instructions to the jury not to discuss the case among themselves, with others, or to report any such improper communication. The jury was not prohibited by the court to view news accounts or discuss the matter prior to the conclusion of the case.

188.  Due process and the Sixth Amendment require trial by a fair and impartial jury free from outside influences.  In capital cases in Louisiana, the sanctity of the jury is protected in part by La.C.Crim.P. Art. 791, which requires the sequestration of jurors during a capital case. A trial judge normally issues instructions and admonitions at the beginning of each case on each day and at lunch recesses or when the court adjourns in the evenings as reminders not to discuss the facts or the case, or to speak with the lawyers in the matter. The trial court is required to remind the jury of this over and over throughout the trial, but this was not done here.

189.  The absence of trial court instructions to the jury on sequestration during the guilt phase is clear from the record on July 15, 1994, in the preliminary instructions to the sworn jurors at R. 993-995, and the court's recess for that day at R.1092.  No mention was made by the court to prohibit the jurors conversations about the case between themselves or to avoid the press or news

_supra_ at ¶ 92.

119

media.

190.  On July 16, 1994, there were no preliminary instructions and no comments by the trial judge at the noon recess. R.1172, and no admonitions at the close of that day's proceedings. R.1322. On July 17, 1994 there were no instructions from the court to the jury the entire day of proceedings or at the conclusion of proceedings that day. R.1392-1395. During trial on July 18, 1994, the noon recess was taken with no instructions from the court, R. 1491, nor any at the adjournment that day. R.1600-1601. The guilt phase continued on July 19, 1994 with the court's continued silence pertaining to their rules of silence about the case during sequestration, R.1602. When the State rested its case and the jury was removed from the courtroom, R.1643-1644, there was no reminder or instruction from the court. There were no instructions upon adjournment after the jury returned its guilty as charged verdicts after which they had to return for the penalty phase — the court merely adjourned without admonitions to the jurors. R.1702.

191.  Mr. Roy does not complain of merely one failure of the trial judge to remind the jury at one recess, but the trial judge's failure to instruct and remind the jury not to discuss the case throughout this entire bifurcated trial which resulted in two death verdicts.

192.  At the penalty phase on July 20 and 21, 1994, no instructions to enforce or explain sequestration and its importance or purpose were given. See R.1771, 1830, 1863, 1881, 1882.

193.  Considering that the jury members at Mr. Roy's trial were removed from their homes and forced through their civil service to consider one of that parish's most sensational trials involving a double homicide and through sequestration were made to eat, sleep, and converse presumably only with each other ... *without* the trial court providing a single instruction on the requirement and necessity of sequestration makes it difficult to support or conceive that the verdicts

120

were not the result of the jurors' premature discussions about the case or outside influences.

194.  As the Supreme Court has observed, "[t]he safeguards of juror impartiality, such as voir dire and *protective instructions from the trial judge,* are not infallible;  it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.   Due process means a jury capable and willing to decide the case solely on the evidence before it, and *a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.*"  Smith v. Phillips, 455 U.S. 209, 217 (1982)(emphasis supplied); see also In re Michael, 326 U.S. 224, 228 (1945)("It is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudged the case. For this prevents the very formation of a proper judicial tribunal."); Winebrenner v. United States, 147 F.2d 322 (8thCir. 1945)(conviction reversed where trial court gave an incorrect admonition to jury before recess), cert. denied, 325 U.S. 863 (1945); United States v. Williams, 635 F.2d 744 (8th Cir. 1980)(reversing where trial court failed to give an instruction either at the outset of trial or before the evening recess, when jurors were able to go home). cf. United States v. Williams, 809 F.2d 1072, 1093 (5th Cir.)(reversing conviction of one defendant on grounds that trial court abused its discretion in denying motion to poll jury regarding midtrial publicity and observing that, given trial court's failure to admonish jury to avoid publicity and failure to question jurors about exposure to publicity, "[i]n the interests of justice, we must give the defendant the benefit of the doubt in this connection."), modified 928 F.2d 1 (5th Cir.), cert. denied, 484 U.S. 896, 913 & 987 (1987); United States v. Aragon, 962 F.2d 439 (5th Cir. 1992)(reversing on grounds that trial court abused discretion in failing to conduct voir dire regarding prejudicial midtrial publicity and observing that trial court's admonition to avoid coverage of the case, "done rather quickly and casually by the court, did not

121

obviate the court's need for inquiry.").

195. The trial court's failure to take adequate steps to ensure the impartiality and fairness of the jury, particularly in this highly sensational case where jurors were left with only each others' company for seven or more days,[57] creates a substantial likelihood that jurors prematurely discussed the evidence and were exposed to outside influences in violation of Mr. Roy's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

## VIII.
### MR. ROY'S RIGHTS UNDER AMENDMENTS VI AND XIV OF THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT PERMITTED ARCHIE BLUE TO TESTIFY TO THE HEARSAY STATEMENT BY DAVID RICHARD THAT MR. ROY COMMITTED THE CRIME (AEA No. 12; PCR Issue No. 9)

196. The State's first witness in the guilt phase, Sheriff Archie Blue, testified over defense objection that, in answer to the Sheriff's question of "who did this to you?" David Richard responded "Larry Roy." R. V. at 1015. The trial court erroneously accepted the State's argument that the statement was an excited utterance or *res gestae* and therefore an exception to the hearsay rule. This testimony was improperly admitted, unfairly bolstered the credibility of David Richard when he subsequently testified on the ultimate issue in this case, and violated Mr. Roy's rights to confront his witnesses under the Louisiana Constitution of 1974, Article 1, sections 2 and 16, and Amendments VI and XIV of the United States Constitution.[58]

---

[57] The minute entries reflect that jurors were sequestered as they were selected. Voir dire commenced on July 12 and concluded on July 15, 1994. Evidence in the guilt and penalty phases was presented over the course of July 16 - July 21, the day on which the jury returned two death sentences.

[58] This claim was one of the many assignments of error raised on appeal which appellate counsel did not bother to brief, to Mr. Roy's prejudice. Although the Louisiana Supreme Court

197. Hearsay is not admissible "except as otherwise provided by [the Evidence Code] or other legislation." La.C.E. 802. Under La.C.E. art. 803(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" constitutes an exception to the hearsay rule and is admissible regardless of the availability of the declarant. The record does not establish that David Richard's statement was an excited utterance, nor did the prosecution lay any foundation for the trial court's finding. The excited utterance exception to the hearsay rule "requires an event sufficiently startling to render a declarant's normal reflective thought process inoperative. Further, the statement of the declarant must have been *a spontaneous reaction to the event and not the result of reflective thought*." State v. Beason, 26,727 (La. App. 2 Cir. 4/7/95), 653 So.2d 1274, 1284 (emphasis added). Here, Sheriff Blue was testifying to a *response* by David Richard to a question he had asked — by definition a situation where the declarant is making the statement as "the result of reflective thought" rather than as "a spontaneous reaction to the event."

198. Nor were the statements part of the *res gestae*, a doctrine which has been subsumed by La.C.E. art. 801(D)(4), which excludes from the definition of hearsay "things said or done."

> The statements are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events,

---

addressed this issue cursorily in its unpublished appendix, its decision was without the benefit of argument and was clearly wrong. The court, in addressing this issue, merely adopted the trial court's reasoning, stating that this assignment "relates to the statement of the police chief as to what one of the young knifing victims said to him at the crime scene. This testimony does not constitute hearsay, see La.C.E. art. 801(D)(4)(res gestae), or falls within an exception to the hearsay rule. See La.C.E art. 803(2)(excited utterance)." Had the issue been properly briefed on appeal, there is a reasonable probability that the Louisiana Supreme Court would have ruled differently.

123

and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.

La.C.E. art. 801(D)(4). David Richard's answer to Sheriff Blue's question, which occurred after the crime had taken place, was a narration of what had occurred and not the "instructive, impulsive and spontaneous words ... of the participants." As such, it was not *res gestae*.

199. David Richard's statement to Sheriff Blue was precisely what the defense stated it was: a hearsay statement "offered in evidence to prove the truth of the matter asserted." As such, it should have been excluded under La.C.E. art. 802, as well as the Louisiana Constitution, Article 1, section 16, and Amendments VI and XIV of the United States Constitution.

200. Although David Richard ultimately took the stand and made the same statement, this error was not harmless. The only question in the guilt phase of this case was who committed the crimes at the Richard home. Sheriff Blue's testimony that David Richard had told him at the crime scene that Larry Roy was the perpetrator improperly bolstered the testimony of young David (who was eleven at the time of the trial). This was particularly prejudicial because inconsistencies in the testimony of the surviving victims suggest that the child witnesses may have been improperly coached or, at least, were susceptible to suggestions that they incorporated into their memories. See, e.g., R. VI. at 1290 (David Richard testifying that the noise he heard sounded like a clothes hanger in the door knob, suggesting that he had been told that someone had tried to unlock the bathroom door with a coat hanger); R. VI. at 1294 (David testifying that when he was in lying down in the front, Larry Roy went in the kitchen with his mother, "Then he had passed back through, then he must have went stabbed my daddy," testimony that (1) is either inconsistent with testimony that the children were in the bedroom when their father was stabbed there or suggests that the child picked

124

up on the suggestion that Larry Roy stabbed Mr. Richard on the neck after he was fatally wounded; and (2) is pure speculation); R. VI. at 1302 (David testifying differently from his mother about positions of cars and people in the parking lot of the Jiffy Pack and what happened at the Jiffy Pack, yet testified in virtually identical language to his mother when stating that Larry Roy said "Things going to be on."[59]

201.  The improper admission of David Richard's hearsay statement bolstered the credibility of the declarant's subsequent testimony on the critical issue in the guilt phase and denied Mr. Roy the right to confront his accusers and to a fair trial.[60]

---

[59]  The prosecutor, in fact, made a point to bolster the credibility of nine-year-old Frederick Richard on this very point.  After Frederick parroted that Larry Roy said at the Jiffy Pack, "Things are going to be on tonight," the following exchange occurred:

Q.    OK.  Now, what I am asking you is this, Frederick.  I know what you just said, are you telling me what you heard without your own two ears from him, or are you telling me what you've heard somebody else say?

A.    No, sir.

Q.    What are you telling me?

A.    I heard it from my ears.

Q.    Are you sure?

A.    Yes, sir.

Q.    Are you absolutely sure.

A.    Yes, sir.

R. VI. at 1313.

[60]  As noted above, appellate counsel's failure to brief this issue, despite raising it as an assignment of error, denied Mr. Roy the effective assistance of appellate counsel.  See *supra* at ¶

125

## IX.
### THE ADMISSION THROUGHOUT BOTH PHASES OF TRIAL OF ENLARGED COLOR PHOTOGRAPHS OF THE VICTIMS VIOLATED MR. ROY'S RIGHTS TO DUE PROCESS AND TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT UNDER AMENDMENTS VI, VIII AND XIV OF THE UNITED STATES CONSTITUTION (AEA No. 1; PCR Issue No. 11)

202.    During the testimony of Police Officer Michael Hanks in the  guilt phase, the prosecution introduced several enlarged 8" by 10" color photographs of the murder victims that were taken at the crime scene — seven photographs of Freddie Richard and five photographs of Rosetta Silas.[61] The defense objected to the admission of these photographs, to their enlargement, and to their being color rather than black and white, both prior to trial by a motion in limine and during the trial, R. 110, on the grounds that they were so prejudicial that they would prevent Mr. Roy from obtaining a fair trial.  The trial court admitted all twelve of these photographs.  The evidence was admitted again during the penalty phase.  R. 1730. The prosecution showed these photographs repeatedly during the trial — during Officer Hank's testimony, R. 1072-73, 1078-82, 1123; during the testimony of Dr. McCormick, the coroner, R. 1346-50, 1358-64; and during closing arguments in the guilt and penalty phases.  See, e.g., R. 1886 ("This lady, this lady right here, is 75 years old.  Is left for the world to see like this.").

203.    A number of these photographs were cumulative and/or exceedingly horrific and should not have been admitted into evidence.  Their admission violated due process and Mr. Roy's

---

92.

[61] The State introduced numerous other crime scene photographs that vividly depicted how bloody the crime scene was.

126

right to trial by a fair and impartial jury.[62]

204.  State's Exhibit 25 is a photograph of Mr. Richard sitting in a slumped-over position on his bed which shows the wounds to his neck and arm, as well as his blood-covered back.  State's Exhibit 26 is a closer shot of Mr. Richard from another angle that again shows the bloody gashes on his neck and arm.  State's Exhibit 27 is a photograph from the back of Mr. Richard that again shows his blood-soaked shirt and blood on bedding. State's Exhibit 28 is a close-up photograph of the gaping wound on Mr. Richard's neck and arm *after* the body has been moved so that the head is nestled on the bed in the wounded arm.  State's Exhibit 29 is a close-up of the gash in Mr. Richard's arm shown already in Exhibit's 25 and 26.  State's Exhibit 30 appears to be a photograph of Mr. Richard's back with his shirt drawn up to expose a puncture-type wound.  State's Exhibit 31, perhaps the most horrific of the Richard pictures, is a close-up of Mr. Richard's face, his head cradled in a white-gloved hand, the eyes wide open and staring vacantly, the mouth ajar, which shows gashes on his forehead and nose.

205.  State's Exhibit 33, the first photograph of Rosetta Silas, depicts a large woman sprawled across a bed, her night clothes hiked up on her body to expose her bare buttocks, the relevance of which is not apparent.  State's Exhibit 34 is a photograph of Ms. Silas shot from her right that shows her face down on a bed, the upper back of her bedclothes soaked in blood and reveals a cord tied around her right hand.  State's Exhibit 35 again shows Ms. Silas's back from a different angle, revealing a cord tied around her left hand.  State's Exhibit 36 is a close-up of Ms. Silas's left hand revealing a cord tied around it.  State's Exhibit 37 is a particularly gory and

---

[62] This is another issue that was raised as an assignment of error on appeal, but never briefed by appellate counsel, to Mr. Roy's prejudice.

gruesome photograph of Ms. Silas turned on her side to display her face, a gash on her neck, her blackened, blood-soaked chest and blackened, blood-soaked sheets.

206.   The district court abused its discretion in admitting many of the photographs, particularly State's Exhibits 31 and 37.  Under the Louisiana rules of evidence applicable in the guilt phase, evidence should be excluded where its probative value is "substantially outweighed by the danger of unfair prejudice...."[63]  La.C.E. art. 403.  Here, many of the photographs were repetitious and cumulative of detailed testimony.[64]  The sheer number, twelve, was excessive.  The extraordinarily ghastly close-ups of the victims' faces, Exhibits 31 and 37, were unduly prejudicial.

207.  As the United States Fifth Circuit has observed with respect to Fed.R.Evid. 403, on which Louisiana's evidence rule is based, "[Rule 403's] major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."  United States v. McRae, 593 F.2d 700, 707 (5th Cir.), cert. denied, 444 U.S. 862 (1979). "[P]hotographs should be excluded where their logical relevancy will unquestionably be overwhelmed by the inherently prejudicial nature of the particular picture; and photographs which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if they are entirely irrelevant or not substantially necessary to show material facts or conditions."  State v. Morris, 245 La. 175, 157 So.2d 728, 731 (La. 1963).  The State's purpose in introducing so many gruesome photographs of the victims was to incite the jury to return convictions and sentences of

---

[63]  The photographs were also available to the jury for consideration in the penalty phase.

[64]  The coroner, Dr. McCormick provided detailed testimony concerning the conditions of the bodies and the causes of death, aided by charts showing the wounds.  R. 131-71, 1381-87, 1389.

128

death on the basis of the jurors' responses to these horrifying photographs.

208. Moreover, the admission of the twelve photographs violated due process and the right to an impartial jury under the Louisiana and federal constitutions. "An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence." Bruton v. United States, 391 U.S. 123, 131 n. 6 (1968). This same right applies in the penalty phase. See Presnell v. Georgia, 439 U.S. 333, 16 (1978)("fundamental principles of procedural fairness apply with no less force at the penalty phase of a trial in a capital case than they do in the guilt determination."). Recognizing that "there is no right which is more essential to an accused's defense than the right to a fair trial free from prejudice," Tobler v. State, 688 P.2d 350, 353 (Okl.Cr.App. 1984), other jurisdictions have acted to safeguard the integrity of the jury's decision-making by restricting the admission of inflammatory photographs that serve little purpose but to prejudice the jury.

209. Thus, in Tobler, supra, the court reversed a conviction and death sentence partly because the district court's admission of a series of grisly photographs had threatened the integrity of the trial, observing:

> The details of the condition of the bodies provided nothing in the way of new evidence, and had the potential, if not the certain, effect of unduly prejudicing appellant. Thus, the evidence should have been excluded. This, of course, does not mean that crime scene photos are per se excludable because they are gruesome; that decision is discretionary with the trial court. [citation omitted] However, when the photos are merely cumulative as they are here, that fact must enter into the probative/prejudice balance.

Id. at 356. Similarly, in President v. State, 609 P.2d 222, 226 (Okl. Cr. App. 1979), the appellate court reversed a conviction where the trial court allowed 19 largely duplicative slides of the victim's body to be admitted into evidence, noting that "there is a point where the display of relevant

129

photographs can be so duplicative as to constitute error in the conduct of a criminal trial."

210. Likewise, in <u>Berry v. State</u>, 718 S.W.2d 447, 453 (Ark. 1986), the court reversed on the grounds that the "six, mostly repetitious, gory, color photographs" of the victim introduced were "excessive," "prejudicial" and "had little probative value and could do nothing but inflame the jury and distract from the issues raised by the appellant.") <u>See also</u>, <u>State v. Chapple</u>, 660 P.2d 1208, 1216 (Ariz. 1983)(holding that gory photographs were cumulative of undisputed issues, thus had "little probative value on the issues being tried" and that "[u]nder such circumstances, there was nothing for the trial court to weigh, nothing on which its discretion could be exercised, and the admission of the photographs was error."); <u>State v. Boyd</u>, 532 P.2d 1064, 1068 (Kan. 1975) (reversing conviction in part on grounds that trial court erred in admitting fourteen autopsy photographs, noting that "[w]e fail to see the necessity ... of the state's offering repetitious exhibits to prove the same point."); <u>State v. Allies</u>, 606 P.2d 1043, 1054 (Mont. 1979)(reversing conviction where trial court erroneously admitted gruesome photographs to demonstrate facts that could have been and were established by other means); <u>State v. Johnson</u>, 259 S.E.2d 752 (N.C. 1979)(holding trial court erred in admitting all but one gruesome photograph and noting that "where a prejudicial photograph is relevant, competent and therefore admissible, the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors.")(citation omitted); <u>Commonwealth v. Scaramuzzino</u>, 317 A.2d 225, 266 (Pa. 1974) (reversing first-degree murder conviction on grounds that it was prejudicial error for trial court to have admitted fourteen gruesome slides in presentation lasting ten minutes and five seconds, observing that "never before have we been faced with the admission of so many slides,

unquestionably repetitive, and viewed for so long a period of time."); State v. McCall, 698 S.W.2d

643, 648 (Tenn.Cr.App. 1985)(error to admit "grossly gruesome, horrifying and inflammatory"

photographs of victim).

211.  The admission of the twelve photographs violated due process and Mr. Roy's rights

to trial by a fair and impartial jury and to be free from cruel and unusual punishment as the

presentation of these excessively prejudicial photographs precluded the jury from reaching a fair and

impartial decision in both the guilt and the penalty phases.

### X.
### THE DEATH SENTENCES MUST BE VACATED AS THE JURY RELIED ON INVALID AGGRAVATING FACTORS THAT WERE ERRONEOUSLY SUBMITTED TO THE JURY, IN VIOLATION OF MR. ROY'S RIGHTS UNDER AMENDMENTS VIII AND XIV TO THE UNITED STATES CONSTITUTION (AEA No. 36; PCR Issue No. 13)

212.  Prior to trial, the defense filed a Motion in Limine to prevent the State's use of invalid

aggravating factors, specifically that "[t]he victim was ... an eye witness to a crime alleged to have

been committed by the defendant or possessed other material evidence against the defendant,"

La.C.Cr.P. 905(8), and that "[t]he offense was committed in an especially heinous, atrocious or cruel

manner." La.C.Cr.P. 905(7). R.120-121.  The trial court denied the motion.  During the penalty

phase, the court included these aggravating factors in its list of factors that the jury was to consider.

The jury's verdict reflects that it found that Rosetta Silas had been an eye witness to a crime alleged

to have been committed by Mr. Roy and that both murders had been committed in a heinous,

atrocious or cruel manner.  These findings are not supported by the evidence.

213.  In closing, the prosecution argued that the "eye witness" aggravating factor applied

because Rosetta Silas had witnessed the "series of crimes" that occurred in the Richard house.

131

VIII.1884-85. The "eye witness" aggravating factor, however, "does not constitute an aggravating circumstance where the victim of the murder cannot be shown to have been an 'eye witness' to an *earlier independent crime* alleged to have been committed by the accused." State v. Koon, 704 So.2d 756, 775 (La. 1997)(emphasis added)(citing State v. Loyd, 459 So.2d 498, 504 (La. 1984). Here, the two fatal assaults and three non-fatal assaults occurred in the same house within minutes of each other during a single course of conduct. The trial court thus improperly submitted this aggravating factor to the jury and the jury's finding that this aggravating factor was proven renders Mr. Roy's death sentence unreliable.

214. Likewise, there is insufficient evidence to support the "heinous, atrocious, or cruel" aggravating factor. This aggravating factor is unconstitutionally vague on its face, see, e.g., Maynard v. Cartwright, 486 U.S. 356 (1988). The Louisiana Supreme Court accordingly has limited its application in order to comply with constitutional dictates, holding that in order for the "heinous, atrocious, or cruel" factor to apply, "there must be evidence of torture or the pitiless infliction of unnecessary pain and suffering to support" the heinous, atrocious and cruel aggravating factor, and not merely evidence that the "wounds were inflicted to kill, not to main or to inflict pain." State v. Tassin, 536 So. 2d 402, 411 (La. 1988); see also State v. Sonnier, 402 So. 2d 650, 659 (La. 1981) ("'[T]orture' requires evidence of serious physical abuse of the victim before death.").

215. With respect to Rosetta Silas, the medical examiner, Dr. McCormick, testified that the wounds were consistent with a person intent on killing his victim, R.1383; that:

> The wounds on the shoulder blade were aimed at vital organs [but hit] the shoulder blade before they could go in. The two wounds in the lower back ... in ... in the middle back, and the one in the lower back hit the spine before they could go in. The fact that the subject continued stabbing her indicated to me intent to kill because he was thwarted in every wound except one from hitting anything vital, so there was

132

a continual stabbing.

R. 1371. He further testified that it's a common misconception that cutting the jugular vein will kill. R.1372. In other words, Dr. McCormick testified that the wounds were intended to kill Ms. Silas. As the evidence at trial established only that the "wounds were inflicted to kill, not to main or to inflict pain," Tassin, supra, 536 So. 2d at 411, they do not establish the heinousness factor.

216. The same is true for the injuries suffered by Freddie Richard. The testimony at trial was that the defendant pulled out a knife in the middle of a violent fight with the victim. R. 1228, 1292. Dr. McCormick testified that the wounds were consistent with being inflicted during a fight, R. 1381 and that Mr. Richard died from loss of blood probably within 2-3 minutes. R. 1353.[65] The heinousness factor, thus, cannot constitutionally be applied to this murder.

217. The invalidation of these aggravating factors cannot be dismissed as irrelevant. Although, under Louisiana's death penalty jurisprudence, the general rule is that "[w]hen at least one aggravating circumstance is supported by the record, the death sentence is not invalidated if an additional aggravating circumstance is not supported, as long as the evidence offered in support of the invalid circumstance did not inject an arbitrary factor into the proceedings," Tassin, supra, 536 So.2d at 414, this rule should not apply under the circumstances of this case.

218. The Louisiana rule of summarily affirming death sentences despite the invalidation of

------

[65] On cross examination, the defense elicited from Dr. McCormick that two wounds on Freddie Richard's neck may have been intended to inflict pain, as they would not have been fatal. R.1385. The defense failed to cross examine the coroner on his opinion that those wounds could only have been inflicted once Mr. Richard had sat down on the bed and slumped over because blood flowed down the sides of his neck, even though the photographic evidence clearly shows that Mr. Richard's shirt also had blood on it near those wounds and therefore they could have been inflicted during the fight between assailant and victim.

133

aggravating factors when other valid aggravating factors remain is predicated on Louisiana death penalty statute's requirement that jurors "consider" aggravating and mitigating factors, rather than "weigh" aggravating factors against mitigating factors, to determine sentence. In a "weighing" jurisdiction, however, the Constitution prohibits the automatic affirmance of a death sentence resting part on invalid aggravating factors. Rather, the jury's finding of improper aggravating factors skews the weighing process by "creat[ing] ... bias in favor of the death penalty," and a reviewing court must either reweigh the remaining valid aggravating factors against mitigating circumstances or conduct a harmless error analysis to determine whether the sentence is invalid. Stringer v. Black, 503 U.S. 222, 236 (1992).

219. Here, Mr. Roy's jury was repeatedly told, by both parties during voir dire and by the state in its penalty phase opening statement and closing argument, that they were to "weigh" aggravating and mitigating circumstances to determine whether Mr. Roy lived or died. See, e.g. R. 344, 347, 348-9, 350-51, 258, 261, 263-64, 270, 273, 275, 316, 403, 471, 481, 482, 484 499, 638-39, 650, 651, 655-7, 660, 662, 670, 692, 694, 1724, 1890, 1891, 1893. The trial court's brief instruction that "[e]ven if you find the existence of an aggravating circumstance, you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed," R.1899, could not possibly illuminate to the jury that the repeated instructions they received to weigh from counsel were inaccurate statements of the law and that what the judge had instructed them to do was somehow different.[66] In effect, the jury became a "weighing" jury, and the jurisprudence supporting

---

[66] Indeed, the jury could not be expected to understand that counsel and the judge were instructing them differently, as the terms "weigh" and "consider" are synonyms in certain contexts. See, e.g., Roget's International Thesaurus, § 477.11, at 311 (3d ed. 1962)(listing both as synonyms for thought); The American Heritage Dictionary of the English Language, New College Edition, 1018 (1978)(defining "ponder" as "to weigh mentally; consider carefully.").

134

summary affirmance of Mr. Roy's death sentences should not be applied.

220. The Court thus must either reweigh the remaining valid aggravating and mitigating circumstances or perform a harmless error analysis to determine whether the death sentences in this matter conform with the dictates Amendments VIII and XIV of the United States Constitution. In so doing, the Court should also the mitigating evidence that, but for trial counsel's ineffectiveness, would have been presented to the jury, and the prosecutor's misconduct in repeatedly and improperly stating that mitigation does not count. See *supra* at ¶¶ 145-48. See, e.g. Williams v. Taylor, __ U.S. __, 120 S. Ct. 1495, 1515 (2000)(in concluding that Virginia petitioner received ineffective assistance of counsel at sentencing phase, the Court held that the state supreme court's prejudice determination "was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — in reweighing it against the evidence in aggravation" -- even though Virginia is not a "weighing" state)(citing Clemons v. Mississippi, 494 U.S. 738, 751-52 (1990)). Evaluation of all of these factors establishes that the death sentences in this case cannot stand.

## XI.
### MR. ROY WAS DENIED A FULL AND FAIR HEARING IN ALL PREVIOUS STATE COURT PROCEEDINGS IN VIOLATION OF HIS DUE PROCESS RIGHTS UNDER THE UNITED STATES CONSTITUTION (PCR Issue No. 17)

221. Mr. Roy was denied a full and fair hearing in all previous state court proceedings in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Mr. Roy has been denied effective assistance of trial counsel, right to present witnesses on his behalf, right to confront witnesses, right to a reliable sentence determination, right to meaningful access to the courts, right to due process and equal protection of law, and his right

to present his claims for post conviction relief in the state courts, all of which are established by the facts set forth in the various claims in this Petition and the entire record in this case and as will be presented at an evidentiary hearing.

## XII
## THE DEATH QUALIFICATION OF MR. ROY'S GUILT-PHASE JURY WAS ILLEGAL AND IN VIOLATION OF THE UNITED STATES CONSTITUTION (PCR Issue No. 18)

222.  During the selection of Mr. Roy's jury, prospective jurors were excused by the Court because of their conscientious or religious scruples against the death penalty.  The exclusion of these jurors caused Mr. Roy's trial jury to be unrepresentative and biased in favor of the prosecution on the issue of Mr. Roy's guilt or innocence of the crimes with which he was charged and biased on the issue of sentence, all in violation of his rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States.

223.  Social science research demonstrates that jurors without conscientious or religious scruples against capital punishment constitute an element of the community which, as a whole, tends to be biased favor of the prosecution in resolving issues of guilt or innocence.

224.  Exclusion of jurors because of their conscientious or religious scruples resulted in a jury in Mr. Roy's case which was conviction-prone and incapable of rendering a fair and impartial verdict on guilt or innocence.

.   225.  The trial court's exclusion of jurors with such scruples from the guilt phase of Mr. Roy's trial, jurors who could be fair and impartial in judging Mr. Roy's guilt or innocence, solely because of their scruples against the imposition of the death penalty, resulted in a jury that was conviction-prone in violation of Mr. Roy's rights to a representative jury and to an impartial jury.

136

## XIII.
## THE COMPARATIVE APPELLATE REVIEW OF MR. ROY'S SENTENCE WAS CONSTITUTIONALLY INADEQUATE (PCR Issue No. 19)

226. The Louisiana statutory provisions and practices governing appellate review of death sentences denied Mr. Roy the effective assistance of counsel and a fundamentally fair hearing on the issue of life or death, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

227. The review by the Louisiana Supreme Court in its comparison of Mr. Roy's case, mandated by the state constitution, did not include the detailed comparison required by the United States Supreme Court.

## XIV.
## MR. ROY'S SENTENCES ARE EXCESSIVE AND DISPROPORTIONATE IN VIOLATION OF THE UNITED STATES CONSTITUTION (PCR Issue No. 20)

228. The imposition and execution of Mr. Roy's death sentences would inflict cruel, and unusual, and excessive punishment upon Mr. Roy, in light of all of the relevant factors and mitigating circumstances relating to the offense and the offender, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## XV.
## MR. ROY'S SENTENCE IS ARBITRARY AND CAPRICIOUS AND IN VIOLATION OF THE UNITED STATES CONSTITUTION (PCR Issue No. 21)

229. The death penalty is in fact administered and applied arbitrarily, capriciously, and whimsically in the State of Louisiana; and Mr. Roy was sentenced to die, and will be executed, pursuant to a pattern and practice of wholly arbitrary and capricious infliction of that penalty in violation of his rights guaranteed by the Eighth and Fourteenth Amendments to the Constitution of the United States.

137

230.  The Supreme Cour

face" only upon the assumption that the procedures mandated by the statutes would assure that sentences of death are not wantonly or freakishly imposed.  Gregg v. Georgia, 428 U.S. 153, 198 (1976).  As those statutes have been applied, however, death sentences in Louisiana have in fact been imposed in an arbitrary and capricious manner.

231.  Cases without any of the compelling mitigating circumstances of Mr. Roy's case have resulted with great frequency in lesser punishments than death.

232.  Cases more aggravated in many respects than that of Mr. Roy have resulted in lesser punishments than death.

233.  There is no rational, constitutionally permissible way of distinguishing the few cases in which the death penalty has been imposed from the many cases in which it has not been imposed.

## XVI.
## LETHAL INJECTION IS A CRUEL AND UNUSUAL MEANS OF PUNISHMENT WHICH VIOLATES MR. ROY'S CONSTITUTIONAL RIGHTS (PCR Issue No. 22)

234.  Lethal injection, the means by which the State of Louisiana intends to execute Mr. Roy, would inflict wanton and unnecessary torture and torment upon him, in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

235.  Lethal injection involves physical torture and is an excessively cruel and unnecessary method of extinguishing human life.  Through the combination and order of the drugs injected, Mr. Roy will be paralyzed, suffocated, and, finally, his heart will be stopped.  Because of the initial paralysis, all but Mr. Rloy will be saved the experience of the agonizing pain he will suffer prior to death.

138

## XVII.
### MR. ROY'S SENTENCE IS INVIDIOUSLY DISCRIMINATORY AND METED OUT, AND THEREFORE VIOLATES HIS RIGHTS UNDER THE UNITED STATES CONSTITUTION (PCR Issue No. 23)

236.  Mr. Roy's death would be exacted pursuant to a pattern and practice of Louisiana's prosecuting authorities, courts, juries, and governors to discriminate on the grounds of race, gender and poverty in the administration of capital punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

237.  The death penalty in the United States and in Louisiana has been and continues to be discriminatorily imposed against poor black males.  The probability of execution is overwhelmingly greater in cases where the defendant is poor, black, and male, irrespective of the seriousness of the crime and the prior record and character of the defendant.  The probability of execution also varies based on the race of the offender, the race of the victim, and on geographical disparities.  Because the imposition of a death sentence in Louisiana is based on such arbitrary and discriminatory factors, its imposition in Louisiana is illegal and unconstitutional.

## XVIII.
### MR. ROY'S RIGHTS AFFORDED UNDER THE UNITED STATES CONSTITUTION ARE VIOLATED BY THE CAPITAL PUNISHMENT HE IS SUBJECTED TO, AS IT IS AN EXCESSIVE PENALTY (PCR Issue No. 24)

238.  The theoretical justifications for capital punishment are groundless and irrational in fact, and death is thus an excessive penalty which fails factually to serve any rational and legitimate social interests that can justify its unique harshness, in violation of Mr. Roy's rights guaranteed by the Eighth and Fourteenth Amendments to the Constitution of the United States.

239.  The death penalty provided by Louisiana law violates the principle that a criminal sanction "cannot be so totally without penological justification that it results in the gratuitous

139

infliction of suffering." <u>Gregg v. Georgia</u>, 428 U.S. 153, 183 (1976). Executions do not have an identifiable deterrent effect beyond that of natural life sentences. Executions set socially sanctioned examples of and provide an inducement to violence. Executions are not fiscally responsible.

### XIX.
### THE CUMULATIVE EFFECT OF THE VIOLATIONS OF MR. ROY'S RIGHTS IS A *PER SE* VIOLATION OF HIS CONSTITUTIONAL RIGHTS
### <u>(PCR Issue No. 25)</u>

240. The cumulative effect of state and federal constitutional and statutory infirmities in the trial and review of Mr. Roy's case violated his constitutional rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Petitioner, Larry Roy, respectfully prays that this Court:

1.  Vacate his unlawfully obtained convictions and/or death sentences;

2.  Order that Mr. Roy be relieved from the illegal restraint on his liberty, such restraint being founded upon unlawful and unconstitutional convictions and death sentences;

3.  Permit Mr. Roy a sufficient period of time within which to file such amendments to this Petition as might be necessary to bring all proper matters before the Court and avoid piecemeal litigation of his challenges to the legality and constitutionality of his convictions and death sentences;

4.  Grant Mr. Roy an evidentiary hearing on all claims raised herein.

5.  Pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, grant Mr. Roy leave to pursue such discovery as would be available under the Federal Rules of Civil Procedure, pending a hearing on his claims; and

6.  Grant such other relief as law and justice require.

RESPECTFULLY SUBMITTED,

The undersigned declare under penalty of perjury that the foregoing is true and correct.

Executed on the _____ Day of October, 2000.

141

Respectfully submitted,

Law Office of Laurie A. White

Laurie A. White, Bar No. 17898
633 Carondelet Street
New Orleans, Louisiana 70130
Telephone: (504) 525-1020
Fax: (504) 525-1025

Law Office of Phyllis E. Mann

Phyllis E. Mann, Bar No. 23419
P.O. Box 705
Alexandria, Louisiana 71309
Telephone: (318) 448-0000

BY: _____

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## ALEXANDRIA  DIVISION

### NOTICE OF DOCUMENTATION NOT FILED IN RECORD

CASE# 1:00CV2311 SEC P

LARRY ROY

    VS.

WARDEN, LA STATE PEN

ATTACHMENTS TO:

    DOCUMENT#:   1

    DESCRIPTION: PETITION FOR HABEAS

    FILED BY:     PETITIONER

    FILE DATE:   10/11/00

HAVE BEEN PLACED IN AN ACCORDIAN FOLDER

                  CM

                  _____

                    DEPUTY CLERK